**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TIMOTHY PLACE, NFP, *et al.*,[1] | ) Case No. 16-01336 (JPC) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

**DECLARATION OF WILLIAM DeYOUNG IN SUPPORT OF THE CHAPTER 11**
**PETITIONS AND FIRST DAY MOTIONS**

I, William DeYoung, hereby declare under penalty of perjury:

1.     I am the Chief Financial Officer ("CFO") of Timothy Place, NFP d/b/a Park Place Christian Community of Elmhurst (the "Corporation") and Christian Healthcare Foundation, NFP d/b/a Providence Healthcare Foundation (the "Foundation" and, collectively with the Corporation, the "Debtors").  The Debtors own and operate Park Place Christian Community of Elmhurst ("Park Place"), in Elmhurst, Illinois, a continuing care retirement community or "CCRC," which provides its residents ("Residents") with independent living units, enriched housing, memory support services, comprehensive licensed skilled nursing care, and related health, social, and quality of life programs and services.

2.     Both the Foundation and the Corporation have the same board of directors (the "Board"), to which I directly report.  The Board oversees the organization's management.

3.     I have over twenty (20) years of experience in long term care.  I have the responsibility of overseeing corporate finance, risk management, and accounting activities.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Timothy Place, NFP (5089) and Christian Healthcare Foundation, NFP (2359).

4.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101- 1532 (the

"Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Illinois

(the "Court").

5.     The Debtors remain in possession of their assets and are managing their business

as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.     In my capacity as Chief Financial Officer for both the Corporation and

Foundation, I am familiar with the Debtors' day-to-day operations, financial condition, business

affairs, and books and records.  I submit this declaration (the "Declaration") to assist the Court

and other parties in interest in understanding the circumstances that compelled the

commencement of these chapter 11 cases (the "Chapter 11 Case"), and in support of: (a) the

Debtors' petitions for relief under chapter 11 the Bankruptcy Code and related procedural

matters; and (b) the following motions filed by the Debtors contemporaneously herewith or

shortly thereafter (collectively, the "First Day Motions"):

    i.   Debtors' Motion for Entry of Order Authorizing Assumption of Plan Support Agreement (the "Plan Support Agreement Motion");

    ii.   Debtors' Motion for Entry of Order (I) Approving the Disclosure Statement; (II) Establishing Plan Solicitation, Voting, and Tabulation Procedures; (III) Scheduling a Hearing and Establishing Notice and Objection Procedures for Confirmation of the Debtors' Chapter 11 Plan; and (IV) Granting Related Relief (the "Disclosure Statement Motion");

    iii.   Debtors' Motion for Interim and Final Orders Authorizing Use Cash of Collateral and Providing Adequate Protection to the Bond Trustee (the "Cash Collateral Motion");

    iv.   Debtors' Motion for Entry of Order (I) Authorizing Debtors to Maintain Their Prepetition Entrance Fee Escrow Account to Hold All Entrance Fees and Reservation Fees Received From

New Residents After the Petition Date And (II) Establishing Procedures for Resident Confidentiality in Court Filings (the "Entrance Fee Motion");

v.   Debtors' Motion For Entry of Order (A) Authorizing Payment of Prepetition Trade Claims in the Ordinary Course of Business; (B) Directing Financial Institutions to Honor Related Checks and Electronic Payment Requests; and (C) Granting Related Relief (the "Payment of Trade in the Ordinary Course Motion");

vi.   Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing (A) Payment of Certain Employee Compensation and Benefits; and (B) Maintenance and Continuation of Such Benefits and Other Employee-Related Programs (the "Employee Wages Motion");

vii.   Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing Payment of Certain Prepetition Taxes and Granting Related Relief (the "Taxes Motion");

viii.   Debtors' Motion for Entry of Order: (I) Authorizing Continued Use of Existing Cash Management System, (II) Authorizing Maintenance of Existing Bank Accounts and Existing Business Forms; (III) Authorizing Continuation of Intercompany Transactions and Preservation of Existing Intercompany Setoff Rights; and (IV) Waiving Certain Investment and Deposit Requirements (the "Cash Management Motion");

ix.   Debtors' Motion for Entry of Order (A) Determining Adequate Assurance of Utility Payment and (B) Granting Related Relief (the "Utilities Motion");

x.   Debtors' Motion for Entry of Order (A) Determining That Appointment of Patient Care Ombudsman Is Not Necessary and (B) Allowing Debtors to Self-Report (the "Ombudsman Motion");

xi.   Debtors' Motion for Entry of Order (A) Authorizing Debtors to Pay Their Insurance In the Ordinary Course of Business and (B) Granting Related Relief (the "Insurance Motion"); and

xii.   Debtors' Motion for Entry of Order Granting Additional Time to File Schedules and Statements (the "Schedules and Statements Motion").

7.     On the Petition Date, the Debtors also filed their proposed Plan of Reorganization

Under Chapter 11 of the Bankruptcy Code (the "Plan") and a proposed disclosure statement (the

"Disclosure Statement"), along with a motion to set objection deadlines and a hearing on the Disclosure Statement and the Debtors' motion to approve the Disclosure Statement and solicitation procedures.

8.      Capitalized terms used but not defined in this Declaration shall have the meanings set forth in the relevant First Day Motion.   Except as otherwise indicated, the facts and information set forth in this Declaration are based upon my personal knowledge, my review of the documents, information provided to me by employees working under my supervision and direction, or my opinion based upon my experience, knowledge, and information concerning the operations and financial condition of the Debtors and the elder care industry as a whole.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.   I am authorized by the Debtors to submit this Declaration in support of the Debtors' chapter 11 petitions and First Day Motions.

9.      This Declaration is divided into two sections.   Section I provides a general overview of the Debtors, their operations, their capital structure, and the events preceding the bankruptcy filing.  Section II affirms and incorporates facts that support the First Day Motions.

## I.      Background

10.      The Debtors filed the Chapter 11 Case to implement a largely consensual balance sheet restructuring of the Debtors' funded debt obligations, i.e., the 2010 Bonds (discussed below), through the pre-negotiated Plan negotiated among the Debtors, the trustee (including any successors, the "2010 Bond Trustee") to the Debtors' currently outstanding bonds issued by the Illinois Finance Authority (the "Issuer"), an ad hoc group of holders of the Debtors' currently outstanding bonds (the "Consenting Bond Holders"), and the Debtors' sole member, Rest Haven Illiana Christian Convalescent Home d/b/a Providence Life Services ("Providence").  Critically, the Debtors' restructuring and Plan are designed to have no meaningful impact on Park Place

operations, Park Place's Residents, or the Debtors' general unsecured and other creditors. Except to the extent that a creditor (other than a bondholder) agrees to less favorable treatment under the Plan (which Providence and GDC (as defined below) have done for significant management and other fees and costs owed by the Debtors), each such creditor will be unimpaired and paid in full. Further, all Resident obligations will be honored under the Plan, including by assumption of related residency agreements and refund of any reservation or entrance fees under the residency agreements.

11.     Accordingly, the Debtors intend for the Chapter 11 Case to be a non-event from an operational perspective, which will just facilitate the balance sheet restructuring under the Plan.

12.     I respectfully request this Court's assistance in a swift exit from chapter 11 protection.

A.     **Overview of the Debtors' Business**

(1)     General Business Description

13.     The Corporation and Foundation are Illinois not-for-profit corporations, formed in May and January 2004, respectively, for the purpose of constructing, owning and operating Park Place, and to support and advance Christian care and services to the elderly and infirm by supporting health related research, the development of a continuum of appropriate living arrangements, and programs and services to support a quality of life for those who suffer from disabilities and age-related illnesses and infirmities. The Corporation and Foundation are exempt from federal income taxation under section 501(a) of the Internal Revenue Code as organizations described in section 501(c)(3) of the Internal Revenue Code. Providence is the sole member of the Corporation.

14.    Park Place is situated on approximately 12.6 acres in Elmhurst, Illinois and licensed under the Illinois Assisted Living and Shared Housing Act, the Illinois Life Care Facilities Act, and by the Illinois Department of Public Health.  Park Place is certified for Medicare by the United States Department of Health and Human Services' Centers for Medicare & Medicaid Services.

