**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TIMOTHY PLACE, NFP, *et al.*,[1] | ) Case No. 16-0336 (JPC) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

## DISCLOSURE STATEMENT FOR DEBTORS' PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

David A. Agay (ARDC No. 6244314)
Joshua A. Gadharf (ARDC No. 6296543)
McDONALD HOPKINS LLC
300 North LaSalle Street, Suite 2100
Chicago, Illinois 60654
Telephone:  (312) 280-0111
Facsimile:  (312) 280-8232
E-mail:  dagay@mcdonaldhopkins.com
          jgadharf@mcdonaldhopkins.com

-and-

Shawn M. Riley (pro hac vice pending)
Manju Gupta (pro hac vice pending)
McDONALD HOPKINS LLC
600 Superior Avenue, E., Suite 2100
Cleveland, OH 44114
Telephone:          (216) 348-5400
Facsimile:          (216) 348-5474
E-mail:             sriley@mcdonaldhopkins.com
                    mgupta@mcdonaldhopkins.com

PROPOSED COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Timothy Place, NFP (5089) and Christian Healthcare Foundation, NFP (2359).

{5906754:}

# TABLE OF CONTENTS

I.   INTRODUCTION........................................................................................................... 4

   A.   General........................................................................................................... 4

   B.   Frequently Asked Questions. ........................................................................ 5

   C.   Classification and Treatment of Claims Under The Plan. ........................... 7

   D.   Plan Overview. ............................................................................................. 12

   E.   Summary of Confirmation Requirements. ................................................... 13

   F.   Voting Instructions and Deadline................................................................ 13

      1.   General Information. .......................................................................... 13

      2.   Administrative Claims. ...................................................................... 13

      3.   Unimpaired Classes Are Deemed to Accept the Plan and Do
          Not Vote. ............................................................................................ 13

      4.   Claims Which Are Not Allowed......................................................... 13

      5.   Voting and Record Date. .................................................................... 14

   G.   The Confirmation Hearing........................................................................... 14

   H.   Definitions..................................................................................................... 15

      1.   Defined Terms. ................................................................................... 15

      2.   Interpretation of Terms. ..................................................................... 15

II.  BACKGROUND INFORMATION ........................................................................... 15

   A.   Description of the Debtors............................................................................ 15

   B.   Capital Structure of the Debtors. ................................................................ 16

   C.   Administration of Park Place. ..................................................................... 17

      1.   Park Place Operations........................................................................ 17

      2.   Park Place Marketing and Development........................................... 17

      3.   Financial Results from 2015.............................................................. 18

   D.   Residents of Park Place. .............................................................................. 18

    E.      Regulatory Agencies. .......................................................................... 20

III.    EVENTS LEADING TO BANKRUPTCY ................................................. 20

IV.    SUMMARY OF THE PLAN SUPPORT AGREEMENT ......................... 21

    A.      Key Terms to the Restructuring. ................................................... 21

    B.      Sponsor Contribution ..................................................................... 22

    C.      Interest Rates for the 2016 Bonds and Maturity Dates. ............... 22

    D.      The Bond Funds and Distribution Waterfall. ............................... 23

V.    APPROVAL FOR THE 2016 BONDS ..................................................... 24

VI.    THE CHAPTER 11 CASE ...................................................................... 24

    A.      Motions to Be Filed. ....................................................................... 24

        1.      Motion for Entry of an Order Authorizing the Debtors to
               Assume Plan Support Agreement .......................................... 24

        2.      Motion for Entry of an Order (I) Approving the Disclosure
               Statement; (II) Establishing Plan Solicitation, Voting, and
               Tabulation Procedures; (III) Scheduling a Hearing and
               Establishing Notice and Objection Procedures for
               Confirmation of the Debtors' Chapter 11 Plan; and (IV)
               Granting Related Relief .......................................................... 25

        3.      Motion for Authority to Use of Cash Collateral. .................. 25

        4.      Motion to Escrow Residents' Entrance Fees. ....................... 25

        5.      Motion to Pay Unsecured Creditors in the Ordinary Course of
               Business. .................................................................................. 25

        6.      Motions for Authority to Pay Prepetition Employee Wages and
               Salaries and Associated Benefits ........................................... 25

        7.      Motion for Authority to Pay Prepetition Sales, Use, and Other
               Taxes ....................................................................................... 26

        8.      Motion to Continue Using Existing Cash Management
               Systems. ................................................................................... 26

        9.      Motion to Prohibit Utilities from Altering, Refusing, or
               Discontinuing Services on Account of Prepetition Invoices and

|   |   | Establishing Procedures for Determining Requests for Additional Adequate Assurance. | 26 |
|---|---|---|---|
|   | 10. | Applications for Retention of Professionals. | 26 |
|   | 11. | Motion to Motion for Determination that Appointment of Patient Care Ombudsman is Unnecessary. | 27 |
|   | 12. | Motion to Continue to Pay Insurance Obligations | 27 |
|   | 13. | Motion to Extend the Deadline to File Schedules and Statements | 27 |
|   | B. | Timetable for Chapter 11 Case. | 27 |
| VII. | PLAN OF REORGANIZATION | | 27 |
|   | A. | Classification of Treatment of Claims Under the Plan. | 28 |
|   | B. | Treatment of Administrative Claims, Priority Tax Claims, and U.S. Trustee Fees. | 28 |
|   | 1. | Administrative Claims. | 28 |
|   | 2. | Professional Compensation. | 28 |
|   | 3. | Priority Tax Claims. | 29 |
|   | 4. | U.S. Trustee Fees. | 29 |
|   | C. | Classification and Treatment of Claims and Interests | 29 |
|   | 1. | Classification and Specification of Treatment of Claims. | 29 |
|   | 2. | Classes of Claims and Interests. | 29 |
|   | 3. | Class 1 — Other Priority Claims. | 30 |
|   | 4. | Class 2 — Series 2010A/B/C Bond Claims. | 30 |
|   | 5. | Class 3 — Series 2010D Bond Claims. | 31 |
|   | 6. | Class 4 — Other Secured Claims. | 31 |
|   | 7. | Class 5 —General Unsecured Claims. | 32 |
|   | 8. | Class 6 — Interests in Debtors. | 32 |
|   | D. | Acceptance or Rejection of the Plan. | 32 |

|        |     | **1.** | Acceptance by an Impaired Class. | 32 |
|        |     | **2.** | Presumed Acceptance of the Plan. | 32 |
|        |     | **3.** | Voting Class. | 32 |
| **E.** |     | **Means for Implementation of the Plan.** | | 32 |
|        |     | **1.** | Sources of Consideration. | 32 |
|        |     | **2.** | Cancellation of 2010 Bonds. | 32 |
|        |     | **3.** | Issuance of 2016 Bonds. | 33 |
|        |     | **4.** | Section 1145 Exemption. | 36 |
|        |     | **5.** | Sponsor and PMDI Agreements. | 36 |
|        |     | **6.** | Greystone Agreement | 36 |
|        |     | **7.** | Assumption of Residency Agreements. | 36 |
|        |     | **8.** | Reorganized Debtors' Board of Directors. | 36 |
|        |     | **9.** | Officers of the Reorganized Debtors. | 36 |
|        |     | **10.** | Employee Benefits. | 36 |
|        |     | **11.** | Vesting of Assets in the Reorganized Debtors. | 37 |
|        |     | **12.** | Restructuring Transactions. | 37 |
|        |     | **13.** | Corporate Action. | 37 |
|        |     | **14.** | Section 1146 Exemption from Certain Taxes and Fees. | 38 |
|        |     | **15.** | Preservation of Causes of Action of the Debtors. | 38 |
| **F.** |     | **Treatment of Executory Contracts and Unexpired Leases.** | | 39 |
|        |     | **1.** | Assumption and Rejection of Executory Contracts and Unexpired Leases. | 39 |
|        |     | **2.** | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 39 |
|        |     | **3.** | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 40 |

4.      Insurance Policies...............................................................40

5.      Modifications, Amendments, Supplements, Restatements, or
        Other Agreements...........................................................40

6.      Reservation of Rights........................................................41

G.  Contracts and Leases Entered Into After the Petition Date. ........................41

H.  Provisions Governing Distributions. ..........................................................41

1.      Timing and Calculation of Amounts to Be Distributed......................41

2.      Distributions. ..................................................................41

3.      Payments and Distributions on Disputed Claims. ...........................41

4.      Special Rules for Distributions to Holders of Disputed Claims..........42

5.      Delivery of Distributions in General. .........................................42

6.      Undeliverable Distributions and Unclaimed Property......................42

7.      Withholding and Reporting Requirements. ..................................42

8.      Setoffs. ..........................................................................42

9.      Insurance Claims. .............................................................43

10.     Applicability of Insurance Policies............................................43

11.     Allocation of Distributions Between Principal and Unpaid
        Interest. .........................................................................43

12.     Interest on Claims.............................................................43

I.  Procedures for Resolving Contingent, Unliquidated, and Disputed
    Claims..........................................................................................44

1.      Prosecution of Objections to Claims. .......................................44

2.      Allowance of Claims. .........................................................44

3.      Distributions After Allowance. ..............................................44

4.      Estimation of Claims..........................................................44

J.  Conditions Precedent to the Effective Date.......................................44

1. Conditions Precedent to the Effective Date. ........................................... 44

2. Waiver of Conditions. ............................................................................... 46

3. Effect of Failure of Conditions. ............................................................... 46

K. Modification, Revocation or Withdrawal of The Plan. ................................. 46

1. Modification and Amendments. ............................................................... 46

2. Effect of Confirmation on Modifications. ............................................... 47

3. Revocation or Withdrawal of the Plan. ................................................... 47

L. Retention of Jurisdiction. ............................................................................... 47

M. Miscellaneous Provisions. ............................................................................. 49

1. Immediate Binding Effect. ....................................................................... 49

2. Additional Documents. ............................................................................. 50

3. Reservation of Rights. .............................................................................. 50

4. Successors and Assigns. ........................................................................... 50

5. Votes Solicited in Good Faith. ................................................................. 50

6. Closing of Chapter 11 Case. .................................................................... 50

VIII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN
OF REORGANIZATION ........................................................................................ 50

A. Elements of Confirmation. ............................................................................. 50

B. Best Interests of Creditors. ............................................................................ 51

C. Feasibility of the Plan. ................................................................................... 51

D. Sufficient Acceptances. ................................................................................. 53

IX. EFFECTS OF PLAN CONFIRMATION ........................................................... 53

A. Compromise and Settlement of Claims, Interests, and Controversies. ......... 54

B. Releases by the Debtors. ................................................................................ 54

C. Releases by Holders of Claims. ..................................................................... 55

D. Exculpation. ................................................................................................... 56

E.      Discharge of Claims. ........................................................... 56

F.      Injunction. ........................................................................... 57

G.     Term of Injunctions or Stays. ............................................ 58

H.     Protection Against Discriminatory Treatment. ................. 58

I.      Release of Liens. ................................................................. 59

X.    RISK FACTORS ............................................................................ 59

A.     Classification of Claims and Interests. ............................. 59

B.     Insufficient Acceptances. ................................................... 59

C.     Confirmation Risks. ........................................................... 60

D.     Conditions Precedent May Not Occur. ............................. 60

E.      Uncertainty of Financial Projections. .............................. 61

F.      Adverse Publicity. .............................................................. 61

XI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................................................. 61

A.     Liquidation Under Chapter 7. .......................................... 61

B.     Alternative Plan of Reorganization. ................................. 62

XII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........... 62

A.     U.S. Federal Income Tax Consequences to the Debtors. .................. 63

B.     U.S. Federal Income Tax Consequences to Holders Upon a Bond Exchange. ........................................................................... 64

C.     U.S. Federal Income Tax Consequences of Holding 2016 Bonds. .................. 65

D.     Information Reporting and Backup Withholding. ........... 65

XIII. CONCLUSION AND RECOMMENDATIONS ...................................... 66

**EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Debtors' Plan of Reorganization under Chapter 11 of the Bankruptcy Code dated January 17, 2016 |
| Exhibit 2 | Consolidated Financial Statements |
| Exhibit 3 | Liquidation Analysis |
| Exhibit 4 | Financial Projections |

## DISCLAIMER

**IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR COPY OF THIS DISCLOSURE STATEMENT. THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE PLAN.**

**EACH HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND SECTION 1125 OF THE BANKRUPTCY CODE. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTORS, THEIR PROPERTY, OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.**

**THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE DEBTORS BELIEVE AND HAVE MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO  THE PLAN, THE SUMMARY DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016-1, AND LOCAL BANKRUPTCY RULE 3016-1 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTORS AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS.**

**THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS**

{5855798:9}

AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND SHOULD NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND THE EFFECTIVE DATE OCCURS, THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF

{5906754:}

**CLAIMS AND INTERESTS THAT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR THAT ARE NOT ENTITLED TO VOTE ON THE PLAN).**

**THE DEBTORS RECOMMEND THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN.   IT IS THE OPINION OF THE DEBTORS THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS. ACCORDINGLY, THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.**

I.

II.   **INTRODUCTION**

    A.    **General.**

        The following introduction is qualified by the Debtors' Plan of Reorganization under Chapter 11 of the Bankruptcy Code proposed by Timothy Place, NFP d/b/a Park Place Christian Community of Elmhurst (the "***Corporation***") and Christian Healthcare Foundation, NFP d/b/a Providence Healthcare Foundation (the "***Foundation***") as debtors and debtors in possession (collectively referred to as the "***Debtors***"), dated January 17, 2016 (the "***Plan***"),[2] which is attached hereto as <u>Exhibit 1</u>, and the more detailed information and financial statements contained elsewhere in this document.   The Debtors believe that confirmation and implementation of the Plan is in the best interests of creditors and that the Plan provides the best alternative available to creditors.

        On January 17, 2016 (the "***Petition Date***"), the Debtors filed voluntary petitions for reorganization under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). The Debtors' chapter 11 cases (the "***Chapter 11 Cases***") are currently pending before the United States Bankruptcy Court for the Northern District of Illinois (the "***Bankruptcy Court***").

        The Debtors own and operate Park Place Christian Community of Elmhurst ("***Park Place***"), a continuing care retirement community or "***CCRC***".   The Debtors continue to be in possession of their properties and are managing their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

        Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.   In addition to permitting a debtor to rehabilitate, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code. Consummating a plan is the principal objective of a chapter 11 case.   A bankruptcy court's confirmation of a plan binds the debtors, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.   Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of a debtor's liabilities in accordance with the terms of the confirmed plan.

        The Debtors have prepared this disclosure statement ("***Disclosure Statement***") as required by section 1125 of the Bankruptcy Code, Federal Bankruptcy Rule 3016(c), and Local Rule 3016-1.   It is being distributed to holders of Claims and Interests against the Debtors to assist such holders in evaluating the feasibility of the Plan and the manner in which their Claims and Interests are treated, and in determining that the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.   The purpose of this Disclosure Statement is to assist those entitled to vote on the Plan to make an informed judgment when voting to accept or reject the Plan.

---

   [2]  All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

{5906754:}

This Disclosure Statement describes the background of the Debtors and the significant events leading up to the filing of the Chapter 11 Case on the Petition Date.  It also summarizes the Plan, which divides Claims and Interests into Classes and provides for the treatment of Allowed Claims.