15.    Generally, CCRCs provide senior citizens with a full range of living accommodations and healthcare services during their retirement years, from independent living to skilled nursing.  CCRCs allow individuals to live in the same location as their healthcare needs change over time.  In addition, CCRCs provide residents with various social and entertainment outlets for all stages of retirement life.  Park Place offers approximately 181 units of varying sizes for independent living, 46 assisted living suites, 20 memory support assisted living units, and 37 nursing beds in its health center to provide short-term rehabilitation and long term care to its Residents and to individuals living in the community.

16.    The Debtors are affiliated with certain non-debtor entities, including other non-profit senior facilities in Illinois, Michigan, and Indiana.

(2)    Administration of Park Place

17.    The Debtors manage Park Place with the assistance of one of their affiliates, Providence Management and Development Company ("PMDI").  Pursuant to the Management Services Agreement, dated October 27, 2009 (the "Management Agreement"), between the Debtors and PMDI, PMDI provides management and related support services to enable the Debtors to fulfill their charitable tax-exempt purposes, which include the ownership and operation of a quality, cost effective CCRC.  Specifically, the Management Agreement calls for PMDI to provide certain administrative, management, support services, and general operational oversight.  Under the Management Agreement and certain other agreements between the Debtors

and PMDI, the Debtors are to pay PMDI monthly fees and other amounts.  All fees to PMDI have been deferred and no payments currently are being made.  As part of the Plan, all accrued and unpaid management fees, development fees, and any and all other fees, costs, or other claims of PMDI and Providence under the Management Agreement or otherwise shall be waived as of the Effective Date, which amount is approximately $5.7 million.  A new management agreement will be entered into between Providence and the Corporation that will provide for an annual management fee of no greater than 3.25% of gross operating revenues (with no more than $30,000 paid each month as an operating expense).

18.     Greystone Development Company II, LP ("GDC") and the Debtors entered into that certain Development Services Agreement dated as of January 26, 2006 (as amended, the "Development Services Agreement"), which was later assigned to Greystone Development Services XVII (collectively with GDC, "Greystone"), pursuant to which Greystone performed certain marketing and sales services during the initial fill-up of Park Place, in addition to construction, accounting, and financial advisory services.  The Development Services Agreement provides for Greystone to receive certain fees, including a base development fee, a marketing fee, and an incentive occupancy fee.  However, all fees to Greystone currently are deferred and not being paid.  As part of the Plan, Greystone has agreed to a release and termination of the Development Services Agreement, in full and final settlement and satisfaction of any claims under the Development Services Agreement, in exchange for payment from Providence of $250,000.00 on or before the Effective date of the Plan.

(3)     Reservation and Residency Agreements

19.     To reserve an independent unit at Park Place an individual executes a reservation agreement (a "Reservation Agreement") with the Debtors, pursuant to which, among other things, the Applicant agrees to submit documentation necessary for the Debtors to determine

whether the applicant is eligible to reside in an independent living unit at Park Place. Additionally, upon execution of the Reservation Agreement, the Applicant pays a fee (a "Reservation Fee") to the Debtors.  The Reservation Fee typically equals 10% of the Entrance Fee (discussed below) that the Applicant has agreed to pay upon occupancy of an independent living unit pursuant to the Reservation Agreement.  Pursuant to the terms of the Reservation Agreement, if the Applicant does not qualify for admission or otherwise does not occupy an independent living unit at Park Place, the Debtors are obligated to refund the Reservation Fee in full.

20.    Before occupying an independent living unit at Park Place, Applicants are required to execute a residency agreement ("Residency Agreement").  The Residency Agreement provides the terms and conditions for the Applicant while residing at Park Place, and also outlines the Applicant's obligations regarding, among other things, the payment of an entrance fee (an "Entrance Fee," and together with a Reservation Fee, the "Resident Fees") to the Debtors as well as the Resident's rights to refund of such Resident Fees.

21.    Park Place offers a choice of Residency Agreements, which differ primarily with regard to the amount of Entrance Fee required and how much of the Entrance Fee is refundable upon termination of the Residency Agreement.  Entrance Fees paid by the Residents range from $227,500 to $899,000.  New Residents generally pay the agreed upon Entrance Fee, less the Reservation Fee, prior to occupancy at Park Place.[2]

22.    By its terms, each Residency Agreement terminates in the event of a Resident's death or if the Resident vacates Park Place by giving the Debtors written notice.  Upon termination of the Residency Agreement, the Debtors are obligated to refund an amount ranging

---

[2] In certain circumstances, different payment terms (including multiple pay installments) may be arranged on a case-by-case basis.

from 90% to 0% of the Entrance Fee, depending on the terms of the Residency Agreement.  Such refunds generally are required to be made within 30 days after the former Resident's living unit has been re-occupied.  Applicants are entitled to a full refund of any Resident Fees if their Residency Agreement is terminated prior to occupancy.

23.     Contemporaneously with commencing the construction of Park Place, recognizing the Debtors' ongoing liability to refund Resident Fees, as well as the Debtors' obligations under applicable Illinois law, the Debtors set up, among other accounts, (a) a trust account (account ending in 0690) (the "Entrance Fee Escrow Account") with MB Financial Bank, N.A. ("MB Financial Bank"), (b) an operating account maintained (account ending in 1104) (the "Operating Account") at MB Financial Bank, and (c) an entrance fee fund (account ending in 5013) (the "Entrance Fee Fund") maintained at UMB Bank, N.A. (the "Bond Trustee").[3]

24.     Prior to the Petition Date, the Debtors deposited all Reservation Fees into the Entrance Fee Escrow Account and funds on deposit in that account were used primarily to refund Reservation Fees, to the extent that a Reservation Agreement terminated prior to occupancy. Upon occupancy and payment by an Applicant of Entrance Fees, the Debtors transferred Reservation Fees on deposit in the Entrance Fee Escrow Account relating to a "first generation" sale (i.e., when a unit is first sold) to the Entrance Fee Fund and transferred Reservation Fees on deposit in the Entrance Fee Escrow Account relating to a "second generation" sale (i.e., when a unit is resold) to the Operating Account.

---

[3] On the date hereof, the Debtor has filed the *Debtors' Motion for Entry of an Order (I) Authorizing Continued Use of Existing Cash Management System, (II) Authorizing Maintenance of Existing Bank Accounts and Existing Business Forms, (III) Authorizing Continuation of Intercompany Transactions and Preservation of Existing Intercompany Setoff Rights, and (IV) Waiving Certain Investment and Deposit Requirements* (the "Cash Management Motion"), pursuant to which the Debtors have, among other things, requested authorization to continue using their existing bank accounts, including the Entrance Fee Escrow Account, the Operating Account, and the Entrance Fee Fund, in the ordinary course of business.  As of the Petition Date, the balance of the Entrance Fee Escrow Account totaled approximately $116,920, the balance of the Operating Account totaled approximately $1,811,218, and the balance of the Entrance Fee Fund totaled approximately $8,060,770.

25.     Funds on deposit in the Entrance Fee Fund were applied on a monthly basis, first to refund Entrance Fees as such refunds became due, and second to pay for certain project costs, to make debt payments, to pay operating expenses, and to generate investment income for the benefit of the Debtors and the Residents.  Funds on deposit in the Operating Account were used to make disbursements relating to the Debtors' day-to-day operations.

26.     The Bond Trustee holds a first priority perfected lien on all funds on deposit in the Entrance Fee Fund.  The terms of use of the Entrance Fees are expressly described in each Residency Agreement.  As of the Petition Date, the Debtors were current on all refunds to Residents.

(4)     Regulatory Agencies

27.     CCRCs are regulated by various state agencies.   Each state has a different regulatory regime regarding disclosure of financial statements, solvency of the facility, maintenance of reserves, and the refunds of Entrance Fees or deposits.  As a CCRC operating in the State of Illinois, the Debtors are regulated by the IDPH under the Life Care Facilities Act. The Life Care Facilities Act provides that no provider of life care services may enter into a life care contract with a prospective resident until IDPH has issued a permit.   The prospective resident is afforded the right to rescind his or her lifecare contract without penalty or future obligation within fourteen days after making the initial deposit, signing the agreement, or receipt of a disclosure statement of financial condition, whichever occurs last.  In the event of such rescission, all money or property paid or transferred by such person shall be fully refunded.