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

B.    **Frequently Asked Questions.**

**THE INFORMATION PRESENTED IN THE ANSWERS TO THE QUESTIONS SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THIS DISCLOSURE STATEMENT AND THE PLAN.**

*Why am I receiving this document?*

This Disclosure Statement is being delivered to you because you either are or may be the holder of, or have otherwise asserted, a Claim against the Debtors.  This Disclosure Statement is intended to provide you with information sufficient to make an informed decision as to whether to vote to accept or reject the Plan.

*Who is eligible to vote to accept or reject the Plan?*

A holder of a Claim in a Class that is impaired under the Plan is entitled to vote to accept or reject the Plan.  Generally, a Class of Claims is impaired unless the Plan leaves unaltered the legal, equitable, and contractual rights to which the Claims in such Class entitle the holders of such Claims.  Under the Plan, Classes 2 and 3 are considered impaired, and holders of Claims in these impaired Classes are entitled to vote.

*I am a resident of Park Place.  Am I eligible to vote to accept or reject the Plan?*

Your status as a resident does not make you eligible to vote on the Plan.  The Plan provides for the assumption of your Residency Agreement and the cure of any defaults thereunder.  Under the Plan, your rights as a resident remain the same as they were prior to the Chapter 11 Case.  Accordingly, in your capacity as a resident, you are considered to be an unimpaired creditor, and as such you are ineligible to vote either for or against the Plan.  This does not mean, however, that you are precluded from challenging the assumption of your Residency Agreement or confirmation of the Plan itself.  Furthermore, if you have claims against the Debtors that do not arise under your Residency Agreement, then you may be eligible to vote for or against the Plan on the basis of these other claims.

*If I am eligible to vote, why should I vote to accept the Plan?*

The Debtors believe that the Plan provides the best means for achieving the maximum distribution on account of your prepetition Claim. The Plan, as presently drafted, is the product of months of difficult negotiations and has the support of a majority in principal amount of the holders of the Bonds. In addition, and as described below, holders of Claims in each Class will receive a better return under the Plan than they would in a potential liquidation.

### How do I vote to accept or reject the Plan?

If you are entitled to vote on the Plan because you are the holder of a Claim in Classes 2 or 3 that is allowed or has been temporarily allowed for voting purposes, as applicable, you must complete, sign, and return the enclosed ballot or ballots (each a "***Ballot***") in accordance with the ballot instructions being delivered to you simultaneously herewith.

### What if I am entitled to vote to accept or reject the Plan and do not vote?

In general, within any particular Class of Claims, only those holders of Claims who actually vote to accept or to reject the Plan will determine whether the Plan is accepted by the requisite holders of Claims in such Class. A Class of Creditors is deemed to have accepted the Plan if the holders representing at least two-thirds (2/3) in dollar amount and more than fifty (50%) percent in number of those voting vote to accept the Plan.

### What happens if the Plan is not accepted by each Class entitled to vote on the Plan?

If no Class of Claims votes to accept the Plan, then the Plan will not be confirmed or consummated in its present form. Conversely, as long as the requisite holders of Claims in at least one impaired Class vote to accept the Plan, the Debtors may seek confirmation pursuant to section 1129(b) of Bankruptcy Code (which will require a determination by the Bankruptcy Court that the Plan is "fair and equitable" and "does not discriminate unfairly" as to each impaired Class that does not accept the Plan or is deemed to have rejected it). The Debtors believe that the Plan satisfies section 1129(b) of the Bankruptcy Code and, in any case, have reserved the right to modify the Plan to achieve confirmation.

### When will the Plan be confirmed?

The Bankruptcy Court will schedule and conduct a hearing concerning confirmation of the Plan. The Plan Confirmation Hearing may be continued or adjourned, however, and even if it is held, there is no guaranty that the Bankruptcy Court will find that the requirements of the Bankruptcy Code with respect to confirmation have been met. In addition, there are additional conditions set forth in the Plan that must be satisfied or waived in accordance with the Plan before the Plan will become effective. The Debtors have requested that  the Bankruptcy Court schedule a hearing to consider confirmation of the Plan on March 28, 2016 at [TIME] (prevailing Central Time), before Honorable Jacqueline P. Cox, at the United States Bankruptcy Court for the Northern District of Illinois, Courtroom 680, U.S. Courthouse, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, 60604.

### When will the Plan Supplement be filed and what will it include?

No later than two weeks before the Plan Confirmation Hearing. the Debtors will file a "***Plan Supplement***," which will likely include the following: (i) the 2016 Bond Documents and (ii) any additional documents filed before the Effective Date as supplements or amendments to the Plan Supplement.   The detailed terms of the documents to be contained in the Plan Supplement have yet to be finalized and will continue to be negotiated by the Debtors.

### C.     Classification and Treatment of Claims Under The Plan.

Certain Classes of Claims are impaired under the Plan and, accordingly, are entitled to vote on the Plan.   The Debtors are seeking votes to accept the Plan from holders of Claims in these Classes. For a description of the Classes of Claims and their treatment under the Plan, see Section 3 of the Plan-Classification and Treatment of Claims and Interests.

Estimated Claim amounts for certain Classes are based upon a preliminary analysis by the Debtors of the Claims pursuant to its books and records.   There can be no assurance that these estimates are correct. The following treatments are possible only if the Plan is approved and the Debtors' estimate of the Claims that are determined to be valid by the Bankruptcy Court. The timing of distributions under the Plan, if any, is subject to conditions described in later sections of this Disclosure Statement.

Each Class of Claims, except Administrative Claims, Priority Tax Claims, and U.S. Trustee Fees, are placed in the following Classes and will receive the following treatment under the Plan:

### Summary of Classification and Treatment of Claims Under the Plan

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| Class 1 - Other Priority Claims | $0 | No | This Class consists of all Allowed Other Priority Claims, if any such Claims still exist as of the Effective Date. Each Allowed Other Priority Claim shall be in a separate subclass. Except to the extent that the holder of an Allowed Other Priority Claim agrees to less favorable treatment, each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim: (i) deferred Cash payments of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim, or (ii) payment in |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| | | | Cash in full on the later of: (a) the third (3rd) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Debtors; and (b) the third (3rd) Business Day after the date on which such Other Priority Claim becomes an Allowed Claim. |
| Class 2 - Series 2010 A/B/C Bond Claims | $121,990,000, plus accrued and unpaid interest as of the Petition Date in the amount of $1,701,306.92, plus accrued and unpaid interest from the Petition Date to the Effective Date in the approximate amount of $2,030,592.12. | Yes | This Class consists of all Series 2010 A/B/C Bond Claims and includes all Claims of the holders of (i) the Series 2010A Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $109,115,000, plus accrued and unpaid interest as of the Petition Date in the amount of 1,531,614.21, plus accrued and unpaid interest from the Petition Date to the Effective Date in the approximate amount of $1,828,055.66; (ii) the Series 2010B Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $7,875,000, plus accrued and unpaid interest as of the Petition Date in the amount of $105,109.38, plus accrued and unpaid interest from the Petition Date to the Effective Date in the amount of $125,453.13; (iii) the Series 2010C Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $5,000,000, plus accrued and unpaid interest as of the Petition Date in the amount of $64,585.33, plus accrued and unpaid interest from the Petition Date to the Effective Date in the amount of $77,083.33. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| | | | satisfaction and discharge of and in exchange for each Allowed Series 2010A/B/C Bond Claims:

Each holder of an outstanding Series 2010A Bond, outstanding Series 2010B Bond, or Series 2010C Bond shall exchange the then outstanding Series 2010A Bond, Series 2010B Bond, or Series 2010C Bond for (i) for a pro rata share of (A) Series 2016A Bonds issued in the aggregate principal amount equal to $103,691,500, and (B) certain of the Series 2016C Bonds in the aggregate principal amount of $21,918,750.

Each holder of an outstanding Series 2010A Bond, Series 2010B Bond, or Series 2010C Bond shall also receive payment in full in Cash on account of its allocable share of accrued and unpaid interest on the Series 2010A Bonds, Series 2010B Bonds, or Series 2010C Bonds as applicable, through the date immediately preceding the Effective Date, which payment shall be made as of the Distribution Date. |
| Class 3 - Series 2010D-1 and Series 2010D-2 Bond Claims | $24,135,000, plus accrued and unpaid interest as of the Petition Date in the amount of $295,384.79, plus accrued and unpaid interest from the Petition Date to the | Yes | This Class consists of all Series 2010D-1 Bond and Series 2010D-2 Bond Claims and includes all Claims of the holders of: (i) the Series 2010D-1 Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $10,275,000, plus accrued and unpaid interest as of the Petition Date in the amount of $128,294.79 plus accrued and unpaid interest from the Petition Date to the Effective Date in the approximate amount of $153,126.04; and (ii) the Series 2010D-2 Bonds, which Claims |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| | Effective Date in the approximate amount of $352,556.04. | | shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $13,860,000, plus accrued and unpaid interest as of the Petition Date in the amount of $167,090.00, plus accrued and unpaid interest from the Petition Date to the Effective Date in the amount of $199,430.00.

Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Series 2010D-1 and Series 2010D-2 Bond Claim:

Each holder of an outstanding Series 2010D-1 Bond or an outstanding Series 2010D-2 Bond, shall exchange the then outstanding Series 2010D-1 Bond or Series 2010D-2 Bond for: (i) for a pro rata share of (A) Series 2016B Bonds issued in the aggregate principal amount equal to $20,514,750, and (ii) a pro rata share of 2016C Bonds in the aggregate principal amount of $21,918,750.

Each holder of an outstanding Series 2010D-1 Bond or Series 2010D-2 Bond shall also receive payment in full in Cash on account of its allocable share of accrued and unpaid interest on the Series 2010D-1 Bond or Series 2010D-2 Bond as applicable, through the date immediately preceding the Effective Date, which payment shall be made as of the Distribution Date. |
| Class 4 - Other Secured Claims | $0 | No | This Class consists of all Other Secured Claims. Except to the extent that a holder of an Allowed Other Secured |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| | | | Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, on the later of the Effective Date and the date such Other Secured Claim becomes Allowed, or as soon as practicable thereafter, each holder of an Allowed Other Secured Claim shall have its Other Secured Claim reinstated and the legal, equitable, and contractual rights to which the holder of such Claim is entitled shall otherwise be unaltered in accordance with section 1124 of the Bankruptcy Code. |
| Class 5 - General Unsecured Claims | $100,000.00. | No | This Class consists of all General Unsecured Claims.

Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive payment in full in Cash of the unpaid portion of such Allowed General Unsecured Claim on the latest of: (i) the third (3rd) Business Day after the Effective Date or as soon as practicable thereafter as determined by the Debtors, (ii) the third (3rd) Business Day after the date on which such General Unsecured Claim becomes an Allowed Claim, (iii) the date such Allowed General Unsecured Claim becomes due and payable in the ordinary course of business, or (iv) as otherwise agreed to by the Debtors and the holder of such General Unsecured Claim, and the Plan shall otherwise leave unaltered the legal, |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| | | | equitable, and contractual rights to which the holder of such General Unsecured Claim is entitled; provided, however, that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business. The Debtors reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date |
| Class 6 - Interests in Debtor | N/A | No | This Class consists of all Interests in the Debtors.<br><br>On the Effective Date, Rest Haven Illiana Christian Convalescent Home d/b/a Providence Life Service will retain all membership interests in the Reorganized Debtors. |

**D.     Plan Overview.**

The following is a brief overview of the Plan and is qualified by reference to the Plan itself.  For a more detailed description of the terms and provisions of the Plan, see Article VII - The Plan of Reorganization.

The Plan is the result of negotiations by and among the Debtors, the 2010 Bond Trustee, and the Consenting Holders.

The Plan provides for the payment and/or full satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed U.S. Trustee Fees, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed General Unsecured Claims against the Debtors.  The Plan also provides that the holders of Allowed Series 2010A Bond Claims, Series 2010B Bond Claims, Series 2010C Bond Claims, Series 2010D-1 Bond Claims, and Series 2010D-2 Bond Claims, in full and final satisfaction and discharge of and in exchange for such Allowed Claims, will receive their pro rata share of certain Series 2016 Bonds and payment in Cash on account of accrued and unpaid prepetition interest, as further set forth in the Plan. Ownership of the Debtors will not change under the Plan.

The potential recoveries are only estimates, and actual recoveries will neither increase or decrease depending upon the occurrence or non-occurrence of numerous factors, including, but not limited to, the risk factors discussed in Article X herein.

**E.      Summary of Confirmation Requirements.**

Under the Bankruptcy Code, only holders of Claims and interests that are "impaired" are entitled to vote to accept or reject the Plan.  The Bankruptcy Code further provides that a Class that is left unimpaired under the Plan is deemed to have accepted the Plan, and a Class that receives no distribution under the Plan is deemed to have rejected the Plan. The Bankruptcy Code requires, as a condition to confirmation of a consensual plan of reorganization, that each impaired Class of Claims accept the Plan.  A class of creditors is deemed to accept a plan if the holders of at least two-thirds in dollar amount and more than one-half in number of those creditors that actually cast ballots vote to accept such plan.  A class of interest holders is deemed to accept a plan if the holders of at least two-thirds in amount of those interest holders that actually cast ballots, vote to accept such plan. Pursuant to section 1129(b) of the Bankruptcy Code, a plan may be confirmed even if it is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan and the bankruptcy court finds that the plan is "fair and equitable" and "does not discriminate unfairly" as to each impaired class that does not accept the plan or that is deemed to have rejected it.

**F.      Voting Instructions and Deadline.**

**1.      General Information.** Under the Bankruptcy Code, certain Classes of Creditors are deemed to accept or reject the Plan, and the vote of these Classes will not be solicited.

**2.      Administrative Claims.** Holders of Administrative Claims will not be entitled to vote on the Plan.

**3.      Unimpaired Classes Are Deemed to Accept the Plan and Do Not Vote.** If a Creditor holds a Claim included within a Class that is not impaired under the Plan, then pursuant to section 1126(f) of the Bankruptcy Code, that Creditor is deemed to have accepted the Plan with respect to such Claim, and its vote on such Claim will not be solicited. Classes 1, 4, 5, and 6 are not impaired under the Plan and will be deemed to accept the Plan.

**4.      Claims Which Are Not Allowed.**  The Bankruptcy Code provides that only the holders of Allowed Claims are entitled to vote on the Plan.  A Claim to which an objection has been filed is not an Allowed Claim unless and until the Bankruptcy Court rules on the objection and allows the Claim.  If the Bankruptcy Court has not ruled on the objection or status of such a Claim, but the holder of a Claim wishes to vote, the holder of the Claim may petition the Bankruptcy Court to estimate its claim for voting purposes under Federal Bankruptcy Rule 3018(a).  Consequently, although holders of such Claims may receive ballots, their votes will not be counted unless the Bankruptcy Court, prior to the Voting Deadline, rules on the objection and allows the Claim or, on proper request under Federal Bankruptcy Rule 3018(a) prior to the Confirmation Hearing, temporarily allows the Claim in an amount that the Bankruptcy Court deems proper for the purpose of voting on the Plan.

     **5.**    <u>**Voting and Record Date.**</u>  If a Creditor holds a Claim classified in a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and filed on time.  The record date for determining which creditors may vote on the Plan is March [___], 2016. The Voting Deadline is 5:00 p.m. (prevailing Central Time).

          a.    <u>How to Vote</u>.  IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY   COMPLETED AND RETURNED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT.

          b.    <u>Ballots</u>. Creditors must use only the ballot or ballots sent to them with this Disclosure Statement.  If a Creditor has Claims in more than one Class, it should receive multiple ballots.