**B.     Capital Structure**

(1)     Bond Debt

28.     To finance Park Place's construction and development, the Illinois Finance Authority (the "Issuer") issued its: (i) $109,115,000 Revenue Bonds (Park Place of Elmhurst

Project) Series 2010A (the "Series 2010A Bonds"), (ii) $7,875,000 Revenue Bonds (Park Place

of Elmhurst Project) Series 2010B (the "Series 2010B Bonds"), (iii) $5,000,000 Revenue Bonds

(Park Place of Elmhurst Project)(Accelerated Redemption Reset Option Securities (ARROS)

Series 2010C (the "Series 2010C Bonds"), (iv) $10,275,000 Revenue Bonds (Park Place of

Elmhurst Project)(Tax-Exempt Mandatory Paydown Securities (TEMPS-75)), Series 2010D-1

(the "Series 2010D-1 Bonds") (v) $15,350,000 Revenue Bonds (Park Place of Elmhurst

Project)(Tax-Exempt Mandatory Paydown Securities (TEMPS-65)), Series 2010D-2 (the "Series

2010D-2 Bonds" and, collectively with the Series 2010D-1 Bonds, the "Series 2010D Bonds");

(vi) $15,275,000 Revenue Bonds, Series 2010D-3 (the "Series 2010D-3 Bonds"), and (vii)

$12,650,000 Revenue Bond (Taxable Revenue), Series 2010E (the "Series 2010E Bonds" and

together with the Series 2010A Bonds, Series 2010B Bonds, Series 2010C Bonds, Series 2010D-

1 Bonds, and Series 2010D-2 Bonds the "2010 Bonds").

29.     UMB Bank, N.A. currently serves as the 2010 Bond Trustee under a certain Bond

Trust Indenture, dated as of May 1, 2010 ("2010 Bond Indenture"), by and between the old bond

trustee (Wells Fargo Bank, N.A.) and the Issuer, pursuant to which the 2010 Bonds were issued.

30.     Pursuant to a Loan Agreement dated as of May 1, 2010 (the "Loan Agreement"),

between the Issuer and the Debtors, the Issuer loaned the proceeds of the 2010 Bonds to the

Debtors.  The rights of the Issuer under the Loan Agreement were assigned to the 2010 Bond

Trustee under the 2010 Bond Indenture.

31.     The Debtors used the proceeds of the 2010 Bonds primarily for construction,

equipment, and facility costs, ongoing working capital, to fund debt service reserve funds, to pay

a portion of the interest on the 2010 Bonds, and to pay certain other expenses relating to the 2010

Bond issuance.

32.    As security for the obligations owing on the 2010 Bonds, the Debtors granted the 2010 Bond Trustee: (i) a first mortgage lien on the real property on which Park Place was constructed, and (ii) a first priority security interest in the personal property and fixtures located in Park Place (collectively, the "Mortgaged Property"), pursuant to a Mortgage and Security Agreement, dated as of May 1, 2010 (the "Mortgage"), between the Debtors and the Bond Trustee.  Pursuant to a Master Trustee Indenture, dated as of May 1, 2010, among the Debtors and the Bond Trustee, as Master Trustee thereunder (the "2010 Master Trust Indenture" and, collectively with the 2010 Bond Indenture, the "Bond Indentures"), the Debtors granted a security interest in their gross revenues as security for the payment of the 2010 Bonds.  The Bond Indentures, the Mortgage, the Loan Agreement and any other document or agreement delivered as security for, or in respect to, the 2010 Bonds or the Debtors' obligations under any of such documents are collectively referred to herein as the "Bond Documents".  In addition, repayment of the 2010 Bonds is secured by funds deposited in the debt service reserve fund, established under the Bond Documents.

33.    As of the Petition Date, the outstanding principal amount owed on: the Series 2010A Bonds is $109,115,000, the Series 2010B Bonds is $7,875,000, the Series 2010C Bonds is $5,000,000,  the Series 2010D-1 Bonds is $10,275,000, and  the Series 2010D-2 Bonds is $13,860,000.  The Series 2010D-3 Bonds and Series 2010E Bonds were repaid in full prior to the Petition Date.

### C.      Events Leading to Bankruptcy

34.      Since opening in February 2012, the Debtors' financial health has been negatively affected by the real estate market not having rebounded from the 2008 recession so as to enable the Debtors to service the 2010 Bonds.   Specifically, following the 2008 recession, large numbers of homeowners were unable to sell their homes without a substantial loss in value. Because individuals interested in residing in a CCRC typically sell their existing homes and use the positive equity value received from the sale to fund the required Resident Fees, the extended decline in the real estate market, combined with a decline in the financial markets, left many individuals without the financial resources to pay the entrance fees for CCRCs such as Park Place.   Additionally, as a result of the economic downturn, Park Place's pricing for assisted living were initially too high for the market, which also contributed to Park Place's slow fill. Park Place therefore had to reduce its fees for assisted living.

35.      Because of these factors, the Debtors have been unable to achieve their originally forecasted occupancy levels.   The lower occupancy rates, have, in turn, caused the Debtors to repay the 2010 Bonds at a slower pace than originally projected.

36.      With the Debtors' financial situation failing to improve, and in light of the defaults and potential defaults under the Bond Indentures, in November 2014, the Debtors began negotiations with the Bond Trustee and the Consenting Bondholders.   During the negotiation process, the Debtors have regularly updated their regulators.

37.      Because of the Debtors' faltering financial position, defaults started to occur in 2015 under the Bond Indenture.   Specifically, on April 13, 2015, the 2010 Bond Trustee provided notice that Debtors breached the Cumulative Cash Operating Loss Covenant.   Then, on May 22, 2015, the 2010 Bond Trustee provided notice that the Debtors failed to maintain minimum balances under certain funds that the Debtors need to maintain under the Bond

Indenture.  Finally, on June 30, 2015, the Debtors failed to make a payment under the 2010 Bond

Indenture.

38.     As a result of the Debtors' defaults, and in order to provide additional time to

negotiate a long-term solution to the Debtors' financial situation, prior to the bankruptcy filing,

the Debtors entered into certain agreements with the 2010 Bond Trustee and the Issuer, pursuant

to which, among other things, the 2010 Bond Trustee agreed to forbear from the exercise of

remedies and permitted the Debtors to maintain certain levels of operating liquidity while

servicing its obligations on the 2010 Bonds, subject to certain budget and reporting requirements.

These agreements include: (i) the Forbearance Agreement, dated August 31, 2015 (the

"Forbearance Agreement"); (ii) the First Amendment to the Loan Agreement, dated October 29,

2015; and (iii) the First Supplemental Indenture of Trust, dated October 29, 2015.

39.     Culminating the negotiations, on January 11, 2016, the Debtors and the

Consenting Bondholders entered into a Plan Support Agreement (the "Plan Support

Agreement"), which provides for the Consenting Bondholders' support of the Debtors' proposed

Plan on terms consistent with the Restructuring Term Sheet (the "Restructuring Term Sheet").

**II.     Summary Of The Plan Support Agreement**

40.     The Plan Support Agreement provides for implementation of the Restructuring

Term Sheet through the filing of the Chapter 11 Case and the Plan.  Through the Plan Support

Agreement, the Debtors have secured support of the Consenting Bondholders for the Plan, which

should enable the Debtors to proceed quickly to confirmation of the Plan and an exit from

bankruptcy.  The Plan Support Agreement contains certain obligations of the Debtors and the

Consenting Bondholders, which, if not fulfilled, would cause termination of the Plan Support

Agreement.  Among the Debtors' obligations are certain milestones the Debtors must meet,

including filing of the Bankruptcy Case by January 17, 2016, obtaining confirmation of the Plan

by March 22, 2016, and the Effective Date for Plan occurring on or before April 1, 2016.