**IF YOU ARE A MEMBER OF A VOTING CLASS AND DID NOT RECEIVE A BALLOT FOR SUCH CLASS, OR IF SUCH BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT:**

Globic Advisors
880 Third Avenue- 12th Floor
New York NY, 10022
Tel: 212.227.9699
Fax: 212.271.3252

    **G.**    **The Confirmation Hearing.**

     The Debtors have requested that the Bankruptcy Court schedule a hearing to consider confirmation of the Plan on March 28, 2016 (prevailing Central Time), before the Honorable Jacqueline P. Cox, at the United States Bankruptcy Court for the Northern District of Illinois, Court 680, U.S. Courthouse, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, 60604.  The Bankruptcy Court has ordered that objections, if any, to confirmation of the Plan be filed and served within the time and in the manner described in the Confirmation Notice and Order that accompany this Disclosure Statement.  The date of the Confirmation Hearing may be continued at such later time(s) as the Bankruptcy Court may announce during the Confirmation Hearing or any continued hearing without further notice.

     If the Plan is confirmed by the Bankruptcy Court, it will be binding on all Claim and interest holders regardless of whether an individual Claim or interest holder has supported or opposed the Plan.

    **CREDITORS ARE NOT REQUIRED TO ATTEND THE CONFIRMATION HEARING UNLESS THEY HAVE EVIDENCE OR ARGUMENT TO PRESENT TO THE BANKRUPTCY COURT CONCERNING THE MATTERS TO BE ADDRESSED AT THE CONFIRMATION HEARING.**

#### H.     Definitions.

**1.     Defined Terms.**  As used in this Disclosure Statement, terms defined in the Plan annexed hereto and not otherwise specifically defined herein will have the meanings attributed to them in the Plan.

**2.     Interpretation of Terms.**  Each definition in this Disclosure Statement and in the Plan includes both the singular and the plural.  Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

### III.   BACKGROUND INFORMATION

#### A.     Description of the Debtors.

The Corporation is an Illinois not-for-profit corporation, formed in May 2004 for the purpose of constructing, owning and operating a CCRC known as Park Place, in Elmhurst, Illinois.  The Corporation is exempt from federal income taxation under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(3) of the Internal Revenue Code.

The Foundation is an Illinois not-for-profit corporation, formed in January 2004 to support and advance Christian care and services to the elderly and infirm by supporting health related research, the development of a continuum of appropriate living arrangements, and programs and services to support a quality of life for those who suffer from disabilities and age-related illnesses and infirmities.  The Foundation is exempt from federal income taxation under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(3) of the Internal Revenue Code.

The Corporation is a controlled affiliate of Rest Haven Illiana Christian Convalescent Home d/b/a Providence Life Services ("***Providence***").  Providence has no payment obligations under the 2010 Bonds.

Park Place is situated on approximately 12.6 acres in Elmhurst, Illinois. Park Place is licensed under Illinois Assisted Living and Shared Housing Act, Illinois Life Care Facilities Act, and by the Illinois Department of Public Health. Generally, CCRCs provide senior citizens with a full range of affordable living accommodations and healthcare services during their retirement years, from independent living to skilled nursing care.  As such, CCRCs allow seniors to live in the same location as their healthcare needs change over time.  In addition, CCRCs provide residents with various social and entertainment outlets for all stages of retirement life.  Park Place offers approximately 181 units of varying sizes for independent living, 46 assisted living suites, 20 memory support assisted living units, and 37 nursing beds in its health center (the "***Health Center***") to provide short-term rehabilitation and long term care to its residents and to individuals living in the community.  The Health Center is certified for Medicare by the United States Department of Health and Human Services' Centers for Medicare & Medicaid Services, and is also licensed by the Illinois State Department of Health.

B.    **Capital Structure of the Debtors.**

To finance Park Place's construction and development, the Illinois Finance Authority (the "***Issuer***") issued its: (i) $109,115,000 Revenue Bonds (Park Place of Elmhurst Project) Series 2010A (the "***Series 2010A Bonds***"), (ii) $7,875,000 Revenue Bonds (Park Place of Elmhurst Project) Series 2010B (the "***Series 2010B Bonds***"), (iii) $5,000,000 Revenue Bonds (Park Place of Elmhurst Project)(Accelerated Redemption Reset Option Securities (ARROS) Series 2010C (the "***Series 2010C Bonds***"), (iv) $10,275,000 Revenue Bonds (Park Place of Elmhurst Project)(Tax-Exempt Mandatory Paydown Securities (TEMPS-75)), Series 2010D-1 (the "***Series 2010D-1 Bonds***") (v) $15,350,000 Revenue Bonds (Park Place of Elmhurst Project)(Tax-Exempt Mandatory Paydown Securities (TEMPS-65)), Series 2010D-2 (the "***Series 2010D-2 Bonds***" and, collectively with the Series 2010D-1 Bonds, the "***Series 2010D Bonds***"); (vi) $15,275,000 Revenue Bonds, Series 2010D-3 (the "***Series 2010D-3 Bonds***"), and (vii) $12,650,000 Revenue Bond (Taxable Revenue), Series 2010E (the "***Series 2010E Bonds***" and together with the Series 2010A Bonds, Series 2010B Bonds, Series 2010C Bonds, Series 2010D-1 Bonds, and Series 2010D-2 Bonds the "***2010 Bonds***"). UMB Bank, N.A. currently serves as successor trustee (the "***2010 Bond Trustee***") under a certain Bond Trust Indenture, dated as of May 1, 2010 ("***2010 Bond Indenture***"), by and between the old bond trustee (Wells Fargo Bank, N.A.) and the Issuer, pursuant to which the 2010 Bonds were issued.

Pursuant to a Loan Agreement dated as of May 1, 2010 (the "***Loan Agreement***"), between the Issuer and the Debtors, the Issuer loaned the proceeds of the 2010 Bonds to the Debtors. The rights of the Issuer under the Loan Agreement were assigned to the 2010 Bond Trustee under the 2010 Bond Indenture.

The Debtors used the proceeds of the 2010 Bonds primarily to: (i) pay or reimburse the Debtors for the payment of all or a portion of the costs of acquiring, constructing, renovating, remodeling and equipping certain heath facilities owned by the Debtors, and all necessary and attendant facilities, equipment, site work, zoning, entitlements and utilities related thereto, including, but not limited to, the acquisition, construction and equipping of Park Place; (ii) provide working capital; (iii) fund debt service reserve funds; (iv) pay a portion of the interest on the 2010 Bonds; and (v) pay certain expenses incurred in connection with the issuance of the 2010 Bonds.

As security for the obligations owing on the 2010 Bonds, the Debtors granted the Bond Trustee: (i) a first mortgage lien on the real property on which Park Place was constructed, and (ii) a first priority security interest in the personal property and fixtures located in Park Place (collectively, the "***Mortgaged Property***"), pursuant to a Mortgage and Security Agreement, dated as of May 1, 2010 (the "***Mortgage***"), between the Debtors and the Master Trustee. Pursuant to a Master Trustee Indenture, dated as of May 1, 2010, among the Debtors and the Bond Trustee, as Master Trustee thereunder (the "***2010 Master Trust Indenture***" and, collectively with the 2010 Bond Indenture, the "***Bond Indentures***"), the Debtors granted a security interest in its gross revenues as security for the payment of the 2010 Bonds. The Bond Indentures, the Mortgage, the Loan Agreement and any other document or agreement delivered as security for, or in respect to, the 2010 Bonds or the Debtors' obligations under any of such documents are collectively referred to herein as the ("***Bond Documents***"). In addition, repayment of the 2010 Bonds is

secured by funds deposited in the debt service reserve fund, established under the Bond Documents.

As of the Petition Date, the outstanding principal amount owed on the Series 2010A Bonds is $109,115,000, the outstanding principal amount owed on the Series 2010B Bonds is $7,875,000, the outstanding principal amount owed on the Series 2010C Bonds is $5,000,000, the outstanding principal amount owed on the Series 2010D-1 Bonds is $10,275,000 and the outstanding principal amount owed on the Series 2010D-2 Bonds is $13,860,000.  There are no obligations due and owing under the Series 2010D-3 Bonds and Series 2010E Bonds as both series of bonds were repaid in full on November 1, 2014 and February 1, 2013, respectively.

### C.   Administration of Park Place.

**1.   Park Place Operations.**   Pursuant to the Management Services Agreement, dated October 27, 2009 (the "***Management Agreement***"), between the Debtors and Providence Management Development Inc. ("**PMDI**"), PMDI provides management and related support services to enable the Debtors to fulfill their charitable tax-exempt purposes, which include, the ownership and operation of a quality, cost effective CCRC.  Specifically, the Management Agreement calls for PMDI to provide certain administrative, management, support services, and general operational oversight of Park Place.  The Debtors are to pay PMDI monthly fees under the Management Agreement.  As part of the Plan, all accrued and unpaid management all accrued and unpaid management fees, development fees and any and all other claims of PMDI and the Sponsor shall be waived as of the Effective Date.  A new management agreement will be entered into between Providence and the Corporation that shall provide for an annual management fee of no greater than 3.25% of gross operating revenues; provided however, no more than $30,000 will be paid each month as an operating expense.

**2.   Park Place Marketing and Development.** Greystone Development Company II, LP ("GDC") and the Debtors entered into that certain Development Services Agreement dated as of January 26, 2006 (as amended, the "Development Services Agreement"), which was later assigned to Greystone Development Services XVII (collectively with GDC, "Greystone"), pursuant to which Greystone performed certain marketing and sales services during the initial fill-up of Park Place, in addition to construction, accounting, and financial advisory services.  The Development Services Agreement provides for Greystone to receive certain fees, including a base development fee, a marketing fee, and an incentive occupancy fee.  However, all fees to Greystone currently are deferred and not being paid.  As part of the Plan, Greystone has agreed to a release and termination of the Development Services Agreement, in full and final settlement and satisfaction of any claims under the Development Services Agreement, in exchange for payment from Providence of $250,000.00 on or before the effective date of the Plan.

3.      **Financial Results from 2015.** For the ten months ending October 31, 2015, the Debtors recorded revenue of approximately $12.53 million.  As of October 31, 2015, the Debtors had reported total assets of approximately $124.83 million and total liabilities of approximately $256.35 million.  The consolidated financial statements for 2015 are attached hereto as Exhibit 2.

D.      **Residents of Park Place.**

Before occupying Park Place, each resident is required to execute with the Debtors a Residency Agreement.  The Residency Agreement provides the terms and conditions for each independent living unit resident while residing at Park Place, and also outlines the resident's obligations regarding payment of Entrance Fees, the resident's rights to refund of such Entrance Fee, and other monthly charges that may be due to the Debtors during the duration of the resident's stay at Park Place (referred to herein as the "***Monthly Service Fees***").

The Debtors currently offer prospective independent living residents the choice of four residency plans, each evidenced by a different Residency Agreement.  The residency plans primarily differ with regard to the required Entrance Fee, the Monthly Service Fees, and the amount subject to refund thereunder.  Generally, the purpose of the Entrance Fee is to pay for operating expenses, certain project costs, retire debt, and generate investment income for the benefit of Park Place and its residents.  Prospective residents typically pay ten percent (10%) of the Entrance Fee upon execution of a Residency Agreement, and the remaining balance prior to occupancy.  The Entrance Fees range from $227,500 to $899,000, depending upon the Residency Agreement and unit selected.

Under the Residency Agreement, the Corporation provides Residents the life care benefit, through which residents gain priority access to medical care at substantially discounted rates, including priority access to the assisted living center, memory support center, and Health Center.

Under the Residency Agreements, prospective residents are entitled to a full refund of Entrance Fees if sought within 30 days after notice of termination of the Residency Agreement under any one of the following conditions:  (i) if the resident terminates the Residency Agreement, for any reason or no reason, by written notice that is received by Park Place within 14 days after the first calendar day following the later of: (1) the date of which the Residency Agreement was signed, (2) the date of receipt of the financial disclosure statement, or (3) the date on which the reservation deposit was paid ("***Rescission Period***"); (ii) if a resident submits a written termination of the Residency Agreement after the Rescission Period, but prior to the date of occupancy; or (iii) termination by Park Place in its sole discretion.

After occupancy, the Residency Agreement may be terminated:  (i) upon death of the resident; (ii) the resident delivering written notice of termination to Park Place, with such termination to be effective on the later of 60 days from the date of such notice was received by Park Place; or (iii) termination by Park Place if the resident meets certain conditions which are set forth in the Residency Agreement.

The terms of any refund rights are outlined in the Residency Agreements.  Under the Plan, the Debtors seek to assume all Residency Agreements and to continue fulfilling all of their obligations thereunder.

In addition to the Entrance Fee, the Debtors also charge residents a Monthly Service Fee.  For residents under a Residency Agreement, the Monthly Service Fees range from $2,503 to $5,715 per month, depending upon the Residency Agreement and unit selected.  The Debtors review Monthly Service Fees periodically and adjust them as necessary to meet Park Place's financial requirements.  The Debtors currently offer four types of Residency Agreements:

- 90% Refundable Plan: This plan offers residents a 90% refundable contract (without interest).  Residents are repaid 90% of the Entrance Fee within 30 days of the resale of their unit.[3]

- 75% Refundable Plan:  This plan offers residents a 75% refundable contract (without interest).  The Entrance Fee under the Plan is 10% lower than the Entrance Fee for the 90% Refundable Plan.

- 50% Refundable Plan: This plan offers residents a 50% refundable contract (without interest).  The Monthly Service Fees under the Plan are 20% lower than the Monthly Service Fees for the 90% Refundable Plan.

- 0% Refundable Plan: This plan offers residents Entrance Fees that are 30% lower than the Entrance Fee for the 90% Refundable Plan.  Residents under the Plan will not receive any portion of a refund of the Entrance Fee upon termination of the Residency Agreement.

In certain circumstances, and in the ordinary course of business, the Debtors provide prospective residents the option of deferring payment of up to eighty percent (80%) of their Entrance Fees for up to twelve (12) months to allow that resident to obtain the funds necessary to pay the Entrance Fees.  This optional deferral is offered in circumstances when residents have not yet sold their existing home to enable payment of the Entrance Fees.  Residents under the deferral program execute a promissory note requiring them to pay the Entrance Fees fourteen (14) days after the closing of the sale of their home, or within one (1) year after occupying Park Place, whichever is earlier. The Debtors intend to continue offering the deferral program on a case-by-case basis, and in the ordinary course of business, during the pendency of the Chapter 11 Case.  All of the incentive programs offered to residents, such as the deferral program discussed above, have been approved by the Illinois Department of Public Health ("**IDPH**") under the Life Care Facilities Act.

**All Residency Agreements shall be assumed under the Plan.**

---

[3] Prior to the completing the construction of Park Place, the Debtors offered a 100% Refundable Plan.  There are 40 residents who currently reside at Park Place who will receive the full amount of the paid Entrance Fee upon termination of the Residency Agreement.

### E.    Regulatory Agencies.

The Residency Agreements, Entrance Fees, and other aspects of Park Place's operations are subject to regulation by the IDPH under the Life Care Facilities Act.