A.    **Key Terms to the Restructuring**

41.    The Restructuring Term Sheet provides that the Issuer will issue new Series 2016

Bonds under a new Bond Trust Indenture between the Issuer and the 2016 Bond Trustee (the

"2016 Indenture").[4]   On the Plan Effective Date, the holders of Series 2010A Bonds, Series

2010B Bonds, and Series 2010C Bonds (i.e., Class 2 under the Plan) will exchange the

outstanding bonds for: (i) their pro rata share of the principal amount of Series 2016A Revenue

Bonds (Park Place at Elmhurst Project) (the "Series 2016A Bonds") in the aggregate principal

amount equal to approximately 85% of the outstanding Series 2010A Bonds, Series 2010B

Bonds and Series 2010C Bonds; (ii) their pro rata share of Series 2016C Bonds Excess Cash

Revenue Bonds (Park Place at Elmhurst Project) (the "Series 2016C") in the aggregate principal

amount equal to 15% of the then outstanding Series 2010A Bonds, Series 2010B Bonds, and

Series 2010C Bonds; and (iii) payment in full in cash on account of their allocable share of

accrued and unpaid interest on the Series 2010A Bonds, Series 2010B Bonds and Series 2010C

Bonds, through the date immediately preceding the consummation of the proposed restructuring.

42.    On the Effective Date, the holders of the Series 2010D Bonds (i.e., Class 3 under

the Plan) will exchange the outstanding bonds for a pro rata share of: (i) the principal amount of

Series 2016B Revenue Bonds (Park Place Elmhurst Project) (the "Series 2016B Bonds") in the

aggregate principal amount equal to approximately 85% of the then outstanding Series 2010D

Bonds, allocated to that respective maturity; (ii) their pro rata share of Series 2016C Bonds in the

aggregate principal amount equal to 15% of the then outstanding Series 2010D Bonds; and (iii)

payment in full in cash on account of its allocable share of accrued and unpaid interest on the

_____

[4] The Issuer will still need to approve the exchange through a separate process.

Series 2010D Bonds through the date immediately preceding the consummation of the transaction.

**B.**    **Sponsor Contribution**

43.    In connection with the restructuring, Providence will deposit $5,000,000 (the "Sponsor Contribution") with the Trustee to be used to support the operations of the Borrower. The repayment of the Sponsor Contribution will be subordinate in security and payment to the Series 2016 Bonds and solely payable from excess cash in accordance with the Distribution Waterfall (defined below).  The Sponsor loan will accrue 0% interest and mature in the same year as the Series 2016C Bonds.

**C.**    **Interest Rates for the Series 2016 Bonds and Maturity Dates**

44.    The Series 2016A Bonds shall be issued as current paying bonds, bear interest at a rate of 6.375%, and mature in 2055.  The Series 2016A Bonds will be subject to optional redemption prior to maturity commencing on the fifth year after the proposed exchange, at a price equal to: in year five, at a price of 102%, in year six, at price of 101%, and thereafter at par.

45.    The Series 2016B Bonds (which shall be in replacement of the Series 2010D Bonds) shall be issued as current paying bonds, bear interest at a rate of 5.625%, and mature in 2020.  The Series 2016B Bonds shall be subject to mandatory redemption from Entrance Fees.

46.    The Series 2016C Bonds shall bear interest at 2%, payable semiannually, but only from Excess Cash (defined below), in accordance with the Distribution Waterfall (defined below), applied first to accrued interest, then to principal.  The Series 2016C Bonds shall mature in 2055 and be subject to optional redemption prior to maturity, at the option of the Debtors, at a redemption price equal to:  (i) 65% of the par amount outstanding from years one through five; (ii) 75% of the par amount outstanding from years six through ten; and (iii) 100% of the par amount outstanding thereafter.

47.     The Series 2016A Bonds and Series 2016B Bonds will be secured *pari passu* by a first priority lien on all assets of the Corporation.  The Series 2016C Bonds shall be secured by a lien on all assets of the Corporation subordinate to the Series 2016A Bonds and Series 2016B Bonds.

### D.     The Bond Funds and Distribution Waterfall

48.     The Restructuring Term Sheet contemplates the Debtors establishing and maintaining certain funds in connection with the 2016 Bonds, including an entrance fee fund (the "Entrance Fee Fund"), a revenue fund (the "Revenue Fund"), an operating reserve fund (the "Operating Reserve Fund"), and a capital expenditures fund (the "Capital Expenditures Fund"). The purpose of these funds is to ensure sufficient operational liquidity and capital reserves for the Debtors and to allow the Debtors to service the 2016 Bonds.  The Restructuring Term Sheet sets forth a distribution scheme for these funds on a go-forward basis.

49.     In particular, pursuant to documents underlying the Series 2016 Bonds (the "2016 Bond Documents"), the Debtors will agree to deposit all gross revenues with the 2016 Bond Trustee for deposit in the Revenue Fund as established under the 2016 Bond Documents.  The restructuring proposes that the Debtors will deposit all Entrance Fees in the Entrance Fee Fund until the Series 2016B Bonds are paid in full.  Entrance Fees on deposit in the Entrance Fee Fund shall be applied on a monthly basis as follows: (i) to pay any refunds; (ii) to replenish the balance of the Operating Reserve Fund and the operating account to combined total of 150 days cash on hand; (iii) to redeem Series 2016B Bonds in authorized denominations; and (iv) after payment in full of the Series 2016B Bonds, any remaining Entrance Fee amounts will be transferred to the Revenue Fund and be available to flow the Distribution Waterfall as described below.

50.     Distributions from the Revenue Fund shall occur as follows on a monthly basis (the "Distribution Waterfall"): (i) to transfer to the Debtors' Operating Account the amount

certified by the Debtors as necessary to pay anticipated operating expenses for the upcoming

month (taking into account any unapplied amount withdrawn for such purpose in a prior month);

(ii) to the Capital Expenditure Fund, in an amount equal to $1/12^{th}$ of such Fiscal Year's capital

budget; (iii) to the Series 2016A Bonds subaccount and the Series 2016B Bonds subaccount of

the Bond Fund, in an amount equal to $1/6^{th}$ of the interest due on the next interest payment date;

(iv) to the Series 2016A Bonds subaccount and the Series 2016B Bonds subaccount of the Bond

Fund, in an amount equal to $1/12^{th}$ of the principal due on the next principal payment date; (v) to

replenish any deficiency as of the Effective Date of the Plan as necessary to make the amount

therein equal the debt service reserve fund requirement, as established under the 2016 Bond

Documents; (vi) to replenish the balance of the Operating Reserve Fund and the Operating

Account to a combined total of 150 Days cash on hand; and (vii) any remaining amounts

thereafter (such remaining amounts referred to as "Excess Cash") shall be transferred as follows

until the combined balance of the Operating Reserve Fund and Operating Account is 200 days

cash on hand: (a) 50% to the Series 2016C Bonds subaccount of the Bond Fund to pay accrued

interest and then to redeem Series 2016C Bonds; and (b) 50% to the Operating Reserve Fund.

After the Debtors have 200 days cash on hand, the Excess Cash shall be distributed as follows:

(a) 25% to the Sponsor to repay the Sponsor Note; and (b) 75% to the Series 2016C Bonds

subaccount of the Bond Fund to pay accrued interest and then redeem Series 2016C Bonds.

51.     The proposed restructuring also contemplates a number of amendments to various

operating and financial covenants to reflect the current operating projections of the Debtors and

Park Place, which shall become effective upon consummation of the restructuring.  Other than

the balance sheet restructuring, the Plan provides for the treatment of all creditors and other

parties (including Residents) in the ordinary course of business.  The Debtors will continue to

operate their business during chapter 11 and intend to seek a Bankruptcy Court order authorizing it to pay their ordinary course creditors in full and on time during the pendency of the case.

### III.   Summary Of First Day Motions

52.   The Debtors have filed the First Day Motions concurrently with the filing of their chapter 11 petitions and this Declaration.   The Debtors request that each of the First Day Motions be granted to ensure the success of their Chapter 11 Case.