The Life Care Facilities Act provides that no provider of life care services may enter into a life care contract with a prospective resident until IDPH has issued a permit with respect to the life care facility.  The prospective resident is afforded the right to rescind his or her lifecare contract without penalty or future obligation within fourteen days after making the initial deposit, signing the agreement, or receipt of a disclosure statement of financial condition, whichever occurs last.  In the event of such rescission, all money or property paid or transferred by such person shall be fully refunded.

## IV.   EVENTS LEADING TO BANKRUPTCY

Since opening in February 2012, the Debtors' financial health has been negatively affected by the real estate market not having rebounded from the 2008 recession so as to enable the Debtors to service their debt under the 2010 Bonds.  Specifically, following the 2008 recession, large numbers of homeowners were unable to sell their homes without a substantial loss in value.  Because individuals interested in residing in a CCRC typically sell their existing homes and use the positive equity value received from the sale to fund the required entrance fees, the extended decline in the real estate market, combined with a decline in the financial markets, left many individuals without the financial resources to pay the entrance fees for CCRCs, including Park Place.  Additionally, as a result of the economic downturn, Park Place's pricing for its Entrance Fees and Monthly Service Fees for assisted living were initially too high for the market, which also contributed to Park Place's slow fill.  As a result, Park Place had to reduce the Entrance Fees and the Monthly Service Fees for assisted living.

Because of these factors, the Debtors have been unable achieve their originally forecasted occupancy levels.  The lower occupancy rates, have, in turn, caused the Debtors to repay the Series 2010D Bonds at a slower pace than originally projected.

With the Debtors' financial situation failing to improve, and in light of the defaults and potential defaults under the Bond Indentures, in November 2014, the Debtors began negotiations with the Bond Trustee and an informal committee of bondholders currently holding approximately 74.18% of the outstanding aggregate principal amount of Series 2010 Bonds (the "***Consenting Bondholders***").  During the negotiation process, the Debtors have regularly updated their regulators.

Because of the Debtors' faltering financial position, defaults started to occur in 2015 under the Bond Indenture.  Specifically, on April 13, 2015, the 2010 Bond Trustee provided notice that Debtors breached the Cumulative Cash Operating Loss Covenant.  Then, on May 22, 2015, the 2010 Bond Trustee provided notice that the Debtors failed to maintain minimum balances under certain funds that the Debtors need to maintain under the Bond Indenture.  Finally, on June 30, 2015, the Debtors failed to make a payment under the 2010 Bond Indenture.

As a result of the Debtors' defaults, and in order to provide additional time to negotiate a long-term solution to the Debtors' financial situation, prior to the bankruptcy filing, the Debtors

entered into certain agreements with the 2010 Bond Trustee and the Issuer, pursuant to which, among other things, the 2010 Bond Trustee agreed to forbear from the exercise of remedies and permitted the Debtors to maintain certain levels of operating liquidity while servicing its obligations on the 2010 Bonds, subject to certain budget and reporting requirements. These agreements include: (i) the Forbearance Agreement, dated August 31, 2015 (the "***Forbearance Agreement***"), (ii) the First Amendment to the Loan Agreement, dated October 29, 2015, and (iii) the First Supplemental Indenture of Trust, dated October 29, 2015.

Culminating the negotiations, on January 11, 2016, the Debtors and the Consenting Holders entered into a Plan Support Agreement (the "***Plan Support Agreement***"), attached as Exhibit A to the Plan, which provides for the Consenting Holders' support of the Debtors' proposed Plan on terms consistent with the Restructuring Term Sheet (the "***Restructuring Term Sheet***"), which Restructuring Term Sheet is attached to the Plan Support Agreement and the Plan.

## V.   SUMMARY OF THE PLAN SUPPORT AGREEMENT

The following summary of the Plan Support Agreement and Restructuring Term Sheet is qualified in its entirety by the documents themselves.  To the extent of any inconsistency, the Plan Support Agreement and Restructuring Term Sheet will govern.

The Plan Support Agreement provides for implementation of the Restructuring Term Sheet through the filing of the Chapter 11 Case and the Plan.  Through the Plan Support Agreement, the Debtors have secured support of the Consenting Bondholders for the Plan, which should enable the Debtors to proceed quickly to confirmation of the Plan and an exit from bankruptcy.  The Plan Support Agreement contains certain obligations of the Debtors and the Consenting Bondholders, which, if not fulfilled, would cause termination of the Plan Support Agreement.  Among the Debtors' obligations are certain milestone the Debtors must meet, including filing of the Bankruptcy Case by January 18, 2016, obtaining confirmation of the Plan by March 22, 2016, and the Effective Date for Plan occurring on or before April 2, 2016.

### A.   Key Terms to the Restructuring.

The Restructuring Term Sheet provides that the Issuer will issue new Series 2016 Bonds under a new Bond Trust Indenture between the Issuer and the 2016 Bond Trustee (the "***2016 Indenture***").  On the Effective Date, the holders of Series 2010A Bonds, Series 2010B Bonds, and Series 2010C Bonds (i.e., Class 2 under the Plan) will exchange the outstanding bonds for a pro rata share of Series 2016A Bonds and Series 2016C Bonds.  Specifically, Class 2 will receive the following distributions in exchange for the existing 2010 Bonds:  (i) their pro rata share of the principal amount of Series 2016A Revenue Bonds (Park Place at Elmhurst Project) (the "***Series 2016A Bonds***") in the aggregate principal amount equal to approximately 85% of the outstanding Series 2010A Bonds, Series 2010B Bonds and Series 2010C Bonds; (ii) their pro rata share of Series 2016C Bonds Excess Cash Revenue Bonds (Park Place at Elmhurst Project) (the "***Series 2016C***") in the aggregate principal amount equal to 15% of the then outstanding Series 2010A Bonds, Series 2010B Bonds, and Series 2010C Bonds; and (iii) payment in full in cash on account of their allocable share of accrued and unpaid interest on the Series 2010A

Bonds, Series 2010B Bonds and Series 2010C Bonds, through the date immediately preceding the consummation of the proposed restructuring.

On the Effective Date, the holders of the Series 2010D Bonds (i.e., Class 3 under the Plan) will exchange their the outstanding bonds for a pro rata share of: (i) the principal amount of Series 2016B Revenue Bonds (Park Place Elmhurst Project) (the "***Series 2016B Bonds***") in the aggregate principal amount equal to approximately 85% of the then outstanding Series 2010D Bonds, allocated to that respective maturity; (ii) their pro rata share of Series 2016C Bonds in the aggregate principal amount equal to 15% of the then outstanding Series 2010D Bonds; and (iii) payment in full in cash on account of its allocable share of accrued and unpaid interest on the Series 2010D Bonds through the date immediately preceding the consummation of the transaction.

### B.      Sponsor Contribution

In connection with the restructuring, Providence will deposit $5,000,000 (the "***Sponsor Contribution***") with the Trustee to be used to support the operations of the Borrower. The repayment of the Sponsor Contribution will be subordinate in security and payment to the Series 2016 Bonds and solely payable from excess cash in accordance with the Distribution Waterfall (defined below). The Sponsor loan will accrue 0% interest and mature in the same year as the Series 2016C Bonds.

### C.      Interest Rates for the 2016 Bonds and Maturity Dates.

The Series 2016A Bonds shall be issued as current paying bonds, bear interest at a rate of 6.375%, and mature in 2055. The Series 2016A Bonds will be subject to optional redemption prior to maturity commencing on the fifth year after the proposed exchange, at a price equal to: in year five, at a price of 102%, in year six, at price of 101%, and thereafter at par.

The Series 2016B Bonds (which shall be in replacement of the Series 2010D Bonds) shall be issued as current paying bonds, bear interest at a rate of 5.625%, and mature in 2020. The Series 2016B Bonds shall be subject to mandatory redemption from Entrance Fees.

The Series 2016C Bonds shall bear interest at 2%, payable semiannually, but only from Excess Cash (defined below), in accordance with the Distribution Waterfall (defined below), applied first to accrued interest, then to principal. The Series 2016C Bonds shall mature in 2055 and be subject to optional redemption prior to maturity, at the option of the Debtors, at a redemption price equal to (i) 65% of the par amount outstanding from years one through five, (ii) 75% of the par amount outstanding from years six through ten and (iii) 100% of the par amount outstanding thereafter.

The Series 2016A Bonds and Series 2016B Bonds will be secured *pari passu* by a first priority lien on all assets of the Corporation. The Series 2016C Bonds shall be secured by a lien on all assets of the Corporation subordinate to the Series 2016A Bonds and Series 2016B Bonds.

D.        **The Bond Funds and Distribution Waterfall.**

The Restructuring Term Sheet contemplates the Debtors establishing and maintaining certain funds in connection with the 2016 Bonds, including an entrance fee fund (the "***Entrance Fee Fund***"), a revenue fund (the "***Revenue Fund***"), an operating reserve fund (the "***Operating Reserve Fund***"), and a capital expenditures fund (the "***Capital Expenditures Fund***").   The purpose of these funds is to ensure sufficient operational liquidity and capital reserves for the Debtors and to allow the Debtors to service the 2016 Bonds.  The Restructuring Term Sheet sets forth a distribution scheme for these funds on a go-forward basis.

In particular, pursuant to documents underlying the Series 2016 Bonds (the "***2016 Bond Documents***"), the Debtors will agree to deposit all gross revenues with the 2016 Bond Trustee for deposit in the Revenue Fund as established under the 2016 Bond Documents.   The restructuring proposes that the Debtors will deposit all Entrance Fees in the Entrance Fee Fund until the Series 2016B Bonds are paid in full.  Entrance Fees on deposit in the Entrance Fee Fund shall be applied on a monthly basis as follows: (i) to pay any refunds; (ii) to replenish the balance of the Operating Reserve Fund and the operating account to combined total of 150 days cash on hand; (iii) to redeem Series 2016B Bonds in authorized denominations; and (iv) after payment in full of the Series 2016B Bonds, any remaining Entrance Fee amounts will be transferred to the Revenue Fund and be available to flow the Distribution Waterfall as described below.

Distributions from the Revenue Fund shall occur as follows on a monthly basis (the "***Distribution Waterfall***"): (i) to transfer to the Debtors' Operating Account the amount certified by the Debtors as necessary to pay anticipated operating expenses for the upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month); (ii) to the Capital Expenditure Fund, in an amount equal to $1/12^{th}$ of such Fiscal Year's capital budget; (iii) to the Series 2016A Bonds subaccount and the Series 2016B Bonds subaccount of the Bond Fund, in an amount equal to $1/6^{th}$ of the interest due on the next interest payment date; (iv) to the Series 2016A Bonds subaccount and the Series 2016B Bonds subaccount of the Bond Fund, in an amount equal to $1/12^{th}$ of the principal due on the next principal payment date; (v) to replenish any deficiency as of the Effective Date of the Plan as necessary to make the amount therein equal the debt service reserve fund requirement, as established under the 2016 Bond Documents; (vi) to replenish the balance of the Operating Reserve Fund and the Operating Account to a combined total of 150 Days cash on hand; and (vii), any remaining amounts thereafter such remaining amounts referred to as "***Excess Cash***") shall be transferred as follows until the combined balance of the Operating Reserve Fund and Operating Account is 200 days cash on hand: (a) 50% to the Series 2016C Bonds subaccount of the Bond Fund to pay accrued interest and then to redeem Series 2016C Bonds; and (b) 50% to the Operating Reserve Fund.  After the Debtors have 200 days cash on hand, the Excess Cash shall be distributed as follows:  (a) 25% to the Sponsor to repay the Sponsor Note; and (b) 75% to the Series 2016C Bonds subaccount of the Bond Fund to pay interest and/or redeem Series 2016C Bonds.

The proposed restructuring also contemplates a number of amendments to various operating and financial covenants to reflect the current operating projections of the Debtors and Park Place, which shall become effective upon consummation of the restructuring.  Other than the balance sheet restructuring, the Plan provides for the treatment of all creditors and other parties (including residents) in the ordinary course of business.  The Debtors will continue to

operate their business during chapter 11 and intend to seek a Bankruptcy Court order authorizing it to pay their ordinary course creditors in full and on time during the pendency of the case.

## VI.   APPROVAL FOR THE 2016 BONDS

The bonds are issued by the Illinois Finance Authority ("**IFA**") and then will be loaned to the Debtors under a loan agreement.   The IFA generally requires two meetings to approve a bond issuance.   The IFA usually reviews the bond issuance application during the first meeting and approves the final resolution during the second meeting.   These meetings are currently planned for February and March, 2016.

## VII.  THE CHAPTER 11 CASE

As required under the Plan Support Agreement, on January 11, 2015, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.   The purpose of the Chapter11 Case is to effectuate the Restructuring Term Sheet.   As of the Petition Date, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors will be stayed under section 362 of the Bankruptcy Code.   The Debtors will continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors do not expect the Chapter 11 Case to be protracted.   To expedite their emergence from chapter 11, the Debtors on the Petition Date, in addition to filing this Disclosure Statement and the Plan, filed motions seeking the relief detailed below, among other relief, from the Bankruptcy Court.   Such relief is intended to facilitate the seamless transition to Chapter 11, and administration of the Chapter 11 Case.   There can be no assurance, however, that the Bankruptcy Court will grant the relief sought.

### A.   Motions to Be Filed.

The Debtors have filed certain motions with the Bankruptcy Court, which are designed to minimize disruptions of business operations and to facilitate their reorganization.   These include, but are not limited to, those described below.

### 1.   Motion for Entry of an Order Authorizing the Debtors to Assume Plan Support Agreement.

The Debtors and the Consenting Bondholders have entered into a Plan Support Agreement, dated January 11, 2016.   The Debtors are seeking approval from the Bankruptcy Court to assume the Plan Support Agreement and perform thereunder.

2.      **Motion for Entry of an Order (I) Approving the Disclosure Statement; (II) Establishing Plan Solicitation, Voting, and Tabulation Procedures; (III) Scheduling a Hearing and Establishing Notice and Objection Procedures for Confirmation of the Debtors' Chapter 11 Plan; and (IV) Granting Related Relief.**

The Debtors have requested that the Bankruptcy Court enter an order: (i) approving the Disclosure Statement, (ii) approving the Plan solicitation, voting, and tabulation procedures; establishing and approving solicitation procedures, including, without limitation, fixing a voting record date, setting a deadline for filing motions to estimate claims for voting purposes, and approving the form of ballots; (c) scheduling a hearing and establishing notice and objection procedures for confirmation of the Plan; and (d) granting related relief.

3.      **Motion for Authority to Use of Cash Collateral.**

The Debtors and the Consenting Bondholders have agreed to the use of cash based on certain conditions.  The Debtors are seeking approval from the Bankruptcy Court for the agreed use of cash collateral from the Bankruptcy Court.

4.      **Motion to Escrow Residents' Entrance Fees.**

As described in more detail above, when new residents move into Park Place, they pay an Entrance Fee, which is usually made in two installments: (a) a 10% deposit when a prospective resident signs a reservation agreement; and (b) the balance of the Entrance Fee when the resident moves in.  The Debtors are seeking approval from the Bankruptcy Court to continue to hold all Entrance Fees received from new residents in escrow and refund any Entrance Fees that are due and owing to residents when such refund is due pursuant to the applicable Residency Agreement. The Debtors are also requesting that the Bankruptcy Court approve certain confidentiality procedures to protect the resident's personal information.