53.   The Debtors anticipate that the Court will conduct a hearing soon after the commencement of this Chapter 11 Case (the "First Day Hearing") at which the Court will hear and consider the First Day Motions.  The First Day Motions are described below.[5]

54.   Generally, the First Day Pleadings have been designed to meet the primary goal of continuing the Debtors' operations postpetition in a manner that will minimize any potential impact on Park Place's Residents and vendors while seeking to implement the balance sheet restructuring contemplated by the Plan through an orderly bankruptcy process.  As such, the First Day Pleadings seek to: (i) obtain use of cash collateral; (ii) protect Residents, employees and vendors and ensure a smooth transition into chapter 11; (iii) maintain the Debtors' operations and business throughout this Chapter 11 Case; (iv) efficiently administer the bankruptcy cases; and (v) provide the basis for confirming the Plan.  I also believe that it is critical that the First Day Pleadings be heard as soon as possible at a "First Day Hearing" to avoid immediate and irreparable harm to the Debtors' estates.  If the relief requested in the First Day Pleadings is not granted on an expedited basis, the Debtors will not have access to cash and will be unable to pay their employees and continue to provide the services that are critical to the elderly Residents at Park Place.

---

[5] Capitalized terms used below in the descriptions of the First Day Motions and not otherwise defined have the meanings given to them in the applicable First Day Motions.  The descriptions of the First Day Motions contained herein are intended only to be summaries.

55.     For more detailed information regarding each First Day Motion, the Debtors respectfully refer the Court to the respective First Day Motion.  In the event that this Declaration and any provision of any First Day Motion are inconsistent, the terms of the First Day Motion shall control.

### A.     Plan Support Agreement Motion

56.     By the Plan Support Agreement Motion, the Debtors seek entry of an order authorizing the Debtors to assume the Plan Support Agreement. As set forth below, I believe that the Plan Support Agreement is in the best interests of the Debtors and their estates so as to ensure that they continue having the affirmative vote of the Consenting Bondholders on the Plan.  The Debtors also seek this relief because, to the extent this Court has not entered an order approving the Plan Support Agreement Motion within 30 days of the Petition Date, the Consenting Bondholders can terminate the Plan Support Agreement and withdraw their votes on the Plan.

57.     The Debtors and the Consenting Bondholders entered into the Plan Support Agreement to effectuate the Debtors' Plan.  Pursuant to the Plan Support Agreement and as more particularly set forth therein, the Debtors agreed that it would: (a) proceed with the consummation of the proposed restructuring in good faith in accordance with the timeline set forth in the Plan Support Agreement; and (b) cooperate with the 2010 Bond Trustee in preparation of the Chapter 11 Case.  Additionally, the Debtors have agreed not to solicit a plan of restructuring that differs from the restructuring contemplated under the Plan without the consent of the Consenting Bondholders.

58.     Moreover, pursuant to the Plan Support Agreement, as more particularly set forth therein, the Consenting Bondholders, which entities hold approximately 74.18% of the principal aggregate amount of the Debtors' outstanding amount of the Bonds, have agreed to among other things: (a) take all steps necessary to support confirmation of the Plan, pursuant to the terms of

the Plan Support Agreement; and (b) take no action inconsistent with the terms of the Plan

Support Agreement or the Plan.  Furthermore, the Consenting Bondholders have agreed not to

sell, transfer, assign, or otherwise dispose of, directly or indirectly, any of the Bonds, or any

right, claim, or interest relating to or arising from the Bonds, held by its respective members,

subject to the terms and conditions of the Plan Support Agreement.

59.      The Plan Support Agreement further provides that upon the occurrence of any of

the following events, as more fully set forth in the Plan Support Agreement, it will be deemed

terminated upon written notice from the non-breaching party to the breaching party: (a) failure

by the parties to agree to the form and substance of any Plan Support Documents (as defined in

the Plan Support Agreement); (b) any Bankruptcy Documents (as defined in the Plan Support

Agreement) are withdrawn, materially modified or amended; (c) failure to file the Bankruptcy

Documents on the Petition Date; (d) failure to file the petition by the January 18, 2016; (e) any

action by the Debtors that would prevent or affect the ability of the Debtors to consummate the

Plan and the Restructuring Transaction; (f) entry of an order by the Court that would prevent or

affect the ability of the parties to consummate the Plan and the Restructuring Transaction in this

Chapter 11 Case, or would affect the rights and interests of any of the Consenting Bondholders

or the 2010 Bond Trustee, as set forth in the Plan Support Agreement; (g) the Effective Date of

the Plan has not occurred by April 1, 2016; (h) an action by a court prevents consummation of

the Plan; (i) a mutual written agreement to terminate the Plan Support Agreement by the Debtors

and the Consenting Bondholders; and (j) failure by either party to comply with any of obligations

set forth in the Plan Support Agreement.

60.      The Plan Support Agreement is integral to the Debtors' efforts to consummate the

restructuring contemplated by the Plan.  The Plan Support Agreement ensures that, absent

unforeseen Termination Events thereunder, the Debtors will have the votes needed to confirm the Plan.   Additionally, the relief requested herein will facilitate a smooth transition and exit from chapter 11 as expeditiously and consensually as possible, while minimizing any business disruption and impact on the Debtors' daily operation of Park Place or on its Residents, and will otherwise minimize the costs and expenses associated with these proceedings.   Absent the benefit of the Plan Support Agreement, the Consenting Bondholders could withdraw support for the Plan and the restructuring process. This could jeopardize the Debtors' restructuring efforts and the continued operation of Park Place and otherwise cause significant delays, costs, and expenses relating to the resolution of the Debtors' obligations owed to the holders of the 2010 Bonds and other creditors.

61.     Notably, the contemplated restructuring will significantly strengthen the Debtors' financial status and better position the Debtors for future profitability and therefore benefit all of the Debtors' stakeholders. In addition, among other things, the Plan Support Agreement importantly provides that all Residency Agreements will be assumed under the Plan. Accordingly, the Debtors submit that the Plan Support Agreement Motion is in the best interests of the Debtors, their estates, their Residents, and all parties in interest.   Therefore, I respectfully ask this Court to grant the relief sought in the Plan Support Agreement Motion.

### B.     Disclosure Statement Motion

62.     By the Disclosure Statement Motion, the Debtors seek entry of an order: (a) approving the Disclosure Statement as containing "adequate information"; (b) establishing and approving solicitation procedures (the "Solicitation Procedures"), including, without limitation, fixing a voting record date, setting a deadline for filing motions to estimate claims for voting purposes, and approving the form of ballots; (c) scheduling a hearing and establishing notice and objection procedures for confirmation of the Plan (the "Confirmation Hearing," and the notice

thereof, the "Confirmation Hearing Notice"); and (d) granting related relief.   The Debtors propose the following dates:

- Voting Record Date: February 23, 2016;

- Solicitation Packages Mailing Deadline: February 24, 2016, or as soon as reasonably practicable thereafter;

- Rule 3018 Motion Deadline: March 25, 2016 at 4:00 p.m. (prevailing Central Time);

- Voting Deadline: March 25, 2016 at 5:00 p.m. (prevailing Central Time);

- Objections to Confirmation of the Plan Deadline: March 25, 2016 at 5:00 p.m.; and

- Confirmation Hearing: March 28, 2016.

63.     The Debtors have filed a pre-negotiated Plan in this Chapter 11 Case.  I believe that the relief requested in the Disclosure Statement Motion is integral to the efficient and fair confirmation of the Plan, is cost-effective, provides adequate notice and an opportunity to be heard, and is in the best interests of the Debtors' estates, their creditors, and other parties in interests.   Therefore, I respectfully ask this Court to grant the relief sought in the Disclosure Statement Motion.

### C.     Cash Collateral Motion

64.     By the Cash Collateral Motion, the Debtors request the entry of interim and final orders (together, the "Proposed Cash Collateral Orders"): (a) authorizing the Debtors to use cash collateral; (b) granting adequate protection; (c) scheduling a final hearing; and (d) granting related relief.

65.     A description of the Debtors' capital structure is provided above in paragraphs 28 through 33.

66.     I believe that the "cash" or "cash equivalents" securing the obligations under the Bond Documents constitute "cash collateral" of the 2010 Bond Trustee within the meaning of section 363 of the Bankruptcy Code (the "Cash Collateral").  Subject to this Court's approval and an approved budget, the Cash Collateral will be used to fund operating expenses and professional fees, as well as insurance, certain Entrance Fee refunds, taxes, and the costs related to this Chapter 11 Case.

67.     Use of the Cash Collateral is critical to the Debtors' ability to fund their postpetition operations in a manner that will permit Park Place to continue providing, amongst its other services, the excellent nursing care, enriched housing services, and skilled nursing services that our Residents deserve and our regulators demand. Without immediate access to the Cash Collateral, the Debtors will be unable to provide for the safety or care of their Residents, repay Entrance Fee refund obligations to Residents, or obtain goods and services needed to carry on their operations during the Chapter 11 Case.