5.      **Motion to Pay Unsecured Creditors in the Ordinary Course of Business.**

The Debtors believe that maintenance of a good relationship with their vendors and other creditors is necessary to the viability of the business during and after the Chapter 11 Case. Notwithstanding provisions of the Bankruptcy Code that would otherwise require the Debtors to defer payment of General Unsecured Claims until the Effective Date, the Debtors are seeking authority from the Bankruptcy Court to pay General Unsecured Claims in the ordinary course of its business.  The relief sought in this motion is critical to ensure the uninterrupted flow of goods and services to the Debtors.  The Debtors believe that this relief is particularly appropriate since: (a) all such Claims are proposed to be paid in full under the Plan and (b) the Consenting Bondholders support such payments.

6.      **Motions for Authority to Pay Prepetition Employee Wages and Salaries and Associated Benefits.**

The Debtors believe that they have a valuable asset in their work force, and that any delay in paying prepetition compensation or benefits to its employees would significantly

jeopardize the Debtors' relationships with employees and irreparably harm morale at a time when the need for the continued dedication, confidence, and cooperation of the Debtors' employees is most critical.  Accordingly, the Debtors will seek authority to pay compensation and benefits which were accrued but unpaid as of the Petition Date.  In addition, the Debtors extended certain benefits and programs to employees.  The Debtors are seeking approval from the Bankruptcy Court to continue to provide such benefits and maintain such programs during the Chapter 11 Case in the ordinary course of business.

7.      **Motion for Authority to Pay Prepetition Sales, Use, and Other Taxes.**

The Debtors pay taxes to various taxing authorities in the ordinary course of business.  As of the Petition Date, the Debtors believe that certain taxes relating to the prepetition period will remain unpaid.  In some case, the Debtors will have collected certain "trust fund" taxes for the benefit of taxing authorities, which taxes do not properly constitute property of the Debtors' estate.  In other cases, the Debtors expect to pay such taxes in full pursuant to the Plan.  Accordingly, the Debtors are seeking approval from the Bankruptcy Court to pay all such taxes in the ordinary course of business.

8.      **Motion to Continue Using Existing Cash Management Systems.**

Because the Debtors expect the Plan to be confirmed in approximately 80 days, and because of the administrative hardship that any operating changes would impose on the Debtors, the Debtors are seeking approval from the Bankruptcy Court to continue using their existing cash management system, bank accounts and business forms and to follow their internal investment and deposit guidelines.  Absent the Bankruptcy Court's authorization of the continued use of the cash management system, the Debtors' cash flow would be impeded to the detriment of the Debtors' estates and their creditors.  Continued use of their existing cash management system will facilitate the Debtors' smooth and orderly transition into chapter 11, minimize the disruption of their business while in chapter 11 and expedite its emergence from chapter 11.

9.      **Motion to Prohibit Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices and Establishing Procedures for Determining Requests for Additional Adequate Assurance.**

The Debtors recognize that uninterrupted utility services are critical to the Debtors' ability to sustain their operations during the pendency of their Chapter 11 Case.  In the normal conduct of its business, the Debtors use water, electric, telecommunications (including wireless), and other services provided by utility companies.  The uninterrupted use of these utilities is critical to the operations of the Debtors and the health of their residents.  Accordingly, the Debtors are seeking approval from the Bankruptcy Court to prohibit utilities from altering, refusing, or discontinuing their services and to establish procedures for determining utilities' requests for adequate assurance.

10.     **Applications for Retention of Professionals.**

The Debtors have filed an application seeking approval of the retention of McDonald Hopkins LLC ("McDonald Hopkins") as restructuring counsel for the Debtors to represent them

and assist them in connection with the Chapter 11 Case. The Debtors also have filed an application seeking approval of the retention of North Shores Consulting Inc., as their financial advisor.

### 11.     Motion to Motion for Determination that Appointment of Patient Care Ombudsman is Unnecessary.

Pursuant to section 333(a) of the Bankruptcy Code, the Debtors are seeking entry of an order allowing the Debtors to self-report information relating to the state of resident care to this Court, the Office of the United States Trustee for the Northern District of Illinois, the Illinois State Department of Health, and any residents or family members thereof who specifically request a copy of such information. The appointment of patient care ombudsman is unnecessary, especially in light of the expected short duration of the Chapter 11 Case.

### 12.     Motion to Continue to Pay Insurance Obligations

The Debtors are seeking to continue their prepetition insurance obligations by third party insurance carriers. It is critical that the Debtors be authorized to maintain the prepetition Insurance Policies on an ongoing basis. Failure to maintain the Insurance Policies could result in Insurance Carriers canceling the Insurance Policies, which would leave the Debtors exposed to substantial liability.

### 13.     Motion to Extend the Deadline to File Schedules and Statements

The Debtors are seeking an extension of time to file their schedules and statements by an additional fourteen days, for a total of twenty-eight days from the Petition Date. This is necessary because of the prepetition negotiations, the preparation of the Plan, and the short expected timeframe of this case, the Debtors' management requires additional time to prepare its Schedules and Statements. Collecting the Debtors' information from voluminous records accumulated over the course of years will require substantial time and effort

### B.     Timetable for Chapter 11 Case.

Assuming that the Bankruptcy Court approves the Debtors' scheduling motion with respect to the hearing on the Disclosure Statement and Confirmation of the Plan, the Debtors anticipate that the Confirmation of the Plan would occur within approximately 80 days of the Petition Date. There can be no assurance, however, that the Bankruptcy Court's orders to be entered on the Petition Date will permit the Chapter 11 Case to proceed as expeditiously as anticipated.

## VIII. PLAN OF REORGANIZATION

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A</u>.**

A. **Classification of Treatment of Claims Under the Plan.**

The Claims against the Debtors are divided into Classes according to their seniority and other criteria. The Classes of Claims against the Debtors and the funds and other property to be distributed under the Plan are described more fully below.

**THE DEBTORS BELIEVE THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTORS' ASSETS.**

B. **Treatment of Administrative Claims, Priority Tax Claims, and U.S. Trustee Fees.**

1. **Administrative Claims.** In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims have not been classified and are treated as described herein. Except as otherwise provided in the Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different treatment than provided under the Plan, or by order of the Bankruptcy Court, a Person holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim that has come due for payment under any applicable order or law, as soon as practicable after the later of: (i) the fifth (5th) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Debtors; (ii) the date on which such Person becomes the holder of such an Allowed Administrative Claim; or (iii) the date or dates when that Allowed Administrative Claim is payable by its terms, consistent with past practice and in accordance with past terms.

2. **Professional Compensation.** Professionals or other Persons asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the Debtors, the Reorganized Debtors, the 2010 Bond Trustee, and such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of such Claim for Accrued Professional Compensation no later than 30 days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtors, the Office of the U.S. Trustee, the 2010 Bond Trustee, and the requesting party no later than 25 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for final allowance of such Claim for Accrued Professional Compensation was served.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and section 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

3.     **Priority Tax Claims.**   In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims have not been classified and are treated as described in Section 2 of the Plan.  Unless otherwise agreed by the holder of an Allowed Priority Tax Claim, any Person holding an Allowed Priority Tax Claim will receive, as determined by the Reorganized Debtors in their sole discretion and in full satisfaction of such Claim, payment in Cash in full on the later of (i) the Effective Date, or as soon as reasonably practicable thereafter as determined by the Debtors, or (ii) the date such Claim becomes an Allowed Claim.

4.     **U.S. Trustee Fees.**  All U.S. Trustee Fees will be paid in full by the Reorganized Debtors as they become due and owing.

C.     **Classification and Treatment of Claims and Interests**

1.     **Classification and Specification of Treatment of Claims.**  All Claims, except those described in Section 2 herein, are placed in the following impaired or unimpaired Classes of Claims pursuant to sections 1123(a)(1), 1123(a)(2), and 1123(a)(3) of the Bankruptcy Code, which sections require the Plan to designate such Classes and to specify their impaired or unimpaired status.  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of the Class and is classified in a different Class to the extent that the Claim qualifies within the description of that different Class.  A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released, withdrawn, waived, or otherwise satisfied under the Plan.  Unless the Plan expressly provides otherwise, when a Class includes a subclass, each subclass is a separate Class for all purposes under the Bankruptcy Code, including, without limitation, voting and distribution.

Subject to all other applicable provisions of the Plan (including its distribution provisions), classified Claims shall receive the treatment set forth below.  The Plan will not provide any distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, through payment by a third party.  Except as specifically provided in the Plan, the Plan will not provide any distributions on account of a Claim for which the obligation to pay has been assumed by a third party.

2.     **Classes of Claims and Interests.**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Series 2010A/B/C Bond Claims | Impaired | Entitled to Vote |
| 3 | Series 2010D Bond Claims | Impaired | Entitled to Vote |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept |

| 6 | Interests in Debtors | Unimpaired | Deemed to Accept |

**3.**     **Class 1 — Other Priority Claims.** This Class is unimpaired and consists of all Allowed Other Priority Claims, if any such Claims still exist as of the Effective Date. Each Allowed Other Priority Claim shall be in a separate subclass. Except to the extent that the holder of an Allowed Other Priority Claim agrees to less favorable treatment, each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim: (i) deferred Cash payments of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim, or (ii) payment in Cash in full on the later of: (a) the fifth (5th) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Debtors; and (b) the fifth (5th) Business Day after the date on which such Other Priority Claim becomes an Allowed Claim.

**4.**     **Class 2 — Series 2010A/B/C Bond Claims.** This Class is impaired and consists of all Series 2010A/B/C Bond Claims and includes all Claims of the holders of (i) the Series 2010A Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $109,115,000, plus accrued and unpaid interest as of the Petition Date in the amount of $1,531,614.21, plus accrued and unpaid interest from the Petition Date through and including the Effective Date in the approximate amount of $1,828,055.66; (ii) the Series 2010B Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $7,875,000, plus accrued and unpaid interest as of the Petition Date in the amount of $105,109.38, plus accrued and unpaid interest from the Petition Date through and including the Effective Date in the amount of $125,453.13; and (iii) the Series 2010C Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $5,000,000, plus accrued and unpaid interest as of the Petition Date in the amount of $64,583.33, plus accrued and unpaid interest from the Petition Date through and including the Effective Date in the amount of $77,083.33. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Series 2010A/B/C Bond Claim:

- Each holder of an outstanding Series 2010A Bond, outstanding Series 2010B Bond, or outstanding Series 2010C Bond shall exchange the then outstanding Series 2010A Bond, Series 2010B Bond, or Series 2010C Bond for (i) its *pro rata* share of Series 2016A Bonds in the aggregate principal amount of $103,691,500; and (ii) its *pro rata* share (together with holders of the Series 2010D Bonds) of certain of the Series 2016C Bonds in the aggregate principal amount of $21,918,750.

- Each holder of an outstanding Series 2010A Bond, outstanding Series 2010B Bond, or outstanding Series 2010C Bond shall also receive payment in full in Cash on account of its allocable share of accrued and unpaid interest on the Series 2010A Bonds, Series 2010B Bonds, or Series 2010C Bonds as applicable, through the date immediately preceding the Effective Date, which payment shall be made as of the Distribution Date.

5.     **Class 3 — Series 2010D Bond Claims.**  This Class is impaired and consists of all Series 2010D Bond Claims and includes all Claims of the holders of the Series 2010D Bonds, which shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $24,135,000, plus accrued and unpaid interest as of the Petition Date in the amount of $295,384.79, plus accrued and unpaid interest from the Petition Date through and including the Effective Date in the amount of $352,556.04.  Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Series 2010D Bond Claim:

- Each holder of an outstanding Series 2010D Bond shall exchange the then outstanding Series 2010D Bond for:  (i) its *pro rata* share of certain Series 2016B Bonds in the aggregate principal amount of $20,514,750; and (ii) its *pro rata* share (together with holders of the Series 2010A Bonds, Series 2010B Bonds and Series 2010C Bonds) of certain of the Series 2016C Bonds in the aggregate principal amount of $21,918,750.

- Each holder of an outstanding Series 2010D Bond shall also receive payment in full in Cash on account of its allocable share of accrued and unpaid interest on the Series 2010D Bonds through the date immediately preceding the Effective Date, which payment shall be made as of the Distribution Date.

6.     **Class 4 — Other Secured Claims.**  This Class is unimpaired and consists of all Other Secured Claims.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, on the later of the Effective Date and the date such Other Secured Claim becomes Allowed, or as soon as practicable thereafter, each holder of an Allowed Other Secured Claim shall have its Other Secured Claim reinstated and the legal, equitable, and contractual rights to which the holder of such Claim is entitled shall otherwise be unaltered in accordance with section 1124 of the Bankruptcy Code.

7.      **Class 5 —General Unsecured Claims.**   This Class is unimpaired and consists of all General Unsecured Claims.   Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive payment in full in Cash of the unpaid portion of such Allowed General Unsecured Claim on the latest of:  (i) the fifth (5th) Business Day after the Effective Date or as soon as practicable thereafter as determined by the Debtors, (ii) the fifth (5th) Business Day after the date on which such General Unsecured Claim becomes an Allowed Claim, (iii) the date such Allowed General Unsecured Claim becomes due and payable in the ordinary course of business, or (iv) as otherwise agreed to by the Debtors and the holder of such General Unsecured Claim, and the Plan shall otherwise leave unaltered the legal, equitable, and contractual rights to which the holder of such General Unsecured Claim is entitled; *provided, however,* that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business.   The Debtors reserve their right, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

8.      **Class 6 — Interests in Debtors.**   This Class is unimpaired and consists of all Interests in the Debtors.   On the Effective Date, the Sponsor, the sole member of the Corporation, will retain all membership interests in the Corporation.   The Foundation has no members.

D.      **Acceptance or Rejection of the Plan.**

1.      **Acceptance by an Impaired Class.**   In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

2.      **Presumed Acceptance of the Plan.**   Classes 1, 4, 5, and 6 are not impaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.      **Voting Class.**   Classes 2 and 3 are impaired under the Plan and are entitled to vote to accept or reject the Plan.

E.      **Means for Implementation of the Plan.**

1.      **Sources of Consideration.**   Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the cash derived from the Reorganized Debtors' business operations, those certain funds established pursuant to the Restructuring Term Sheet and 2016 Bond Documents, and the Sponsor Contribution.   A schedule of the source and uses of cash is attached as **Exhibit B** to the Plan.

2.      **Cancellation of 2010 Bonds.**   Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the 2010 Bonds shall be cancelled, and the 2010

Bonds and related 2010 Bond Documents shall continue in effect solely to the extent they relate to and are necessary to:  (i) allow for the applicable distributions pursuant to the Plan, (ii) permit the 2010 Bond Trustee and the Authority to be compensated for fees and reimbursed for expenses including expenses of its professionals, assert its charging lien, enforce its indemnity and other rights and protections with respect to and pursuant to the 2010 Bond Documents, (iii) permit the 2010 Bond Trustee to set one or more record dates and distributions dates with respect to the distribution of funds to beneficial holders of the 2010 Bonds, as applicable, (iv) permit the 2010 Bond Trustee to appear in the Chapter 11 Case, and (v) permit the 2010 Bond Trustee and the Authority to perform any functions that are necessary in connection with the foregoing clauses (i) through (iv).