68.     After an arm's length negotiation with the Debtors, the 2010 Bond Trustee has consented to the Debtors' use of the Cash Collateral, subject to the terms and conditions described in the Cash Collateral Motion and Proposed Cash Collateral Order attached thereto.  I believe that the Proposed Cash Collateral Orders are fair, reasonable, and consistent with the Bankruptcy Code. Granting the Cash Collateral Motion will allow the Debtors to continue the operations necessary to maintain Residents' health and well-being while facilitating the restructuring the Debtors' debt in this Chapter 11 Case.

69.     The Debtors will suffer immediate and irreparable injury if it is not granted access to the Cash Collateral.  Without Cash Collateral, the Debtors would be required to cease operations, which would jeopardize the health and safety of Residents, or seek alternate forms of

funding, which likely would be more expensive due to interest and fees, and therefore not in the best interest of the Debtors' estates and all parties in interest. Instead, the Debtors should have access to the Cash Collateral, as mutually agreed by the Debtors and the 2010 Bond Trustee, subject to the Debtors' provision of the adequate protection set forth in the Proposed Cash Collateral Orders.

70.     Therefore, I respectfully ask this Court grant the relief sought in the Cash Collateral Motion.

**D.     Entrance Fee Motion**

71.     By the Entrance Fee Motion, the Debtors seek entry of an order authorizing the Debtors to continue: (a) to maintain their pre-petition Entrance Fee Escrow Account wherein the Debtors will deposit all Resident Fees received from New Residents and from which the Debtors will pay any New Resident Refund Claims that become due to New Residents during the pendency of the Chapter 11 Case; and (b) establish the Confidentially Procedures. The Debtors requested authority to place all Entrance Fees and Reservation Fees received from all New Residents after the Petition Date into Entrance Fee Escrow Account, which fund shall be governed by the terms of the Amended and Restated Escrow Agreement.

72.     Among other terms, the Escrow Agreement contemplates that postpetition Entrance Fees and Reservation Fees will remain in the Entrance Fee Escrow Account until the earlier of: (a) the effective date of the Plan; (b) an Entrance Fund Refund Claim becoming due and payable to a New Resident; and (c) this Court enters an order directing the disbursement of some or all of the Escrow Funds from the Entrance Fee Escrow Account. The Debtors believe that the maintenance of the Entrance Fee Escrow Account will provide comfort to New Residents that the payment of Entrance Fees and Reservation Fees to the Corporation will not be affected by the Debtors' Chapter 11 Case. With respect to Entrance Fees received prior to the

bankruptcy filing, the Debtors will continue paying such refunds in accordance with the respective Residency Agreements.

73.     In an effort to ease concerns of New Residents, the Debtors have made the business decision to add an addendum to each New Resident's Residency Agreement (the "Addendum") to provide New Residents with the right (the "Rescission Right") to rescind their Residency Agreements at any time between the Petition Date and the "Trigger Date", which is the date that is 10 business days before the Plan goes effective (the "Effective Date") and to receive a full refund of all Resident Fees within 30 days of exercising their Rescission Right.  To that end, the Addendum will require the Debtors to provide New Residents with 10 days' notice prior to the Trigger Date.  The Addendum will provide that the Rescission Right will terminate on the Trigger Date and, if a New Resident does not exercise the Rescission Right prior to the Trigger Date, the terms and conditions relating to a Resident Fee refund will revert to the terms and conditions set forth in the Residency Agreement (i.e., refunds will be paid within 30 days of the Resident's unit being re-occupied), and thereafter the funds in the Entrance Fee Escrow Account shall be transferred to the Entrance Fee Fund pursuant to the terms of the Plan.  The valid claims of New Residents to receive refunds of Resident Fees in accordance with the Addendum are collectively referred to herein as the "New Resident Refund Claims."

74.     The Debtors also desire to protect the privacy of Park Place's Residents to the fullest extent possible.  Making the decision to live in a CCRC is an intensely personal decision, and the Debtors believe that Park Place's Residents' privacy should not be invaded simply because the Debtors have commenced the Chapter 11 Case.

75.     I believe that a Resident's willingness to pay the Entrance Fee to the Debtors during the pendency of this Chapter 11 Case is dependent on the Resident's belief that the

Entrance Fee is refundable as outlined in their Residency Agreement, without any risk arising as a result of the Debtors being in chapter 11.  Escrowing the Entrance Fees and permitting all Entrance Fees to be refunded in the ordinary course of business gives both current and prospective Residents confidence that this Chapter 11 Case will not negatively impact the deposits, and encourages prospective Residents to enter into new Residency Agreements during the pendency of this case.

76.    I believe that any doubt from Residents or prospective Residents regarding the Debtors' ability to honor their refund obligations with respect to Entrance Fees could seriously undermine the Debtors' ability to attract new Residents during the pendency of this pre-negotiated Chapter 11 Case.  For example, I believe that prospective Residents would be reluctant to make the Entrance Fee deposits necessary to reside at Park Place if they were not certain that their new Entrance Fees would be protected while the Debtors are in chapter 11. Likewise, my own experience and discussions with existing Residents convinces me that their powerful promotion of Park Place sales among their friend and family networks would be chilled if there were any question about the refund of existing Entrance Fees.

77.    I believe the Entrance Fee Motion should be granted because Entrance Fees are critical to the Debtors' operations. The Entrance Fees, and the ability to generate new Entrance Fees, represent a significant amount of the Debtors' annual budget, and are critical to the Debtors' ability to reorganize.  Furthermore, I believe that because the Entrance Fees are significant amounts of money, the departing Residents would likely need the refunds of the existing Entrance Fees to secure alternative housing.

78.     I believe that the Entrance Fee Motion is reasonable, necessary, and in the best interests of the Debtors, their estates, their Residents, and all parties in interest.  Therefore, I respectfully ask this Court grant the relief sought in the Entrance Fee Motion.

### E.     Payment of Trade in Ordinary Course of Business Motion

79.     The Debtors believe that maintenance of a good relationship with their vendors and other creditors is necessary to the viability of the business during and after the Chapter 11 Case.  Notwithstanding applicable provisions of the Bankruptcy Code, the Debtors are seeking authority from the Bankruptcy Court to pay General Unsecured Claims in the ordinary course of their business ("Ordinary Course Claims").  The relief sought in this motion is critical to ensure the uninterrupted flow of goods and services to the Debtors.  The Debtors believe that this relief is particularly appropriate since: (a) all such Claims are proposed to be paid in full under the Plan; (b) there is limited amount of such claims outstanding (i.e. approximately $119,000); and (c) given the prenegotiated Plan it is anticipated that these proceedings will be concluded fairly quickly.

80.     As a CCRC, the Debtors' Residents rely on the Debtors for food, healthcare and other vital services.  Also, Residents enjoy, among other things, access to exercise programs and facilities, certain housekeeping and bed linen services, social and recreational programs, and 24/7 medical services, including nurse monitoring, medication and treatment administration.  Many Residents chose to live in a CCRC because they could no longer provide these services for themselves without considerable hardship.  Payment of the Ordinary Course Claims is necessary for the Debtors to continue these services without disruption, maintain their high quality standards, and guarantee the health, comfort, and well-being of their Residents.

81.     Included among the creditors holding Ordinary Course Claims (the "Ordinary Course Creditors") are many the creditors that provide theses critical services described above,

including health care service providers, so-called "sole source" providers, and other providers of services that meet Residents' daily needs. Because many Ordinary Course Creditors provide services relating to Residents' daily needs, comfort, healthcare, and overall well-being, including food, utilities, and garbage removal, any disruption in these services could be catastrophic and Residents could be forced to leave Park Place. Moreover, Park Place would face significant challenges recruiting new Residents, all of which would jeopardize the Debtors' reorganization.