      **3.**    **Issuance of 2016 Bonds.**  On the Effective Date, the Authority will issue the 2016 Bonds in accordance with the terms of the Plan and pursuant to the 2016 Indenture.

    a.    Series 2016A Bonds.  The Series 2016A Bonds shall be issued as current paying bonds with an aggregate principal amount of $103,691,500.  The Series 2016A Bonds shall bear interest at the rate of 6.375% per annum and have maturities in the years and in principal amounts as set forth in Schedule 1 to the Restructuring Term Sheet.  The Series 2016A Bonds shall further be subject to mandatory redemption/amortization as set forth in the Restructuring Term Sheet.  Interest on the Series 2016A Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Schedule 2 to the Restructuring Term Sheet.  The Series 2016A Bonds will be subject to optional redemption prior to maturity commencing on the fifth (5th) year after the Effective Date, at a price equal to: in year 5, at a price of 102%; in year 6, at a price of 101%; and thereafter at par.

    b.    Series 2016B Bonds.  The Series 2016B Bonds shall be issued as current paying bonds with an aggregate principal amount of $20,514,750.  The Series 2016B Bonds shall bear interest at 5.625%, payable semiannually, and shall mature on May 15, 2020.  The Series 2016B Bonds shall be subject to mandatory optional redemption from Entrance Fees as set forth in the 2016 Indenture.

    c.    Series 2016C Bonds.  The Series 2016C Bonds shall be issued in the aggregate principal amount of $21,918,750 and shall bear interest at an annual rate of 2.0% per annum.  Interest and principal on the Series 2016C Bonds shall be payable semiannually, but only to the extent of Excess Cash, in accordance with the Distribution Waterfall, applied first to accrued interest, then to principal.  The Series 2016C Bonds shall mature on May 15, 2055 and any balance outstanding on the Series 2016C Bonds at final maturity shall be due and payable in full.  To the extent available Excess Cash is insufficient to pay interest on the Series 2016C Bonds on

any scheduled Interest Payment Date, the amount of such unpaid interest shall accrete and be added to the principal amount of the Series 2016C Bonds on the applicable Interest Payment Date and therefore shall bear interest at the interest rate due on the Series 2016C Bonds.   The Series 2016C Bonds shall be subject to redemption as follows:

| Years | Redemption Price as a Percentage of Principal |
|---|---|
| 1-5 | 65% |
| 6-10 | 75% |
| 11 to maturity | 100% |

d.     Sponsor Note.  On the Effective Date, the Sponsor will deposit the Sponsor Contribution into the Operating Reserve Fund with the proceeds to be used in accordance with the Restructuring Term Sheet.  The Sponsor will receive the Sponsor Note in the amount of the Sponsor Contribution, which shall be subordinate in security and payment to the Series 2016 Bonds and payable from Excess Cash in accordance with the Distribution Waterfall.  The Sponsor Loan will be repaid solely from Excess Cash and will have a final and bullet maturity in the same year as of the Series 2016C Bonds.  The Sponsor Loan will be non-interest bearing.

e.     Priority of 2016 Bonds and the Sponsor Note.  The Series 2016A Bonds and the Series 2016B Bonds will be *pari passu,* secured by a first priority Lien on all assets of the Reorganized Debtors and will be senior to the Series 2016C and the Sponsor Note in repayment.  The Series 2016C Bonds will be secured by a Lien on all assets of Reorganized Debtors and be subordinated to the lien securing the Series 2016A Bonds and the Series 2016B Bonds.  The Sponsor Note will be secured by a lien on all assets of Reorganized Debtors, subordinate to the 2016 Bonds, and any parity bonds issued under the 2016 Indenture.

f.     2016 Bond Documents.  In connection with the foregoing matters described in Section 4.3.6 of the Plan, on the Effective Date, the Authority, the Debtors, and the 2016 Bond Trustee, as applicable, will enter into the 2016 Bond Documents, including the 2016 Indenture, the 2016 Master Indenture, and the 2016 Mortgage.  The 2010 Bond Trustee shall transfer substantially all funds and accounts created or maintained under or pursuant to the 2010 Indenture in accordance with the 2016 Bond Documents and the Plan.

g.     <u>Effective Date Transactions</u>.  Upon the Effective Date, the Debtors shall establish and/or maintain the accounts and funds described in the 2016 Bond Documents and the Restructuring Term Sheet. Upon the Effective Date, all Entrance Fees, including any Entrance Fees received and escrowed by the Debtor after the Petition Date pursuant to the Entrance Fee Escrow Agreement, shall be deposited with the 2016 Master Trustee in the Entrance Fee Fund. The deposits in the Entrance Fee Fund, together with the balances of the Debtors' operating accounts and the Operating Reserve Fund, as of the Effective Date, the revenues and other income of the Debtors available on the Effective Date, and the Sponsor Contribution shall be applied in the following order of priority to the extent of available funds: (i) to pay any Refunds due and owing; (ii) to pay the professional fees and expenses incurred in connection with the transactions contemplated under the Plan (including, without limitation, any costs associated with obtaining opinions from bond counsel) subject to the Budget; (iii) to fund the Debt Service Reserve Fund up to any shortfall, if any, to the initial Debt Service Reserve Fund requirement; (iv) to fund the Operating Account in an amount equal to approximately 45 Days Cash on Hand; and (v) to fund the Operating Reserve Fund in an amount equal to 105 Days Cash on Hand.

h.     <u>Additional Terms of 2016 Bonds</u>.  Additional terms and conditions with respect to the 2016 Bonds are set forth in the Restructuring Term Sheet and in the 2016 Bond Documents.  To the extent of any inconsistencies between the Restructuring Term Sheet and the 2016 Bond Documents, the 2016 Bond Documents shall govern the respective rights and obligations of the parties.

4.    **Section 1145 Exemption.**   Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the 2016 Bonds shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act of 1933 (as now in effect or hereafter amended) and any other applicable state or federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities.   Any person who solicits or participates in the offer, issuance, sale, or purchase of the 2016 Bonds issued under, or in accordance with, the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, is not liable, on account of such solicitation or participation, for violation of an applicable law, rule, or regulation governing solicitation of acceptance or rejection of the Plan or the offer, issuance, sale, or purchase of securities pursuant thereto.

5.    **Sponsor and PMDI Agreements.**   On or before the Effective Date, the Management Agreement will be terminated and PMDI will waive all accrued and unpaid management fees through the Effective Date.   On the Effective Date, the Sponsor shall enter into a new management agreement with the Reorganized Debtors, which shall be included in the Plan Supplement that shall provide for an annual management fee in an amount no greater than the Base Management Fee.   On or before the Effective Date, the Development Services Agreement and the Liquidity Support Agreement will be terminated and the Sponsor will waive all fees, expenses, and other amounts owed to the Sponsor by the Corporation under such agreements.

6.    **Greystone Agreement.**   Pursuant to that certain Termination Agreement and General Release, entered into by and between the Corporation, Greystone, and the Sponsor, on the Effective Date, the Greystone Agreement will be terminated and, in exchange for a settlement payment, Greystone will waive and release any and all claims, liabilities, or other amounts, including any outstanding fees and expenses, currently or in the future owed under the Greystone Agreement.

7.    **Assumption of Residency Agreements.**   On the Effective Date, the Reorganized Debtors shall assume all of the Residency Agreements in their entirety.

8.    **Reorganized Debtors' Board of Directors.**   The existing members of the Boards of Directors of the Debtors shall continue to be members of the Boards of Directors of the Reorganized Debtors.   The Boards of Directors of the Debtors consists of Norm Aardema, Sharon Clousing, Cal Tameling, Howard Hoff, Tim Breems, Rich Van Hattem, and Justin Kats.

9.    **Officers of the Reorganized Debtors.**   The existing officers of the Debtors shall continue to be officers of the Reorganized Debtors.   Such officers shall serve in accordance with applicable non-bankruptcy law.   The existing officers of the Debtors include Richard C. Schutt (President and Chief Executive Officer), Ray Hemphill (Executive Vice President of Project Development), William DeYoung (Chief Financial Officer), and Barry Vander Genugten (Vice President of Finance).

10.    **Employee Benefits.**   Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtors may: (i) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings,

severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity at any time, and (ii) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; *provided, however,* that the Debtors' or the Reorganized Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing herein shall limit, diminish, or otherwise alter the Reorganized Debtors' or the Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.

**11.    Vesting of Assets in the Reorganized Debtors.**  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, or as soon as practicable thereafter, all property of the Debtors' Estate and all Causes of Action of the Debtors (except those released pursuant to the Releases by the Debtors) shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing the 2016 Bonds). On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**12.    Restructuring Transactions.**  On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Persons may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable Persons agree; (iii) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

**13.    Corporate Action.**  Upon the Effective Date, all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, and all matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors or the Reorganized Debtors, as the case may be, and any and all other agreements, documents, securities, and instruments relating to the foregoing.

14.    **Section 1146 Exemption from Certain Taxes and Fees.**    Pursuant to section 1146(a) of the Bankruptcy Code, any transfer of property and any issuance, transfer, or exchange of a security in connection with or pursuant to the Plan shall not be subject to any stamp, mortgage recording, or other similar tax, charge, or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax, charge, or governmental assessment and, as applicable, to accept for filing and recordation instruments or other documents pursuant to such transfer of property or to permit the issuance, transfer, or exchange of a security without the payment of any such tax, charge, or governmental assessment. Such exemption specifically applies, without limitation, to (i) the creation and recordation of any mortgage, deed of trust, lien, or other security interest; (ii) the making or assignment of any lease or sublease; (iii) any restructuring transaction authorized by the Plan, including, without limitation, the issuance by the Authority of the 2016 Bonds; or (iv) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

15.    **Preservation of Causes of Action of the Debtors.**    In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, the Exculpated Claims against the Exculpated Parties and the Debtor Released Claims against the Released Parties), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including those Causes of Action listed in the Plan Supplement, whether arising before or after the Petition Date, and the Reorganized Debtors' right to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Person may rely on the absence of a specific reference in the Plan Supplement, the Plan, or the Disclosure Statement to any Cause of Action against such Person as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such Person. Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Person on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or the Reorganized Debtors, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan. Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by an order of the Bankruptcy Court, the Reorganized Debtors expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the

doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan.  For the avoidance of doubt, nothing in Section 4.14 of the Plan shall affect the "Release by the Debtor" provided in Section 8.2 of the Plan.

**F.**    **Treatment of Executory Contracts and Unexpired Leases.**

**1.**    **Assumption and Rejection of Executory Contracts and Unexpired Leases.**  Except as otherwise provided in the Plan or in an order of the Bankruptcy Court, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by the Debtors; (ii) expired or terminated pursuant to its own terms before the Effective Date; (iii) is the subject of a motion to reject filed on or before the Effective Date; or (iv) is identified as an Executory Contract or Unexpired Lease to be rejected in the Plan Supplement filed on or before the Effective Date.

**Notwithstanding anything contained in the Plan to the contrary, each Residency Agreement, and all obligations arising thereunder, including the payment of Refunds and all other entrance deposits and fees, will be assumed by the Reorganized Debtors, as of the Effective Date, pursuant to the Plan.**

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revert in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may have been modified by such order.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date.  After the Effective Date, the Reorganized Debtors shall have the right to terminate, amend, or modify any contracts, leases, or other agreements without approval of the Bankruptcy Court, subject to the terms thereof.

**2.**    **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**  All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; *provided, that* any such Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by section 502(b)(6) of the Bankruptcy Code.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors,

the Reorganized Debtors, the Estate, or their property, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, action by, or order or approval of the Bankruptcy Court.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Class 5 General Unsecured Claims and shall be treated in accordance with the Plan.

**3.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**  Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Plan is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by Cure.  If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full waiver, release, and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting change in control or ownership interest composition and other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

**4.      Insurance Policies.**  Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption and assignment of each of the Insurance Policies.

**5.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.**  Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, unless such Executory Contract or Unexpired Lease has been previously assumed by the Debtors.

6. **Reservation of Rights.** Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

G. **Contracts and Leases Entered Into After the Petition Date.**

Notwithstanding any other provision in the Plan, contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

H. **Provisions Governing Distributions.**

1. **Timing and Calculation of Amounts to Be Distributed.** Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the Plan. Except as otherwise provided for in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

2. **Distributions.** Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors. With respect to the issuance of the 2016 Bonds, such bonds shall be deemed issued and exchanged as of the Effective Date without presentment by the beneficial owners. The Distribution Record Date in connection with the holders of the 2016 Bonds shall be as early as practicable so as to enable the Debtors, the Authority, and their respective agents to comply with the customary practices and procedures of the Depository Trust Company. All Cash distributions to be made to beneficial holders of the 2010 Bonds shall be made to the 2010 Bond Trustee, which shall make such distributions to the beneficial holders of the 2010 Bonds in accordance with the terms of the 2010 Indenture.

3. **Payments and Distributions on Disputed Claims.** Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the

Effective Date but that later become Allowed Claims shall be deemed to have been made on the Effective Date.

4.     **Special Rules for Distributions to Holders of Disputed Claims.**
Notwithstanding any other provision of the Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

5.     **Delivery of Distributions in General.**   Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Reorganized Debtors.   Distributions to holders of Allowed Claims will be made at the address of each such holder as set forth in the Debtors' books and records, except that, in the case of holders of the 2010 Bonds, distributions will be made by means of book-entry exchange through the facilities of the Depository Trust Company in accordance with the customary practices of the Depository Trust Company, as and to the extent practicable.   Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.   Neither the Debtors, nor the Reorganized Debtors, shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct, or fraud.

6.     **Undeliverable Distributions and Unclaimed Property.**   In the event that any distribution to any holder is returned as undeliverable, the Reorganized Debtors shall use reasonable efforts to determine the current address of such holder.   No distribution to such holder shall be made unless and until the Reorganized Debtors have determined such holder's then current address, at which time such distribution shall be made as soon as practicable; *provided, however,* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the Distribution Date.   After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat or abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property shall be discharged and forever barred.

7.     **Withholding and Reporting Requirements.**   In connection with the Plan and all instruments issued in connection therewith, the Reorganized Debtors shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

8.     **Setoffs.**   Except as otherwise provided in Section 6.9 of the Plan and subject to applicable law, the Debtors and the Reorganized Debtors as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, setoff against any Allowed Claim (which setoff shall be made against the Allowed Claim, not against any distributions to be made under the Plan with respect to such Allowed Claim), any claims, rights, and Causes of

Action of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such holder have not been otherwise released, waived, relinquished, exculpated, compromised, or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), and any distribution to which a holder is entitled under the Plan shall be made on account of the Claim, as reduced after application of the setoff described above.  In no event shall any holder of a Claim be entitled to setoff any Claim against any claim, right, or Cause of Action of the Debtors or Reorganized Debtors unless such holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtors and a holder of a Claim; *provided, that,* where there is no written agreement between the Debtors or Reorganized Debtors, as applicable, and a holder of a Claim authorizing such setoff, nothing herein shall prejudice or be deemed to have prejudiced the right of the Debtors or the Reorganized Debtors, as applicable, to assert that any holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date.  This Section shall not be applicable to the distributions to be made to or for the benefit of the beneficial holders of the 2010 Bonds.

          **9.**      **Insurance Claims.**  No distributions under the Plan shall be made on account of an Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to the Debtors' Insurance Policies.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim, then immediately upon such agreement, such Claim may be expunged without an objection to such Claim having to be filed and without any further notice to, action by, or order or approval of the Bankruptcy Court.