82.     The magnitude of the relief requested is not substantial, as the Debtors anticipate that the maximum amount of prepetition Ordinary Course Claims that will be paid during the Chapter 11 Case is approximately $100,000. Second, the Plan provides that all the Ordinary Course Claims are unimpaired and will be reinstated. Third, based on the bondholders executing the Plan Support Agreement, the Debtors expect the Plan to be accepted by the requisite majorities of impaired classes. Fourth, the Debtors expect that the Plan to be consummated within three months of the Petition Date. Thus, in light of the foregoing considerations, the relief sought through this Motion merely impacts the timing of the payment of the Ordinary Course Claims, not their ultimate treatment in the cases. Moreover, the Debtors are not seeking to accelerate any existing payment arrangements.

83.     If the motion is not granted, there is substantial risk associated with not granting the requested relief. The Debtors' elderly Residents rely on the Debtors for numerous essential goods and services, and any noticeable disruption in those services would severely impact the Debtors' ability to retain and recruit Residents. Also, any bankruptcy filing by a CCRC creates inherent concerns and uncertainty among Residents who depend on the CCRC for their daily needs and welfare. The Motion therefore is as much about the Debtors maintaining the confidence of their Residents and other stakeholders as they undertake this balance sheet

restructuring to ensure the long-term viability and success of Park Place.  This requires a delicate balance, including consideration of the interests of all stakeholders.  In light of the Plan and the Debtors' goals for this case, the Debtors have concluded that the best course is to obtain authority to pay the Ordinary Course Claims and not take the risk of vendors discontinuing services postpetition.

84.     Apart from the need to file this case to effectuate this debt restructuring, the Debtors' intention is to prevent a material impact on parties in interest by the bankruptcy.  The Debtors have sufficient funds to pay the amounts on account of the general unsecured claims in the ordinary course of business by virtue of expected cash flows from ongoing business operations.

85.     I believe that that this motion is reasonable, necessary, and in the best interests of the Debtors, their estates, their Residents, and all parties in interest.  Here, not allowing payment to the Ordinary Course Creditors could significantly undermine the Debtors' reorganization.  The Debtors' Residents depend on the Debtors to provide them with food, healthcare, and other vital services.  These are not services that can be delayed for any amount of time without imposing significant and irreparable harm on the Debtors' elderly Residents.  Therefore, I respectfully ask this Court grant the relief sought in the Payment of Trade in the Ordinary Course of Business Motion.

**F.      Employee Wages Motion.**

86.      By the Employee Wages Motion, the Debtors seek entry of an order: (a) authorizing, but not requiring, the Debtors to pay prepetition claims for, among other things, ordinary and customary wages and salaries, federal and state withholding taxes, and payroll taxes, (collectively, the "Compensation Obligations"), which are paid by the Debtors in the ordinary course of business; (b) authorizing, but not requiring, the Debtors to continue their employee benefits  programs  (the  "Employee Benefits" and together with the Compensation Obligations  the "Employee Obligations"); and (c) requiring banks and financial institutions to process, honor, and pay any checks presented by the Debtors' employees, and directing the banks and financial institutions to honor all related fund transfer requests made by the Debtors.

87.      The Debtors have the following Employee Obligations:

a.      Wages, salaries, and other compensation;

b.      Employee Benefits, including, but not limited to:

    i.    Medical and dental insurance;

    ii.   COBRA benefits;

    iii.  Life and long-term disability insurance;

    iv.   Short-term disability insurance;

    v.    A 403(b) voluntary retirement savings plan;

    vi.   Flexible spending programs;

    vii.  Workers' compensation insurance;

    viii. Sick time, jury duty, and bereavement; and

    ix.   Payroll taxes and other deductions.

88.     Currently, the Debtors directly employ approximately 233 employees (the "Employees"), who perform a variety of functions ranging from providing nursing services, to providing maintenance, dining services, and housekeeping, to office administration.

89.     The Debtors cannot operate without the Employees.  Each of the Employees are critical to the uninterrupted operation of the Debtors' service oriented business.  The Employees have familiarity with not only the Debtors' business operations, but also with each unique Resident's health and safety needs.  Failure to maintain the Employee Obligations will result in the loss of key Employees, which will negatively impact the quality and scope of services provided to current Residents and, in turn, could jeopardize their health and well-being.  Furthermore, loss of Employees and their vital services could result in a loss of confidence from current and prospective Residents, leading to increased Resident turnover.  Minimizing Resident turnover by maintaining Employees and the services they provide are essential to preserving the Debtors' estates. I also believe that the Debtors' ability to maintain Employees in the ordinary course of business is vital to the ongoing reorganization efforts.

90.     Furthermore, pursuant to state laws, the Debtors must maintain their workers' compensation obligations to ensure prompt and efficient payment and/or reimbursement of their employees.  If the Debtors fail to maintain such obligations, it will be prohibited by state law from operating in the state.  As a result, I believe that payment of all amounts related to the Debtors' workers' compensation obligations are crucial to the continued operation of their business.

91.     Therefore, I respectfully ask this Court grant the relief sought in the Employee Wages Motion.

### G.    Taxes Motion

92.    By the Taxes Motion, the Debtors seek entry of an order authorizing, but not requiring, the Debtors to pay all income, sales, and all other similar obligations (collectively, the "Prepetition Taxes") levied by federal, state, and local authorities (the "Taxing Authorities") as such Prepetition Taxes come due in the ordinary course of business.  Furthermore, the Debtors request that all banks or financial institutions be directed to receive, process, or pay all requests for payment related to the Prepetition Taxes, whether submitted prior to or after the Petition Date.  The Debtors also request that all banks or financial institutions be authorized to rely upon the Debtors' representations or designation regarding whether a particular check or payment request is appropriate pursuant to the Taxes Motion.

93.    In the ordinary course of business, the Debtors are subject to certain Prepetition Taxes payable to the Issuer, the State of Illinois, and the Internal Revenue Service.   The Prepetition Taxes have historically been approximately $350,000 per year. As of the Petition Date, I believe that the Debtors are current on all Prepetition Taxes, and no amount is owed to the Taxing Authorities.   During the pendency of this Chapter 11 Case, I believe that approximately $67,000 in Prepetition Taxes will become due and payable.

94.    I believe that failure to pay the Prepetition Taxes as they become due will expose the Debtors and their officers or management to substantial civil and/or criminal liability. A lawsuit or criminal prosecution, and any potential liability, would distract the Debtors and their officers or managers from not only the Debtors' business operations, but also the ongoing administration of this Chapter 11 Case.   I believe that any such lawsuit, and its potential liabilities, would be a detriment to the Debtors' estates, their Residents, and all parties in interest. Therefore, I respectfully ask this Court to grant the relief sought in the Taxes Motion.

## H.   Cash Management Motion

95.   By the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to continue operating their centralized cash management system (the "Cash Management System"), bank accounts (the "Bank Accounts") located at various banks (the "Banks"), and business forms (the "Business Forms"); (b) granting the Debtors a waiver of certain bank account and related U.S. Trustee requirements; (c) authorizing the Debtors to continue their existing deposit practices under the Cash Management System; and (d) authorizing the continued intercompany funding postpetition ("Intercompany Transactions")(subject to any reasonable changes to the Cash Management System that the Debtors may implement).

96.   Among other things, the Debtors ask that the Court allow them to: (a) maintain and continue using the Bank Accounts in the same manner and with the same account numbers, styles, and document forms as are currently employed; (b) deposit funds in, and withdraw funds from, the Bank Accounts by all usual means, including checks, wire transfers, automatic clearing house transfers, drafts, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts; (c) pay ordinary course bank fees in connection with the Bank Accounts; (d) perform their obligations under the documents and agreements governing the Bank Accounts; and (e) treat the Bank Accounts for all purposes as accounts of the Debtors in their capacity as Debtors in possession.

97.   Furthermore, I am advised by counsel that the Debtors' Bank Accounts are in compliance with the requirements of section 345(b) of the Bankruptcy Code.  To the extent that the Bank Accounts are not in compliance thereof, I believe that "*cause*" exists to waive the requirements of the section.  The Debtors are sophisticated companies with a cash management system that have the capacity to move funds as necessary to ensure the Debtors' fiscal safety.  I

believe that strict compliance with section 345(b) of the Code will unduly burden the Debtors with administrative expenses and difficulties.