          **10.**      **Applicability of Insurance Policies.**  Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy.  Except as expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Person may hold against any other Person, including insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

          **11.**      **Allocation of Distributions Between Principal and Unpaid Interest.**  With the exception of distributions on account of the 2010 Bonds, which shall be treated as provided in Classes 2 and 3 herein, to the extent that any Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for U.S. federal income tax purposes, be allocated on the Debtors' books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest.

          **12.**      **Interest on Claims.**  Unless otherwise specifically provided for in the Plan (including interest payable under the 2010 Bonds), postpetition interest will not accrue or be paid on Claims, and no Claim holder will be entitled to interest accruing on or after the Petition Date on any Claim.  Similarly, unless otherwise specifically provided for in the Plan, postpetition interest will not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

I.        **Procedures for Resolving Contingent, Unliquidated, and Disputed Claims.**

1.        **Prosecution of Objections to Claims.**  The Debtors or the Reorganized Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  The Reorganized Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

2.        **Allowance of Claims.**  Except as expressly provided in  Section 7.2 of the Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), the Reorganized Debtors after the Effective Date will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date.  All Claims of any Person against the Debtors shall be disallowed unless and until such Person pays, in full, the amount it owes the Debtors.  This section shall not be applicable to the 2010 Bond Trustee or the beneficial holders of the 2010 Bonds.

3.        **Distributions After Allowance.**  As soon as practicable following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Debtors shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan, without any interest to be paid on account of such Claim.

4.        **Estimation of Claims.**  The Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Person, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

J.        **Conditions Precedent to the Effective Date.**

1.        **Conditions Precedent to the Effective Date.**  It shall be a condition precedent to the Effective Date that each of the following provisions, terms, and conditions shall have been satisfied or waived pursuant to the provisions of the Plan.

a.  The Bankruptcy Court shall have entered the Confirmation Order containing findings of fact and conclusions of law satisfactory to the Debtors and the 2010 Bond Trustee, which Confirmation Order shall not be subject to any stay and shall be a Final Order, and which Confirmation Order shall include or provide, among other things:

(i)  a finding by the Bankruptcy Court that the 2016 Bonds to be issued on the Effective Date will be authorized and exempt from registration under the applicable securities law, pursuant to section 1145 of the Bankruptcy Code;

(ii)  all provisions, terms and conditions of the Plan and related documents are approved; and

b.  all Executory Contracts or Unexpired Leases assumed by the Debtors during the Chapter 11 Case including under the Plan shall remain in full force and effect for the benefit of the Reorganized Debtors or their assignee notwithstanding any provision in such contract or lease (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables, permits, or requires termination of such contract or lease;

c.  The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

d.  The Authority shall consent to the issuance of the 2016 Bonds;

e.  The 2016 Bonds shall be issued by the Authority;

f.  In connection with issuance of the 2016 Bonds, the 2016 Bond Trustee shall have received a satisfactory opinion of bond counsel that the interest on the 2016 Bonds will be excluded from gross income for federal tax purposes;

g.  The Trigger Date (as defined in the Entrance Fee Escrow Agreement) shall have occurred;

h.  The Plan and all Plan Supplement documents, including any amendments, modifications, or supplements thereto, shall be in form and substance acceptable to the 2010 Bond Trustee;

i.  All payments and transfers to be made on the Effective Date shall be made or duly provided for, and the Debtors shall have sufficient Cash on such date to make such payments;

j.   All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained;

k.   All other actions, documents and agreements necessary to implement the Plan shall be in form and substance acceptable to the 2010 Bond Trustee and shall have been effected or executed; and

l.   The Effective Date shall be on or before April 1, 2016.

**2.   Waiver of Conditions.**  The conditions to the Effective Date set forth herein may be waived at any time by the Debtors (except for:  (i) the Confirmation Order being satisfactory to the 2010 Bond Trustee, (ii) the issuance of the 2016 Bonds, (iii) the bond counsel opinion referred to in Section 9.1(e) above, (iv) the condition that the aforementioned documents and orders be reasonably acceptable to the 2010 Bond Trustee, and (v) the Effective Date shall be on or before April 1, 2016); *provided, however,* that the Debtors may not waive entry of an order or orders approving the Disclosure Statement and confirming the Plan.

**3.   Effect of Failure of Conditions.**  If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against the Debtors; (ii) prejudice in any manner the rights of the Debtors, any holders of Claims, or any other Person; or (iii)  constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders, or any other Person in any respect.

**K.   Modification, Revocation or Withdrawal of The Plan.**

**1.   Modification and Amendments.**  Except as otherwise specifically provided in section 10.1 of the Plan, the Debtors reserve the right to modify the Plan as to material terms and seek confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Federal Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their right to alter, amend, or modify materially the Plan one or more times, after confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, *provided, however,* that, except with the prior written consent of each of the 2010 Bond Trustee and the Consenting Holders, the Debtors may not alter, amend, or modify the Plan in any manner that:  (i) alters or affects the rights or interests of the 2010 Bond Trustee or the holders of the 2010 Bonds, (ii) alters or affects the treatment of the Series 2010A/B/C Bond Claims or the Series 2010D Bond Claims under the Plan, (iii) alters or affects the terms or characteristics of the 2016 Bonds as set forth in the Plan prior to such alteration, amendment, or modification, or (iv) is inconsistent with the terms of the Plan Support Agreement.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with the Plan.  For the avoidance of doubt, nothing in this

Section shall be deemed to supplant or supersede the requirements of Federal Bankruptcy Rule 3019.

       **2.**     **Effect of Confirmation on Modifications.**  Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Federal Bankruptcy Rule 3019.

       **3.**     **Revocation or Withdrawal of the Plan.**  The Debtors reserve the right to, consistent with their fiduciary duties, revoke or withdraw the Plan before the Effective Date.  If the Debtors revoke or withdraws the Plan, or if confirmation does not occur, then: (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of any Executory Contract or Unexpired Lease effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Person; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Person.

      **L.**     **Retention of Jurisdiction.**

       Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Case and all matters arising out of or related to the Chapter 11 Case and the Plan, including jurisdiction to:

       a.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

       b.     decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

       c.     resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtors are parties or with respect to which the Debtors may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including rejection Claims, cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease, (ii) any potential contractual

obligation under any Executory Contract or Unexpired Lease that is assumed, (iii) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, any Executory Contracts or Unexpired Leases on the list of Executory Contracts and Unexpired Leases to be assumed or rejected, and (iv) any dispute regarding whether a contract or lease is or was executory or unexpired;

d.      ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

f.      adjudicate, decide, or resolve any and all matters related to any Cause of Action;

g.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

h.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

i.      resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551, and 553 of the Bankruptcy Code;

j.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation of the Plan or any Person's obligations incurred in connection with the Plan (exclusive of the obligations arising under the 2016 Bonds);

k.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

l.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

m.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

n.  adjudicate any and all disputes arising from or relating to distributions under the Plan;

o.  consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

p.  determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

q.  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan (exclusive of those documents relating to the 2016 Bonds);

r.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

s.  hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

t.  enforce all orders previously entered by the Bankruptcy Court;

u.  hear any other matter not inconsistent with the Bankruptcy Code; and

v.  enter an order concluding or closing the Chapter 11 Case.

**M.     Miscellaneous Provisions.**

1.  **Immediate Binding Effect.**  Notwithstanding Federal Bankruptcy Rules 3020(e), 6004(h), or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests are deemed to have accepted the Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, exculpation, discharges, and injunctions described in the Plan, each Person acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**2.     Additional Documents.**   On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, subject to the consent of the 2010 Bond Trustee.   The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**3.     Reservation of Rights.**   Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Plan, any statement or provision contained in the Plan, or any action taken or not taken by the Debtors or other Person with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or other Person with respect to the holders of Claims or Interests before the Effective Date.

**4.     Successors and Assigns.**   The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of such Person.

**5.     Votes Solicited in Good Faith.**   Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the 2016 Bonds offered under the Plan.

**6.     Closing of Chapter 11 Case.**   The Debtors or the Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Federal Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

## IX.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION

In order to become effective, the Plan must be approved by the Bankruptcy Court after a confirmation hearing.

### A.     Elements of Confirmation.

In order for the Plan to be confirmed, the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan complies with the technical requirements of chapter 11 of the

Bankruptcy Code.  Among other things, the Bankruptcy Code requires that: (i) the Plan be in the "best interests" of Creditors under section 1129(a)(7) of the Bankruptcy Code (that is, impaired Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code); (ii) the Plan be feasible  (that is, there is a reasonable probability that the Debtors will be able to perform its obligations under the Plan without needing further financial reorganization  not  contemplated  by  the  Plan); and (iii) the Plan be accepted by a sufficient number of Classes.

## B.      Best Interests of Creditors.

With respect to each impaired Class of Claims, confirmation of the Plan requires that each holder of a Claim either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To calculate the probable distribution to holders of each impaired Class of Claims if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code.  This "*liquidation value*" would consist primarily of the proceeds from a forced sale of the Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both a chapter 7 liquidation and the Chapter  11 Case.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the 2010 Bond Trustee; asset disposition expenses; all unpaid expenses incurred by the Debtors in their Chapter 11 Case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 case; litigation costs; and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Case.  The liquidation itself could trigger certain Tax and Other Priority Claims (collectively,  "*Priority Claims*").  Those Priority Claims would be paid in full from the liquidation proceeds before the balance would be made available to pay General Unsecured Claims.  The liquidation would also prompt the rejection of most, if not all, of the Debtors' Executory Contracts and Unexpired Leases, thereby creating a significant increase in General Unsecured Claims.

The Debtors believe that the Plan meets the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that the members of impaired Classes 2 and 3 will receive as much or more under the Plan as they would receive in a liquidation.  The liquidation analysis (the "*Liquidation Analysis*") for a potential chapter 7 liquidation scenario is attached hereto as Exhibit 3.

## C.      Feasibility of the Plan.

The Bankruptcy Code requires the Bankruptcy Court to determine that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors.  For purposes of showing that the Plan meets this feasibility requirement, the

Debtors have analyzed the ability of the Reorganized Debtors to: (i) meet their obligations under the Plan; and (ii) retain sufficient liquidity and capital resources to conduct their businesses.

The Debtors believe that it will be able to support the financial projections set forth in Exhibit 4 to this Disclosure Statement (the "***Projections***").  Holders of Claims against the Debtors are advised, however, that the Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles.

In addition to the assumptions footnoted in the Projections themselves, the Projections also assume that: (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material adverse change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Reorganized Debtors, (iii) there will be no change in United States generally accepted accounting principles that will have a material effect on the reported financial results of the Reorganized  Debtors, and (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors.  To the extent the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and considered reasonable by the Debtors when taken as a whole, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors.

Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized, and that actual results will vary from the Projections, which variations may be material and are likely to increase over time.  The Projections should therefore not be regarded as a representation by the Debtors or any other person that the results set forth in the Projections will be achieved.  In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.

The Debtors do not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions.  Whether actual results will conform to the Projections is subject to a number of risks and uncertainties, including: the Debtors' ability to improve profitability and generate positive operating cash flow; the Debtors' ability to sustain sales increases; the Debtors' ability to increase capital expenditures in the future; the Debtors' ability to implement effective pricing and promotional programs; the Debtors' ability to successfully implement effective business continuity; changes in federal, state, or local laws or  regulations; general economic conditions in the Debtors' operating region; stability of product costs; increases in labor and employee benefit costs, such as health care and pension expenses; or changes in accounting standards and taxation requirements.

D.    **Sufficient Acceptances.**

Under section 1129(a) of the Bankruptcy Code, a plan of reorganization may be confirmed only if all impaired classes of claims accept the plan.  Section 1129(b) of the Bankruptcy Code provides that a plan of reorganization may be confirmed even if such plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan and a number of other requirements have been met.   These additional requirements under section 1129(b) include (i) the requirement that the plan "not discriminate unfairly" and (ii) the requirement that the plan be "fair and equitable" with respect to each impaired class that has not accepted the plan.

Generally, a plan does not discriminate unfairly with respect to a dissenting class if the dissenting class does not receive treatment less favorable than the treatment afforded to other classes of equal rank.  The Debtors believe that the classification of Claims under the Plan does not discriminate unfairly against any Class.

In order for a plan to be "fair and equitable" with respect to a class of secured claims, the plan must provide: (i) that the holders of such claims shall retain the liens securing their claims to the extent of the allowed amount of such claims, and must further provide (ii) either (a) that each holder of a claim of such class shall receive on account of its claim deferred cash payments totaling at least the allowed amount of its claim, of a value, as of the Effective date of the plan, of at least the value of such holder's interest in the estate's interest in the property securing the holder's claim, or (b) for the realization by such holders of the "indubitable equivalent" of their claims.[4]  In order for a plan to be "fair and equitable" with respect to a class of unsecured claims, the plan must provide (i) for each holder of a claim in that class to receive or retain on account of that claim property that has a value, as of the Effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property on account of such junior claim or interest.  The Debtors believe that the Plan is fair and equitable with respect to all impaired Classes under the plan.

## X.   EFFECTS OF PLAN CONFIRMATION

A confirmed plan leaves the holders of Claims with new rights as set forth in the confirmed plan. Therefore, in the event of a default after confirmation, a holder of a Claim may pursue its remedies under the Plan. Some rights may remain with holders of Claims after the provisions of the confirmed Plan (and the applicable documents evidencing obligations issued in connection with the Plan) have been carried out.  The automatic stay imposed by section 362(a) of the Bankruptcy Code as to actions against the Debtors and the Debtors' assets remain in effect until the Effective Date.  Thereafter, all parties in interest will be enjoined from taking any action inconsistent with the Plan.

---

[4] A third alternative applies where a debtor seeks to sell property that is subject to a lien held by a member of a non-accepting class. Here, however, the Debtors do not intend to undertake any such sale of encumbered assets.

A.      **Compromise and Settlement of Claims, Interests, and Controversies.**

Pursuant to section 1123 of the Bankruptcy Code and Federal Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions  of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estate, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Federal Bankruptcy Rule 9019(a), without any further notice to, action by, or order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against it and Causes of Action against other Persons.

B.      **Releases by the Debtors.**

Pursuant to section 1123(b) of the Bankruptcy Code, and except as specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released by the Debtors, the Estate, and the Reorganized Debtors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable by behalf of the Debtors or the Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Estate, or Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively), by or on behalf of the Holder of any Claim or Interest or other entity, based on or related to, or in any manner arising from, in whole or in part, the Debtors, the 2010 Bond Documents, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the any agreement or other document formalizing the transactions contemplated by the Plan, or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence or any breach of the Plan Support Agreement by a Released Party (collectively, the "***Debtor Released Claims***").

"***Released  Parties***" means (i) the Debtors  and their  member  or  members, (ii) the Reorganized Debtors and their member or members, (iii) each member of a Consenting Holder

in any capacity, (iv) the Authority, (v) the 2010 Bond Trustee in any capacity, (vi) the 2010 Master Trustee in any capacity, (vii) 2016 Bond Trustee in any capacity, (viii) the 2016 Master Trustee in any capacity, and (ix) the current and former affiliates, subsidiaries, officers, directors, members, managers, principals, employees, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacities as such, of each of the parties described in clauses (i) through (ix).