98.     The continued use of the Cash Management System, the Bank Accounts, Business Forms and Intercompany Transactions during the pendency of this Chapter 11 Case is essential to the Debtors' business operations.   The Debtors employ the Cash Management System and Bank Accounts to maximize efficiencies and the value of their business, and to collect, transfer, and disburse the funds generated by its operation.   Using the Cash Management System and Bank Accounts, the Debtors are able to collect and transfer cash efficiently to satisfy their financial obligations.   The Cash Management System and Bank Accounts facilitate the Debtors' cash forecasting and reporting and enable the Debtors to monitor the collection and disbursement of funds and maintain control over the administration of their accounts at the Banks.   As a practical matter, it would be extremely burdensome and expensive to establish and maintain a different cash management system and different Bank Accounts.   Accordingly, the Debtors request to continue the Cash Management System and the Bank Accounts without disruption.

99.     Without the relief requested, I believe the Debtors would be unable to effectively and efficiently maintain their financial operations.   This would cause significant harm to the Debtors' business and the value of their estates.   Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest, and I respectfully ask this Court to grant the relief sought in the Cash Management Motion.

## I.     Utilities Motion

100.     By the Utilities Motion, the Debtors seek entry of interim and final orders: (a) prohibiting utilities from altering, refusing, or discontinuing service to the Debtors; (b) approving

the Debtors' proposed form of adequate assurance of payment; and (c) establishing procedures for resolving objections to the Debtors' proposed form of adequate assurance of payment.

101.    In the ordinary course of business, the Debtors obtain electricity, natural gas, water, telephone services, internet, garbage collection, sewerage, and other similar services (collectively, the "Utility Services") from a number of utility providers (the "Utility Providers").

102.    A list of the names and addresses of the Utility Providers, and the recent amounts owed per month over the previous calendar year is attached to the Utilities Motion as Exhibit A (the "Utilities Service List").  On average, the Debtors pay approximately $60,000 each month on Utility Services.  The Debtors historically have made full and timely payments for the Utility Services to Utility Providers.

103.    During the pendency of this case, the Debtors intend to pay all Utility Providers, subject to the granting of the Cash Collateral Motion, in a timely manner consistent with the Debtors' ordinary course of business and customary payment terms.

104.    Uninterrupted Utility Services are essential to the Debtors' continued business operations and successful reorganization, and are especially important in light of the healthcare services the Debtors provide to their elderly Residents.  If the Utility Providers are permitted to suspend or discontinue service to the Debtors, the Debtors would be unable to furnish the healthcare services necessary to ensure the safety and well-being of their elderly Residents. Furthermore, discontinuation of the Utility Services would hamper the Debtors' ability to generate revenues, which would hinder the Debtors' ability to reorganize and also degrade the value of the Debtors' estates.  Therefore, I believe that it is critical that this Court grant the relief sought in the Utilities Motion.

105.     As adequate protection, the Debtors propose depositing two (2) weeks' worth of Utility Service payments (an "Adequate Assurance Deposit") to each Utility Provider that requests such a deposit in writing.  I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services and contingent on the granting of the Cash Collateral Motion, constitutes adequate protection under the Bankruptcy Code.

106.     Furthermore, the Debtors propose certain procedures, discussed in detail in the Utilities Motion, which permit a Utility Provider to request additional adequate protection if it believes that there are circumstances warranting greater protection.

107.     I believe that the Utilities Motion is in the best interests of the Debtors, their estates, their Residents, and all parties in interest.  Therefore, I respectfully ask this Court grant the relief sought in the Utilities Motion.

**J.      Ombudsman Motion**

108.     By the Ombudsman Motion, the Debtors seek entry of an order: (a) finding that no patient care ombudsman be appointed in this Chapter 11 Case; and (b) allowing the Debtors to self-report.  I believe that an ombudsman is unnecessary in this case because, among other reasons: (a) the Debtors have history of providing excellent Resident healthcare services and, subject to the Cash Collateral Motion being granted, will have the resources necessary to continue providing a high level of patient care during this Chapter 11 Case; (b) the Debtors have existing and stringent internal safeguards that adequately protect Residents; and (c) the Debtors already are subject to regulatory oversight by numerous governmental authorities, such as CMS, the Illinois Department of Public Health ("IDPH"), and DuPage County, and the City of Elmhurst.  The Debtors have informed the governmental regulatory authorities of this pending Chapter 11 Case and intend to continue notifying them of material updates of these cases.  None

of the governmental regulatory authorities have expressed concerns regarding the Debtors' ability to continue rendering healthcare services to Residents.

109.    I believe that an ombudsman would not serve the best interests of the Debtors' Residents, the Debtors' estates, or any parties in interest in this case.  An ombudsman would provide services or supervision that would be duplicative of existing safeguards, and would therefore result in additional costs to the Debtors' estates with little additional value.  Given the anticipated short duration of this Chapter 11 Case, I believe that an ombudsman would spend only the estates' resources and valuable time familiarizing itself with the Debtors' business before being able to render services already provided by governmental regulatory authorities and internal quality management procedures.  Therefore, I respectfully ask this Court to decline appointing an ombudsman at this time.

110.    Finally, the Debtors are willing to self-report the information relating to the state of Resident care to this Court, the U.S. Trustee, the IDPH, and any Residents or family members thereof who specifically request a copy of such information.  I believe that self- reporting will allow this Court and all parties in interest to assess the state of patient care at Park Place, and goes beyond what is required of a patient care ombudsman, without incurring the added expense of a patient care ombudsman.  Therefore, I respectfully ask this Court grant the relief sought in the Ombudsman Motion.

**K.    Insurance Motion**

111.    By the Insurance Motion, the Debtors seek interim and final orders authorizing, but not requiring, the Debtors to: (a) continue their prepetition existing  insurance policies (the "Insurance Policies") maintained and administered by third-party insurance carriers (the "Insurance Carriers"); and (b) revise, extend, supplement or change its insurance coverage, by, among other  things,  entering  into  new  insurance  policies,  renewing  the  current  Insurance

Policies, or purchasing new postpetition policies.  Furthermore, the Debtors request that all banks or financial institutions be directed to receive, process, or pay all requests for payment related to the Insurance Policies, whether submitted prior to or after the Petition Date.  The Debtors also requests that all banks or financial institutions be authorized to rely upon the Debtors' representations or designation regarding whether a particular check or payment request is appropriate pursuant to the Insurance Motion.

112.    A list of the Insurance Policies, their respective providers, and the recent amounts owed per year over the previous calendar year is attached to the Insurance Motion as Exhibit A. On average, the Debtors pay approximately $350,000 each year in insurance premiums.  The Debtors have historically made full and timely payments for the insurance premiums.

113.    It is critical that the Debtors be authorized to maintain the prepetition Insurance Policies on an ongoing basis.  Failure to maintain the Insurance Policies could result in Insurance Carriers canceling the Insurance Policies, which would leave the Debtors exposed to substantial liability.  I believe that being exposed to substantial liability is not in the best interest of the Debtors' estates, their Residents, or any party-in-interest.  In addition, I understand that operating guidelines established by the U.S. Trustee for debtors in possession in order to supervise the administration of the Chapter 11 Case require the Debtors to maintain insurance coverage throughout this Chapter 11 Case.  Therefore, I respectfully ask this Court to grant the relief sought in the Insurance Motion.

L.      **Schedules and Statements Motion**

114.    By the Schedules and Statements Motion, the Debtors seek entry of an order extending the time by which Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and

statements of financial affairs (collectively, the "Schedules and Statements") until twenty-eight (28) days after the Petition Date.

115.    Because of the prepetition negotiations, the preparation of the Plan, and the short expected timeframe of this case, the Debtors' management requires additional time to prepare its Schedules and Statements.    Collecting the Debtors' information from voluminous records accumulated over the course of years will require substantial time and effort.

116.    I believe that the Schedules and Statements Motion is in the best interests of the Debtors, their estates, and other parties in interest.    Therefore, I respectfully ask this Court to grant the relief sought in the Schedules and Statements Motion.

[The remainder of the page is left intentionally blank.]

## CONCLUSION

The Debtors respectfully request that the orders granting relief requested in the First Day Motions be entered. I reserve the right to supplement and/or amend this Declaration with testimony and/or exhibits.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: January 7, 2016

William De Young
Chief Financial Officer of Timothy Place,
NFP and Christian Healthcare Foundation
NFP