### C.     Releases by Holders of Claims.

As of the Effective Date, except as otherwise provided in the Plan, the Releasing Parties are deemed to have released the Debtors, the Estate, the Reorganized Debtors, and the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors or Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the 2010 Bond Documents, the Debtors' restructuring, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of any agreement or other document formalizing the transactions contemplated by the Plan, or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence or any breach of the Plan Support Agreement by a Released Party.

*"Releasing Party"* means each holder of a Claim who has voted to accept the Plan and who has not chosen, by marking the appropriate box on the Ballot, to opt out of the "Release by Holders of Claims" provided for in Section 8.3 of the Plan (and set forth above).

**The releases set forth above in the Plan do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement, including the 2016 Bond Documents) executed to implement the Plan, including, without limitation, any legal opinion requested or required by an entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan (inclusive of the tax opinion).**

## D.      Exculpation.

Except as otherwise specifically provided in the Plan, each Debtor, each Reorganized Debtor, the Estate, and each Released Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any Exculpated Claim, except to the extent such claim, obligation, Cause of Action, or liability arises from the willful misconduct or gross negligence or the breach of the Plan Support Agreement (notwithstanding advice of counsel), but in all respect such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors, the Reorganized Debtors, the Estate, and the Released Parties have, and upon completing of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the restructuring of the Claims and Interests in the Chapter 11 Case and in connection with the transactions contemplated by the Plan, the negotiation, formulation, or preparing any agreement or other document formalizing the transactions contemplated by the Plan, or any related agreements, instruments, or other documents (including the 2016 Bond Documents and the Sponsor Note, as applicable, and documents and instruments related thereto and any legal opinion requested by an entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) in connection with the Plan, and the solicitation and distribution of the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

"*Exculpated Party*" means each of: (i) the Debtors and their member or members, (ii) the Reorganized Debtors and their member or members, (iii) each member of a Consenting Holder in any capacity, (iv) the Authority, (v) the 2010 Bond Trustee in any capacity; (vi) the 2010 Master Trustee in any capacity; (vii) the 2016 Bond Trustee in any capacity, (viii) the 2016 Master Trustee in any capacity, and (ix) the current and former officers, directors, members, managers, employees, attorneys, and advisors, each in their respective capacities as such, of each of the foregoing.

## E.      Discharge of Claims.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Bar Date Order, in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan (including, but not limited to, the 2016 Bond Documents), the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, and rights against the Debtors or  any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of  representations  or  warranties issued  on or before the Effective  Date, and all debts of the kind  specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim

based upon such Claim, debt, or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such Claim, debt, or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim has accepted the Plan. Except as otherwise provided herein, any default by the Debtors with respect to any Claim that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### F.   Injunction.

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE PLAN, ALL RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE OBLIGATIONS RELATING TO THE 2016 BONDS), ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATE OF SUCH PERSONS ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION

WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED, OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATE.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN).

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE OBLIGATIONS RELATING TO THE 2016 BONDS) FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(g) OF THE BANKRUPTCY CODE.

ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATE, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

### G.      Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. Upon the Effective Date, all injunctions or stays contained in the Plan or the Confirmation Order shall be in full force and effect in accordance with their terms.

### H.      Protection Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Persons, including governmental units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Reorganized Debtors or another Person with whom the Reorganized Debtors have been associated, solely because the Debtors have been a debtors under Chapter 11,

have been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before such Debtors is granted or denied a discharge), or have not paid a debt that is dischargeable in the Chapter 11 Case.

### I.   Release of Liens.

Except as otherwise provided in the Plan, the 2016 Bond Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. For the avoidance of doubt, except as otherwise provided in the Plan (including the Plan Supplement, inclusive of the 2016 Bond Documents), all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

## XI.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors, they should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.   Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims in such class. The Debtors believe that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B.   Insufficient Acceptances.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan under section 1129(a) of the Bankruptcy Code, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.

If votes are not received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan under section 1129(a) of the Bankruptcy Code, the Debtors may nevertheless seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, as explained above in Article VIII. However, there can be no assurance that the Debtors will be able to utilize section l129(b) of the Bankruptcy Code for confirmation of the Plan. Any modification of the Plan necessary to effect a confirmation of the Plan pursuant to section 1129(b) may result in a

different treatment of Claims than that currently afforded in the Plan, which treatment, as to any Claim, may be less favorable.  Furthermore, distributions to holders of Claims may be delayed if the Debtors must seek confirmation under section 1129(b) rather than under section 1129(a).

### C.      Confirmation Risks.

Even if the requisite acceptances are received, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court: (i) the Debtors may not be able to reorganize their businesses; (ii) the distributions that holders of Claims ultimately would receive, if any, with respect to their Claims is uncertain; and (iii) there is no assurance that the Debtors would be able to successfully develop, prosecute, confirm, and consummate an alternative plan that would be acceptable to the Bankruptcy Court and the holders of Claims.  It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization.

### D.      Conditions Precedent May Not Occur.

As more fully set forth in the Plan and as described in Article VII above, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are neither met nor waived, the Effective Date will not take place.

The conditions precedent to the Effective Date include that the 2016 Bonds be issued and that all authorizations, consents, and regulatory approvals required in connection with the consummation of the Plan be obtained.  The issuance of the 2016 Bonds must be approved by the Issuer. While the Debtors are currently seeking the necessary approvals for the issuance of the 2016 Bonds, there can be no assurance that such approvals will be obtained.

The conditions precedent to the Effective Date also include that all payments and transfers to be made on the Effective Date shall be made or duly provided for, and the Debtors shall have sufficient Cash on such date to make such payments.  Additional costs could arise in connection with the transfers to take place on the Effective Date, including the issuance of the 2016 Bonds, that could materially impact the Debtors' ability to satisfy this condition precedent.

### E.       Uncertainty of Financial Projections.

The Projections set forth on <u>Exhibit 4</u> to this Disclosure Statement represent the Debtors' best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations.  The Debtors' actual financial results may differ significantly from the Projections.  As explained above, whether actual results will conform to the Projections is subject to a number of risks and uncertainties, including but not limited to: the Debtors' ability to improve profitability and generate positive operating cash flow; the Debtors' ability to sustain sales increases; the Debtors' ability to increase capital expenditures in the future; the Debtors' ability to implement effective pricing and promotional programs; the Debtors' ability to successfully implement effective business continuity; changes in federal, state, or local laws or regulations; general economic conditions in the Debtors' operating region; stability of product costs; increases in labor and employee benefit costs, such as health care and pension expenses; or changes in accounting standards and taxation requirements.

If the Debtors do not achieve their projected financial results, the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### F.       Adverse Publicity.

Adverse publicity or news coverage relating to the Debtors, including publicity or news coverage in connection with the Chapter 11 Case, may negatively impact the Debtors' efforts to market their facilities and services to prospective residents and, in turn, negatively impact the Debtors' and Reorganized Debtors' financial performance.

## XII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.       Liquidation Under Chapter 7.

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtors.  The Debtors believe that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals during such liquidation.  Further, distributions in a case under chapter 7 would not reflect the concessions agreed to by the Debtors' bondholders under the Plan.

The Debtors, with the assistance of their professionals, have prepared a Liquidation Analysis, attached hereto as <u>Exhibit 3</u>.  The Liquidation Analysis is based upon a hypothetical liquidation in a Chapter 7 case.  The Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests.

The likely form of any liquidation would be the sale of the Debtors' assets. Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to Creditors than that recoverable under the Plan. In the opinion of the Debtors, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the holders of Claims as great a realization potential as does the Plan.

**B.      Alternative Plan of Reorganization.**

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization. In the course of negotiating the Plan, the Debtors explored various other alternatives and concluded that the Plan represented the best alternative to protect the interests of Creditors, Park Place's residents, and other parties in interest. The Debtors have not changed their conclusions.

## XIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**A GENERAL DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE ("*IRS*"),   NO OPINION HAS BEEN REQUESTED FROM THE DEBTORS' COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION IS GIVEN BY THE DISCLOSURE STATEMENT. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED BELOW, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.**

**THE FOLLOWING SUMMARY OF CERTAIN POTENTIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, ESTATE, GIFT, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**THE OCCURRENCE OF THE EFFECTIVE DATE IS CONDITIONED ON THE 2016 BOND TRUSTEE RECEIVING AN OPINION OF A NATIONALLY RECOGNIZED BOND COUNSEL, IN FORM AND SUBSTANCE REASONABLY ACCEPTABLE TO THE 2016 BOND TRUSTEE, THAT INTEREST ON THE 2016 BONDS IS EXCLUDABLE FROM THE GROSS INCOME OF THE HOLDERS THEREOF FOR PURPOSES OF U.S. FEDERAL INCOME TAXATION AND INCOME TAXATION UNDER THE LAWS OF THE STATE OF ILLINOIS.**

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to certain holders of Claims. The following summary is based on the Tax Code, Treasury Regulations ("***Regulations***") promulgated thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service as in effect on the date

hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

This summary does not address the U.S. federal income tax consequences of the Plan to taxpayers subject to special treatment under the Tax Code (including, but not limited to, persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, S corporations, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, partnerships and other pass-through entities (and their beneficial holders), holders of Claims who are themselves in bankruptcy, and agents).  Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim.  Furthermore, this discussion assumes that a holder of a Claim only holds Claims of a single Class.  This summary assumes that the 2010 Bonds and the 2016 Bonds are treated as "debt" for U.S. federal income tax purposes.

This summary also assumes that each holder of a Claim is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCES TO EACH BONDHOLDER. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH BONDHOLDER OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH BONDHOLDER OF THE PLAN.

### A.     U.S. Federal Income Tax Consequences to the Debtors.

Generally, when a debtor discharges its debt obligation for an amount less than the adjusted issue price of the debt obligation, the debtor must include such difference in its gross income as cancellation of debt ("***COD***") income.  Due to their status as non-profit corporations that are exempt from federal income tax pursuant to Section 501(a) of the Code, the Debtors do not expect that the Plan will result in any significant federal income tax consequences to the Debtors.

Although the Debtors expect to maintain their exempt status, and Debtors do not believe that any COD income triggered by the Plan would be treated as unrelated business taxable income ("***UBTI***"), if exempt status were not maintained or the COD income were treated as UBTI, the Plan, if approved, would most likely allow the Debtors to qualify for a bankruptcy exclusion rule by which the Debtors would not recognize COD income if the discharge were granted by the Bankruptcy Court or occurred pursuant to a plan of reorganization approved by the Bankruptcy Court.

### B.      U.S. Federal Income Tax Consequences to Holders Upon a Bond Exchange.

In accordance with the Plan, and as described in more detail in this Disclosure Statement, holders of 2010 Bonds will exchange such bonds for 2016 Bonds (each, a "***Bond Exchange***"). The U.S. Federal income tax consequences to holders of 2010 Bonds arising from the Bond Exchange may vary, depending upon, among other things: (a) whether the 2010 Bonds and 2016 Bonds constitute securities; (b) whether the holder of 2010 Bonds is a citizen or resident of the United States for tax purposes, or subject to U.S. Federal income tax on a net income basis; (c) whether the Bond Exchange qualifies as a recapitalization as described below; and (d) whether the holder of 2010 Bonds reports income on the accrual or cash basis.  For tax purposes, if gain or loss is recognized by a holder of 2010 Bonds, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the 2010 Bonds constitute a capital asset in the hands of the holder and how long the 2010 Bonds have been held or is treated as having been held, whether the 2010 Bonds were acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt or worthless stock or securities deduction with respect to the 2010 Bonds.  A holder who purchased 2010 Bonds from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.

The Bond Exchange may qualify as a recapitalization in which the holders realize but do not recognize gain or loss with respect to the 2010 Bonds.  If the Bond Exchange qualifies as a recapitalization, a holder's tax basis in the 2016 Bonds would equal the holder's basis in the 2010 Bonds.  If the Bond Exchange does not qualify as a recapitalization, holders of 2010 Bonds may be entitled to claim a loss for U.S. federal income tax purposes as a result of the Bond Exchange. The amount of such loss generally would be determined as the excess of the holder's adjusted basis in its 2010 Bonds over the issue price (as determined under the Code) of the 2016 Bonds.  Whether a holder can take a loss at all, and the character of such loss and the holder's ability to claim a deduction of such loss may be affected by a number of factors, including whether the 2010 Bonds and 2016 Bonds are treated as securities for U.S. Federal income tax purposes and the holder's particular circumstances, such as the business activities of the holder and its status as a bank. As a result, each holder of 2010 Bonds should consult its own tax advisor regarding the consequences of the Bond Exchange.

The tax consequences of the Bond Exchange to a particular holder will vary depending on each holder's circumstances.  Accordingly, each holder should consult with their tax advisors as to any potential tax consequences to such holder, including as to: (i) whether the Bond Exchange could result in a taxable disposition to a particular holder, and (ii) the treatment and tax consequences of the cash received by a holder in exchange for its allocable share of accrued and unpaid interest on its 2010 Bonds.

{5906754:}                                                 64

### C.      U.S. Federal Income Tax Consequences of Holding 2016 Bonds.

The federal income tax consequences of holding the 2016 Bonds will depend on the terms, structure and composition of the 2016 Bonds.

As a condition precedent to the Effective Date, the 2016 Bond Trustee will receive a satisfactory opinion of bond counsel that the interest on the 2016 Bonds will be excluded from gross income for federal tax purposes.   Notwithstanding this opinion, ownership of the 2016 Bonds may result in additional federal income tax consequences to certain taxpayers.   Each holder should consult with their tax advisors as to the tax consequences of their ownership of the 2016 Bonds.

The opinion of bond counsel is based on current legal authority, may cover matters not directly addressed by such authorities, and represents the bond counsel's judgment as to the proper treatment of the 2016 Bonds.   It is not binding on the IRS or the courts.   Furthermore, bond counsel cannot give, and will not give, any opinion or assurance about the further activities of the Debtors, or about the effect of future changes in the Internal Revenue Code of 1986 (the "***Tax Code***"), as amended, the applicable regulations promulgated thereunder, or the interpretation or enforcement thereof by the IRS.   The Debtors, however, have agreed to act in a manner consistent with the requirements of the Tax Code.

### D.      Information Reporting and Backup Withholding.

Payments of interest (including accruals of original issue discount) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the 2016 Bonds, may be subject to "***backup withholding***" (currently at a rate of 28%) if a holder fails to furnish to the payor certain identifying information, and, in some cases, a certification that the holder is not subject to backup withholding.   Backup withholding is not an additional tax.   Any amounts deducted and withheld generally should be allowed as a credit against the holder's U.S. federal income tax liability.   Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.   A holder may also be required to provide additional information to the IRS concerning payments, unless an exemption applies. holders should consult their own tax advisors regarding their qualifications for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN POTENTIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX ADVISOR. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT CONSTITUTE TAX ADVICE.

THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON THE PARTICULAR CIRCUMSTANCES OF A HOLDER OF A CLAIM. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XIV. CONCLUSION AND RECOMMENDATIONS

The Debtors urge all creditors entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by immediately returning their properly completed Ballots to the appropriate voting agent as set forth on the Ballots within the time stated in the notice served with this Disclosure Statement.

Dated:  January 17, 2016                     Respectfully submitted,


**TIMOTHY PLACE, NFP**

By:    _____
Name:
Title:


**CHRISTIAN HEALTHCARE
FOUNDATION, NFP**

By:    _____
Name:
Title: