**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TIMOTHY PLACE, NFP, *et al.*,[1] | ) | Case No. 16-01336 (JPC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

# DEBTORS' AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

David A. Agay (ARDC No. 6244314)
Joshua A. Gadharf (ARDC No. 6296543)
McDONALD HOPKINS LLC
300 North LaSalle Street, Suite 2100
Chicago, Illinois 60654
Telephone: (312) 280-0111
Facsimile: (312) 280-8232
E-mail: dagay@mcdonaldhopkins.com
jgadharf@mcdonaldhopkins.com

-and-

Shawn M. Riley (admitted *pro hac vice*)
Manju Gupta (admitted *pro hac vice*)
McDONALD HOPKINS LLC
600 Superior Avenue, E., Suite 2100
Cleveland, OH 44114
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
E-mail: sriley@mcdonaldhopkins.com
mgupta@mcdonaldhopkins.com

COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

February 18, 2016

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Timothy Place, NFP (5089) and Christian Healthcare Foundation, NFP (2359).

**TABLE OF CONTENTS**

**SECTION 1: DEFINITIONS AND INTERPRETATION** ..... 1

**A. Definitions.** ..... 1

**B. Interpretation: Application of Definitions and Rules of Construction** ..... 11

**SECTION 2: TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES** ..... 11

**2.1. Administrative Claims** ..... 11

**2.2. Professional Compensation** ..... 12

**2.3. Priority Tax Claims** ..... 12

**2.4. U.S. Trustee Fees** ..... 12

**SECTION 3: CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ..... 12

**3.1. Classification and Specification of Treatment of Claims** ..... 12

**3.2. Classes of Claims and Interests** ..... 13

**3.2.1. Class 1 — Other Priority Claims** ..... 13

**3.2.2. Class 2 — Series 2010A/B/C Bond Claims** ..... 13

**3.2.3. Class 3 — Series 2010D Bond Claims** ..... 14

**3.2.4. Class 4 — Other Secured Claims** ..... 14

**3.2.5. Class 5 —General Unsecured Claims** ..... 15

**3.2.6. Class 6 — Interests in Debtors** ..... 15

**3.3. Acceptance or Rejection of this Plan** ..... 15

**3.3.1. Acceptance by an Impaired Class** ..... 15

**3.3.2. Presumed Acceptance of this Plan** ..... 15

**3.3.3. Voting Class** ..... 15

**SECTION 4: MEANS FOR IMPLEMENTATION OF THIS PLAN** ..... 15

**4.1. Sources of Consideration** ..... 15

**4.2. Cancellation of 2010 Bonds** ..... 16

**4.3. Issuance of 2016 Bonds** ..... 16

**4.3.1. Series 2016A Bonds** ..... 16

**4.3.2. Series 2016B Bonds** ..... 16

**4.3.3. Series 2016C Bonds** ..... 16

**4.3.4. Sponsor Note** ..... 17

**4.3.5. Priority of 2016 Bonds and the Sponsor Note** ..... 17

**4.3.6. 2016 Bond Documents** ... 17
**4.3.7. Effective Date Transactions** ... 17
**4.3.8. Additional Terms of 2016 Bonds** ... 18
**4.4. Section 1145 Exemption** ... 18
**4.5. Sponsor and PMDI Agreements** ... 18
**4.6. Greystone Agreement** ... 18
**4.7. Assumption of Residency Agreements** ... 18
**4.8. Reorganized Debtors' Board of Directors** ... 18
**4.9. Officers of the Reorganized Debtors** ... 19
**4.10. Employee Benefits** ... 19
**4.11. Vesting of Assets in the Reorganized Debtors** ... 19
**4.12. Restructuring Transactions** ... 19
**4.13. Corporate Action** ... 20
**4.14. Section 1146 Exemption from Certain Taxes and Fees** ... 20
**4.15. Preservation of Causes of Action of the Debtors** ... 20
**SECTION 5: TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ... 21
**5.1. Assumption and Rejection of Executory Contracts and Unexpired Leases** ... 21
**5.2. Claims Based on Rejection of Executory Contracts or Unexpired Leases** ... 22
**5.3. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases** ... 22
**5.4. Insurance Policies** ... 22
**5.5. Modifications, Amendments, Supplements, Restatements, or Other Agreements** ... 22
**5.6. Reservation of Rights** ... 23
**5.7. Contracts and Leases Entered Into After the Petition Date** ... 23
**SECTION 6: PROVISIONS GOVERNING DISTRIBUTIONS** ... 23
**6.1. Timing and Calculation of Amounts to Be Distributed** ... 23
**6.2. Distributions** ... 23
**6.3. Payments and Distributions on Disputed Claims** ... 24
**6.4. Special Rules for Distributions to Holders of Disputed Claims** ... 24
**6.5. Delivery of Distributions in General** ... 24
**6.6. Undeliverable Distributions and Unclaimed Property** ... 24
**6.7. Withholding and Reporting Requirements** ... 24
**6.8. Setoffs** ... 25
**6.9. Insurance Claims** ... 25
**6.10. Applicability of Insurance Policies** ... 25

**6.11. Allocation of Distributions Between Principal and Unpaid Interest** ........ 25

**6.12. Interest on Claims** ........ 26

**SECTION 7: PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** ........ 26

**7.1. Prosecution of Objections to Claims** ........ 26

**7.2. Retention of Debtors' Rights and Defenses** ........ 26

**7.3. Distributions After Allowance** ........ 26

**7.4. Estimation of Claims** ........ 26

**SECTION 8: SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS** ........ 27

**8.1. Compromise and Settlement of Claims, Interests and Controversies** ........ 27

**8.2. Releases by the Debtors** ........ 27

**8.3. Releases by Holders of Claims and Interests** ........ 28

**8.4. Notwithstanding** ........ 28

**8.5. Exculpation** ........ 28

**8.6. Discharge of Claims** ........ 29

**8.7. Injunction** ........ 29

**8.8. Term of Injunctions or Stays** ........ 31

**8.9. Protection Against Discriminatory Treatment** ........ 31

**8.10. Release of Liens** ........ 31

**SECTION 9: CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ........ 32

**9.1. Conditions Precedent to the Effective Date** ........ 32

**9.2. Waiver of Conditions** ........ 33

**9.3. Effect of Failure of Conditions** ........ 33

**SECTION 10: MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN** ........ 33

**10.1. Modification and Amendments** ........ 33

**10.2. Effect of Confirmation on Modifications** ........ 34

**10.3. Revocation or Withdrawal of this Plan** ........ 34

**SECTION 11: RETENTION OF JURISDICTION** ........ 34

**SECTION 12: MISCELLANEOUS PROVISIONS** ........ 36

**12.1. Immediate Binding Effect** ........ 36

**12.2. Additional Documents** ........ 36

**12.3. Reservation of Rights** ........ 37

**12.4. Successors and Assigns** ........ 37

**12.5. Votes Solicited in Good Faith** .......... 37
**12.6. Closing of Chapter 11 Case** .......... 37
**12.7. Notices** .......... 37
**12.8. Headings** .......... 38
**12.9. Severability** .......... 38
**12.10. Validity and Enforceability** .......... 38
**12.11. Plan Supplement** .......... 39
**12.12. Governing Law** .......... 39
**12.13. Request for Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code** .......... 39

**Exhibit A – Plan Support Agreement**

**Exhibit B – Sources and Uses**

Timothy Place, NFP (the "***Corporation***") and Christian Healthcare Foundation, NFP (the "***Foundation***," and together with Timothy Place, the *"**Debtors**")* propose this Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code.

## SECTION 1
## DEFINITIONS AND INTERPRETATION

**A. Definitions**.

The following terms used herein shall have the respective meanings below:

1.1 ***2010 Bond Documents*** means the 2010 Indenture and any bonds, loan agreement, mortgage, security agreement, document, agreement, or instrument executed or delivered in connection with the issuance of the 2010 Bonds.

1.2 ***2010 Bond Trustee*** means UMB Bank, N.A., in its capacity as trustee under the 2010 Indenture, and any successor trustee in such capacity.

1.3 ***2010 Bonds*** means, collectively, the Series 2010A Bonds, the Series 2010B Bonds, the Series 2010C Bonds, the Series 2010D-1 Bonds, and the Series 2010D-2 Bonds.

1.4 ***2010 Indenture*** means that certain Bond Trust Indenture, dated as of May 1, 2010, as may have been amended, modified, and/or supplemented, by and between the Authority and the 2010 Bond Trustee, pursuant to which the 2010 Bonds were issued.

1.5 ***2010 Master Trust Indenture*** means that certain Master Trust Indenture, dated as of May 1, 2010, as may have been amended, modified, and/or supplemented, by and between the among the Debtors and the 2010 Bond Trustee as the 2010 Master Trustee thereunder.

1.6 ***2010 Master Trustee*** means UMB Bank, N.A., in its capacity as master trustee under the 2010 Master Trust Indenture, and any successor trustee in such capacity.

1.7 ***2016 Bond Documents*** means the 2016 Indenture, and any bonds, loan agreement, mortgage, security agreement, document, agreement, or instrument executed or delivered in connection with the issuance of the 2016 Bonds, including but not limited to the 2016 Master Trust Indenture and the 2016 Mortgage.

1.8 ***2016 Bond Trustee*** means UMB Bank, N.A., in its capacity as bond trustee under the 2016 Indenture, and any successor trustee in such capacity.

1.9 ***2016 Bonds*** means, collectively, the Series 2016A Bonds, the Series 2016B Bonds and the Series 2016C Bonds.

1.10 ***2016 Indenture*** means that certain Bond Trust Indenture (as such indenture may be further amended, supplemented, or modified from time to time) to be entered into by and between the Authority and the 2016 Bond Trustee pursuant to this Plan on or after the Effective Date, including all notes and instruments delivered pursuant thereto or in connection therewith in

connection with the issuance of the 2016 Bonds, and which shall be in form and substance acceptable to the Debtors, the Authority and the 2016 Bond Trustee.

1.11 ***2016 Master Trust Indenture*** means that certain Master Trust Indenture (as such indenture may be further amended, supplemented, or modified from time to time) to be entered into by and between the Reorganized Debtors and the 2016 Bond Trustee, as the 2016 Master Trustee thereunder, pursuant to this Plan on or after the Effective Date and which shall be in form and substance acceptable to the Debtors and the 2016 Bond Trustee.

1.12 ***2016 Master Trustee*** means UMB Bank, N.A., in its capacity as master trustee under the 2016 Master Trust Indenture, and any successor trustee in such capacity

1.13 ***2016 Mortgage*** means, collectively, any mortgage amendment agreement or agreements whereby the Debtors, directly or by way of assignment, grant one or more mortgages or other liens to the 2016 Master Trustee to secure the Debtors' obligations under the 2016 Bond Documents.

1.14 ***Accrued Professional Compensation*** means, at any given moment, all accrued, contingent and/or unpaid fees for legal, financial advisory, accounting, and other services, along with all obligations for reimbursement of expenses rendered or incurred before the Effective Date under sections 327, 328, 329, 330, 331, or 1103 of the Bankruptcy Code by any retained Professional in the Chapter 11 Case, or under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid.

1.15 ***Administrative Claim*** means any Claim for payment of costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), and 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estate and operating the business of either of the Debtors; (ii) compensation for Accrued Professional Compensation; (iii) all fees and charges assessed against the Estate pursuant to Chapter 123 of Title 28 of the United States Code; and (iv) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

1.16 ***Allowed*** means with respect to Claims (a) any Claim, proof of which is timely filed by the applicable bar date; (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided, that* with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time, as may be extended by the Bankruptcy Court from time to time, fixed by the Plan, the Bankruptcy Code the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely filed, is not considered Allowed and shall be expunged without further action by the

Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. An Allowed Claim (i) includes a Disputed Claim to the extent such Disputed Claim becomes Allowed after the Effective Date and (ii) shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law. Unless otherwise specified in this Plan, in section 506(b) of the Bankruptcy Code, or by Final Order of the Bankruptcy Court, "Allowed" Claims shall not, for purposes of distributions under this Plan, include interest on such Claim accruing from and after the Petition Date. For the avoidance of doubt, the 2010 Bond Trustee shall hold an Allowed Claim in the amount of (i) $112,474,669.86 on account of the Series 2010A Bonds, (ii) $8,105,562.50 on account of the Series 2010B Bonds, (iii) $5,141,666.66 on account of the Series 2010C Bonds, (iv) $10,556,420.84 on account of the Series 2010D-1 Bonds, and (v) $14,226,520.00 on account of the Series 2010D-2 Bonds, plus unliquidated, accrued, and unpaid fees and expenses of the 2010 Bond Trustee and its professionals incurred through the Effective Date.

1.17 ***Assets*** means all assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Estate pursuant to section 541 of the Bankruptcy Code, Cash, Avoidance and Other Actions, equipment, inventory, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of any of the foregoing.

1.18 ***Authority*** means the Illinois Finance Authority.

1.19 ***Avoidance and Other Actions*** means all actions, causes of action, suits, choses in action, and claims of the Debtors and/or the Estate against any entity or Person, whether direct, indirect, derivative, or otherwise arising under section 510 of the Bankruptcy Code or seeking to avoid a transfer of property or recover property pursuant to sections 542 through 550 of the Bankruptcy Code or applicable non-bankruptcy law.

1.20 ***Bankruptcy Code*** means title 11 of the United States Code, as now in effect or hereafter applicable to this Chapter 11 Case.

1.21 ***Bankruptcy Court*** means the United States Bankruptcy Court for the Northern District of Illinois, having jurisdiction over the Chapter 11 Case.

1.22 ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as amended, and the Local Rules of the Bankruptcy Court, as applicable to this Chapter 11 Case.

1.23 ***Bar Date Order*** means, collectively, any order or orders entered by the Bankruptcy Court establishing a bar date by which a Proof of Claim must be filed in the Chapter 11 Case.

1.24 ***Base Management Fee*** means an amount no greater than 3.25% of gross operating revenues; provided that no more than $30,000 shall be paid each month as an operating expense, with the balance payable from Excess Cash.

1.25 ***Business Day*** means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Federal Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in Chicago, Illinois.

1.26 ***Cash*** means cash and cash equivalents of the Debtors, including, without limitation, deposits in transit whether in the form of check or electronic transfer.

1.27 ***Cash Collateral Order*** means any order, whether interim or final, allowing the use by the Debtors during the Chapter 11 Case of the cash collateral of the 2010 Bond Trustee.

1.28 ***Causes of Action*** means any claim, cause of action, controversy, demand, agreement, right (including to legal or equitable remedies), action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action includes, without limitation: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or Chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any claim listed in the Plan Supplement.

1.29 ***Chapter 11*** means chapter 11 of the Bankruptcy Code.

1.30 ***Chapter 11 Case*** means the above-captioned cases.

1.31 ***Claim*** means a claim, as defined by section 101(5) of the Bankruptcy Code, against either of the Debtors or their Assets, whether or not asserted.

1.32 ***Class*** means a class or category of Claims as classified and described in Section 3 of this Plan.

1.33 ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court's docket.

1.34 ***Confirmation Hearing*** means the hearing on confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

1.35 ***Confirmation Order*** means the order entered by the Bankruptcy Court confirming this Plan in accordance with Chapter 11 of the Bankruptcy Code.

1.36 ***Consenting Holders*** means parties holding all rights with respect to or otherwise having authority to vote the Series 2010 Bonds that are party to the Plan Support Agreement.

1.37 ***Corporation*** means Debtor Timothy Place, NFP.

1.38 ***Creditor*** means a holder of a Claim.

1.39 ***Cure*** means the payment of Cash by the Reorganized Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to

(i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Reorganized Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.40 ***Days Cash on Hand*** shall have the meaning set forth in the 2016 Master Indenture.

1.41 ***Debtor Released Claims*** shall have the meaning set forth in Section 8.2 of this Plan.

1.42 ***Debtors*** means, collectively, Timothy Place, NFP and Christian Healthcare Founding, NFP, as debtors and debtors in possession, and includes the Estate, where appropriate.

1.43 ***Debt Service Reserve Fund*** means a fund that the Debtors will establish on the Effective Date under the 2016 Indenture, as defined in the Restructuring Term Sheet and as more fully set forth in the 2016 Indenture.

1.44 ***Development Services Agreement*** means that certain Development Services Agreement, dated December 15, 2005, by and between the Corporation and the Sponsor.

1.45 ***Disclosure Statement*** means the disclosure statement in respect of the Plan, as the same may be altered, modified, or amended.

1.46 ***Disputed*** means, with respect to any Claim, any Claim that is not yet Allowed and is subject to a claims objection filed before any deadline set by the Bankruptcy Court.

1.47 ***Distribution Date*** means the date, occurring on or as soon as reasonably practicable after the Effective Date, but no later than five (5) days after the Effective Date, on which the Debtors first make the required distributions to holders of Allowed Claims as provided in this Plan.

1.48 ***Distribution Record Date*** means the Effective Date or such other date as may be designated in the Confirmation Order.

1.49 ***Distribution Waterfall*** means the waterfall described in the Restructuring Term Sheet and as more fully set forth in the 2016 Master Trust Indenture.

1.50 ***Effective Date*** means a Business Day selected by the Debtors with the consent of the 2010 Bond Trustee, which is, unless the Confirmation Order directs otherwise, no earlier than the date on which each of the conditions to this Plan's Effective Date set forth herein has either been satisfied or waived in accordance with this Plan and no later than April 1, 2016.

1.51 ***Entrance Fee Escrow Agreement*** means that certain escrow agreement entered into by and between MB Financial Bank and the Debtors pursuant to which the Debtors shall deposit all Entrance Fees received by the Debtors between the Petition Date and the Effective Date as approved by the Bankruptcy Court.

1.52 ***Entrance Fee Fund*** means the existing Entrance Fee Fund held by the 2010 Bond Trustee pursuant to the 2010 Master Trust Indenture, which the Debtors will maintain as more fully set forth in the 2016 Master Trust Indenture.

1.53 ***Entrance Fees*** means fees, other than security deposits, monthly rentals, or monthly services charges, paid to a Debtor by residents of living units for the purpose of obtaining the right to reside in those living units or to obtain a parking space including any refundable resident deposits described in any lease, Residency Agreement, or similar agreement with respect to those living units or parking spaces, but shall not include any such amounts held in escrow or otherwise set aside pursuant to the requirements of any such agreement or a reservation agreement prior to the occupancy of the living unit or parking space covered by such lease, Residency Agreement, or similar agreement (which amounts shall be included if an when occupancy occurs).

1.54 ***Estate*** means the estates of the Debtors created by the Debtors' Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

1.55 ***Excess Cash*** shall have the meaning set forth in the Restructuring Term Sheet, as more fully set forth in the 2016 Master Trust Indenture.

1.56 ***Exculpated Claims*** means any Claim related to any act or omission in connection with, related to, or arising out of the filing or administration of the Chapter 11 Case, the Plan, or the transactions contemplated by the Plan, the formulation, preparation, dissemination, negotiation of any document in connection with the Plan, any agreement or other document formalizing the transactions contemplated by the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or the distribution of property pursuant to the Plan.

1.57 ***Exculpated Party*** means each of: (i) the Debtors and their member or members, (ii) the Reorganized Debtors and their member or members, (iii) each member of a Consenting Holder in any capacity, (iv) the Authority, (v) the 2010 Bond Trustee in any capacity, (vi) the 2010 Master Trustee in any capacity, (vii) the 2016 Bond Trustee in any capacity, (viii) the 2016 Master Trustee in any capacity, and (ix) the current and former officers, directors, members, managers, employees, attorneys, and advisors, each in their respective capacities as such, of each of the foregoing.

1.58 ***Executory Contract*** means a contract to which a Debtor is a party that is capable of assumption or rejection under section 365 of the Bankruptcy Code.

1.59 ***Facility*** means the continuing care retirement community known as "Park Place Elmhurst" and owned by the Corporation, located in Elmhurst, Illinois.

1.60 ***Federal Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as amended.

1.61 ***Final Order*** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Case that has not been reversed,

vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, to petition for certiorari, or to move for a new trial, reargument, or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure, or Federal Bankruptcy Rules 9023 or 9024, may be filed relating to such order shall not cause such order to not be a Final Order.

1.62 ***Foundation*** means Debtor Christian Healthcare Foundation, NFP.

1.63 ***General Unsecured Claim*** means any unsecured Claim against either of the Debtors, including, without limitation, any Resident Claim, that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Series 2010A/B/C Bond Claim, or Series 2010D Bond Claim.

1.64 ***Greystone*** means Greystone Development Services XVII, as assignee of Greystone Development Company, II, LP.

1.65 ***Greystone Agreement*** means that certain Development Services Agreement, dated as of January 26, 2006, as amended, by and between the Corporation and Greystone.

1.66 ***Insurance Policies*** means, collectively, all of the Debtors' insurance policies.

1.67 ***Interest*** means any membership, or other ownership, interest in either of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.68 ***Interest Payment Date*** shall have the meaning provided in the 2016 Indenture.

1.69 ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.70 ***Liquidity Support Agreement*** means that certain Liquidity Support Agreement, dated May 1, 2010, by and between the Corporation and the Sponsor.

1.71 ***Management Agreement*** means that certain Management Agreement entered into by and between the Corporation and PMDI, dated as of October 27, 2009, as may have been amended, modified, and/or supplemented.

1.72 ***MB Financial Bank*** shall mean MB Financial Bank, N.A.

1.73 ***Office of the U.S. Trustee*** means the Office of The United States Trustee, 219 S. Dearborn Street, Room 873, Chicago, IL 60604.

1.74 ***Other Priority Claim*** means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.75 ***Other Secured Claim*** means any Secured Claim other than a Series 2010A/B/C Bond Claim or Series 2010D Bond Claim.

1.76 ***Operating Reserve Fund*** means the existing Operating Reserve Fund held by the 2010 Master Trustee pursuant the 2010 Master Trust Indenture, which the Debtors will maintain as more fully set forth in the 2016 Master Trust Indenture.

1.77 ***Person*** means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Debtors.

1.78 ***Petition Date*** means the date on which the Debtors filed petitions commencing the Chapter 11 Case.

1.79 ***Plan*** means this Plan, as altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

1.80 ***Plan Supplement*** means the compilation of documents and forms of documents, schedules, and exhibits to this Plan, to be filed prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules. The Plan Supplement shall include, among other documents, the 2016 Bond Documents and a schedule of the Reorganized Debtors' retained Causes of Action.

1.81 ***Plan Support Agreement*** means that certain Plan Support Agreement, dated as of January 11, 2016 (including, without limitation, the exhibits, attachments, and appendices thereto), entered into by and among the Debtors and the Consenting Holders on the date thereof, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof. A copy of the Plan Support Agreement is attached as **Exhibit A** to the Plan.

1.82 ***PMDI*** means Providence Management and Development Company Incorporated.

1.83 ***Priority Tax Claim*** means any Claim of a governmental unit of a kind entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.84 ***Professionals*** means all professionals employed in this Chapter 11 Case pursuant to sections 327, 328, and 1103 of the Bankruptcy Code.

1.85 ***Proof of Claim*** means a proof of Claim filed against either of the Debtors in the Chapter 11 Case.

1.86 ***Refunds*** means any resident refund obligations under the terms of the Residency Agreements.

1.87 ***Released Parties*** means (i) the Debtors and their member or members, (ii) the Reorganized Debtors and their member or members, (iii) each member of a Consenting Holder in any capacity, (iv) the Authority, (v) the 2010 Bond Trustee in any capacity, (vi) the 2010 Master Trustee in any capacity, (vii) the 2016 Bond Trustee in any capacity, (viii) the 2016 Master Trustee in any capacity, and (ix) the current and former affiliates, subsidiaries, officers, directors, members, managers, principals, employees, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacities as such, of each of the parties described in clauses (i) through (viii).

1.88 ***Releasing Party*** means each holder of a Claim who has voted to accept the Plan and who has not chosen, by marking the appropriate box on the ballot, to opt out of the "Release by Holders of Claims" provided for in Section 8.3 of this Plan.

1.89 ***Reorganized Debtors*** means, collectively, the reorganized Timothy Place, NFP and the reorganized Christian Healthcare Foundation, NFP, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, after giving effect to the restructuring transactions occurring on the Effective Date in accordance with this Plan.

1.90 ***Residency Agreements*** means those certain residency agreements entered into by and between the residents of the Facility and the Corporation and any additional documents related thereto, including any amendments, supplements, or addendums.

1.91 ***Resident Claim*** means any Claim that a resident may hold or assert against either of the Debtors, their Estate, or their Assets, including, without limitation, any Claim arising under, related to, or in connection with a Residency Agreement.

1.92 ***Restructuring Term Sheet*** means that certain Restructuring Term Sheet, dated as of January 11, 2016, setting forth the principal terms and conditions of a financial restructuring of the outstanding indebtedness of the Debtors. A copy of the Restructured Term Sheet is attached as **Exhibit 1** to the Plan Support Agreement.

1.93 ***Schedules*** means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs, if any, filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

1.94 ***Secured Claim*** means any Claim of a Creditor that is (i) secured by property of the Estate, to the extent of the value of the Creditor's interest in the Estate's interest in such property, as provided in section 506(a) of the Bankruptcy Code or (ii) subject to setoff under section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff, as provided in section 506(a) of the Bankruptcy Code.

1.95 ***Series 2010A/B/C Bond Claims*** means any and all Claims in respect of the Series 2010A Bonds, the Series 2010B Bonds, or the Series 2010C Bonds.

1.96 ***Series 2010A Bonds*** means the Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2010A in the original aggregate principal amount of $109,115,000 issued pursuant to the 2010 Indenture.

1.97 ***Series 2010B Bonds*** means the Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2010B in the original aggregate principal amount of $7,875,000 issued pursuant to the 2010 Indenture.

1.98 ***Series 2010C Bonds*** means the Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) (Accelerated Redemption Reset Option Securities (ARROS)) Series 2010C in the original aggregate principal amount of $5,000,000 issued pursuant to the 2010 Indenture.

1.99 ***Series 2010D Bond Claims*** means any and all Claims in respect of the Series 2010D-1 Bonds or the Series 2010D-2 Bonds.

1.100 ***Series 2010D-1 Bonds*** means the Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) (Tax-Exempt Mandatory Paydown Securities (TEMPS-75)) Series 2010D-1 in the original aggregate principal amount of $10,275,000 issued pursuant to the 2010 Indenture.

1.101 ***Series 2010D-2 Bonds*** means the Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) (Tax-Exempt Mandatory Paydown Securities (TEMPS-65)) Series 2010D-2 in the original aggregate principal amount of $15,350,000 issued pursuant to the 2010 Indenture.

1.102 ***Series 2016A Bonds*** means the Illinois Finance Authority Revenue Bonds, Series 2016A (Park Place of Elmhurst Project) to be issued by the Authority pursuant to this Plan under the 2016 Indenture and as more fully described in Section 4.3.1 of this Plan.

1.103 ***Series 2016B Bonds*** means the Illinois Finance Authority Revenue Bonds, Series 2016B (Park Place of Elmhurst Project) to be issued by the Authority pursuant to this Plan under the 2016 Indenture and as more fully described in Section 4.3.2 of this Plan.

1.104 ***Series 2016C Bonds*** means the Illinois Finance Authority Excess Cash Revenue Bonds, Series 2016C (Park Place of Elmhurst Project) to be issued by the Authority pursuant to this Plan under the 2016 Indenture and as more fully described in Section 4.3.3 of this Plan.

1.105 ***Sponsor*** means Rest Haven Illiana Christian Convalescent Home d/b/a Providence Life Services.

1.106 ***Sponsor Contribution*** means a $5,000,000 cash transfer that will be made by the Sponsor on the Effective Date.

1.107 ***Sponsor Loan*** means the loan made by the Sponsor to the Reorganized Debtors in the amount of the Sponsor Contribution.

1.108 ***Sponsor Note*** means that certain promissory note in the amount of the Sponsor Contribution issued by the Debtors to the Sponsor on the Effective Date and included in the Plan Supplement, as more fully described in Section 4.3.4 of this Plan.

1.109 ***Subordination Agreement*** means the subordination agreement between the Sponsor, the Reorganized Debtors, and the 2016 Master Trustee, dated as of the Effective Date, included in the Plan Supplement, as such subordination agreement may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof

1.110 ***Unexpired Lease*** means a lease to which a Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.111 ***U.S. Trustee Fees*** means all fees and charges assessed against the Estate of the Debtors under 28 U.S.C. § 1930.

1.112 ***Voting Deadline*** means the deadline to vote to accept or reject this Plan set forth in the Disclosure Statement or an order of the Bankruptcy Court, as such deadline may be extended or modified from time to time.

**B. Interpretation: Application of Definitions and Rules of Construction**.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to this Plan. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Unless otherwise provided, any reference in this Plan to an existing document, exhibit, or schedule means such document, exhibit, or schedule as it may have been amended, restated, revised, supplemented, or otherwise modified. If a time or date is specified for any payments or other distribution under this Plan, it shall mean on or as soon as reasonably practicable thereafter. Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral.

## SECTION 2
## TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

2.1. **Administrative Claims.** In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims have not been classified and are treated as described herein. Except as otherwise provided in this Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different treatment than provided under this Plan, or by order of the Bankruptcy Court, a Person holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim that has come due for payment under any applicable order or law, as soon as practicable after the later of: (i) the fifth (5th) Business Day after the Effective Date or as soon as reasonably practicable thereafter as

determined by the Debtors; (ii) the date on which such Person becomes the holder of such an Allowed Administrative Claim; or (iii) the date or dates when that Allowed Administrative Claim is payable by its terms, consistent with past practice and in accordance with past terms.

2.2. **Professional Compensation.** Professionals or other Persons asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the Debtors, the Reorganized Debtors, the 2010 Bond Trustee, and such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of such Claim for Accrued Professional Compensation no later than 30 days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtors, the Office of the U.S. Trustee, the 2010 Bond Trustee, and the requesting party no later than 25 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for final allowance of such Claim for Accrued Professional Compensation was served.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and section 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

2.3. **Priority Tax Claims.** In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims have not been classified and are treated as described in this Section 2 of this Plan. Unless otherwise agreed by the holder of an Allowed Priority Tax Claim, any Person holding an Allowed Priority Tax Claim will receive, as determined by the Reorganized Debtors in their sole discretion and in full satisfaction of such Claim, payment in Cash in full on the later of (i) the Effective Date, or as soon as reasonably practicable thereafter as determined by the Debtors, or (ii) the date such Claim becomes an Allowed Claim.

2.4. **U.S. Trustee Fees.** All U.S. Trustee Fees will be paid in full by the Reorganized Debtors as they become due and owing.

## SECTION 3
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

3.1. **Classification and Specification of Treatment of Claims.** All Claims, except those described in Section 2 herein, are placed in the following impaired or unimpaired Classes of Claims pursuant to sections 1123(a)(1), 1123(a)(2), and 1123(a)(3) of the Bankruptcy Code, which sections require this Plan to designate such Classes and to specify their impaired or unimpaired status. A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of the Class and is classified in a different Class to the extent that the Claim qualifies within the description of that different Class. A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released, withdrawn, waived, or otherwise satisfied under this Plan. Unless this Plan expressly

provides otherwise, when a Class includes a subclass, each subclass is a separate Class for all purposes under the Bankruptcy Code, including, without limitation, voting and distribution.

Subject to all other applicable provisions of this Plan (including its distribution provisions), classified Claims shall receive the treatment set forth below. This Plan will not provide any distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, through payment by a third party. Except as specifically provided in this Plan, this Plan will not provide any distributions on account of a Claim for which the obligation to pay has been assumed by a third party.

3.2. **Classes of Claims and Interests.**

| **Class** | **Claim** | **Status** | **Voting Rights** |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Series 2010A/B/C Bond Claims | Impaired | Entitled to Vote |
| 3 | Series 2010D Bond Claims | Impaired | Entitled to Vote |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 6 | Interests in Debtors | Unimpaired | Deemed to Accept |

3.2.1. Class 1 — Other Priority Claims. This Class is unimpaired and consists of all Allowed Other Priority Claims, if any such Claims still exist as of the Effective Date. Each Allowed Other Priority Claim shall be in a separate subclass. Except to the extent that the holder of an Allowed Other Priority Claim agrees to less favorable treatment, each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim: (i) deferred Cash payments of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim, or (ii) payment in Cash in full on the later of: (a) the fifth (5th) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Debtors; and (b) the fifth (5th) Business Day after the date on which such Other Priority Claim becomes an Allowed Claim.

3.2.2. Class 2 — Series 2010A/B/C Bond Claims**.** This Class is impaired and consists of all Series 2010A/B/C Bond Claims and includes all Claims of the holders of (i) the Series 2010A Bonds, which Claims shall be deemed Allowed pursuant to this Plan in the aggregate principal amount of $109,115,000, plus accrued and unpaid interest as of the Petition Date in the amount of $1,531,614.21, plus accrued and unpaid interest from the Petition Date through and including the Effective Date in the approximate amount of $1,828,055.66; (ii) the Series 2010B Bonds, which Claims shall be deemed Allowed pursuant to this Plan in the aggregate principal amount of $7,875,000, plus accrued and unpaid interest as of the Petition Date in the amount of $105,109.38, plus accrued and unpaid interest from the Petition Date

through and including the Effective Date in the amount of $125,453.13; and (iii) the Series 2010C Bonds, which Claims shall be deemed Allowed pursuant to this Plan in the aggregate principal amount of $5,000,000, plus accrued and unpaid interest as of the Petition Date in the amount of $64,583.33, plus accrued and unpaid interest from the Petition Date through and including the Effective Date in the amount of $77,083.33. Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Series 2010A/B/C Bond Claim:

- Each holder of an outstanding Series 2010A Bond, outstanding Series 2010B Bond, or outstanding Series 2010C Bond shall exchange the then outstanding Series 2010A Bond, Series 2010B Bond, or Series 2010C Bond for (i) its *pro rata* share of Series 2016A Bonds in the aggregate principal amount of $103,691,500; and (ii) its *pro rata* share (together with holders of the Series 2010D Bonds) of certain of the Series 2016C Bonds in the aggregate principal amount of $21,918,750.

- Each holder of an outstanding Series 2010A Bond, outstanding Series 2010B Bond, or outstanding Series 2010C Bond shall also receive payment in full in Cash on account of its allocable share of accrued and unpaid interest on the Series 2010A Bonds, Series 2010B Bonds, or Series 2010C Bonds as applicable, through the date immediately preceding the Effective Date, which payment shall be made as of the Distribution Date.

3.2.3. Class 3 — Series 2010D Bond Claims**.** This Class is impaired and consists of all Series 2010D Bond Claims and includes all Claims of the holders of the Series 2010D Bonds, which shall be deemed Allowed pursuant to this Plan in the aggregate principal amount of $24,135,000, plus accrued and unpaid interest as of the Petition Date in the amount of $295,384.79, plus accrued and unpaid interest from the Petition Date through and including the Effective Date in the amount of $352,556.04. Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Series 2010D Bond Claim:

- Each holder of an outstanding Series 2010D Bond shall exchange the then outstanding Series 2010D Bond for (i) its *pro rata* share of certain Series 2016B Bonds in the aggregate principal amount of $20,514,750; and (ii) its *pro rata* share (together with holders of the Series 2010A Bonds, Series 2010B Bonds and Series 2010C Bonds) of certain of the Series 2016C Bonds in the aggregate principal amount of $21,918,750.

- Each holder of an outstanding Series 2010D Bond shall also receive payment in full in Cash on account of its allocable share of accrued and unpaid interest on the Series 2010D Bonds through the date immediately preceding the Effective Date, which payment shall be made as of the Distribution Date.

3.2.4. Class 4 — Other Secured Claims**.** This Class is unimpaired and consists of all Other Secured Claims. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in

exchange for each Allowed Other Secured Claim, on the later of the Effective Date and the date such Other Secured Claim becomes Allowed, or as soon as practicable thereafter, each holder of an Allowed Other Secured Claim shall have its Other Secured Claim reinstated and the legal, equitable, and contractual rights to which the holder of such Claim is entitled shall otherwise be unaltered in accordance with section 1124 of the Bankruptcy Code.

3.2.5. Class 5 —General Unsecured Claims. This Class is unimpaired and consists of all General Unsecured Claims. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive payment in full in Cash of the unpaid portion of such Allowed General Unsecured Claim on the latest of (i) the fifth (5th) Business Day after the Effective Date or as soon as practicable thereafter as determined by the Debtors, (ii) the fifth (5th) Business Day after the date on which such General Unsecured Claim becomes an Allowed Claim, (iii) the date such Allowed General Unsecured Claim becomes due and payable in the ordinary course of business, or (iv) as otherwise agreed to by the Debtors and the holder of such General Unsecured Claim, and this Plan shall otherwise leave unaltered the legal, equitable, and contractual rights to which the holder of such General Unsecured Claim is entitled; *provided, however,* that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business. The Debtors reserve their right, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

3.2.6. Class 6 — Interests in Debtors. This Class is unimpaired and consists of all Interests in the Debtors. On the Effective Date, the Sponsor, the sole member of the Corporation, will retain all membership interests in the Corporation. The Foundation has no members.

**3.3. Acceptance or Rejection of this Plan.**

3.3.1. Acceptance by an Impaired Class. In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

3.3.2. Presumed Acceptance of this Plan. Classes 1, 4, 5, and 6 are not impaired under this Plan and are, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.3.3. Voting Class**.** Classes 2 and 3 are impaired under this Plan and are entitled to vote to accept or reject this Plan.

## SECTION 4
## MEANS FOR IMPLEMENTATION OF THIS PLAN

4.1. **Sources of Consideration.** Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the cash

derived from the Reorganized Debtors' business operations, those certain funds established pursuant to the Restructuring Term Sheet and 2016 Bond Documents, and the Sponsor Contribution. A schedule of the source and uses of cash is attached as **Exhibit B** to the Plan.

4.2. **Cancellation of 2010 Bonds.** Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, the 2010 Bonds shall be cancelled, and the 2010 Bonds and related 2010 Bond Documents shall continue in effect solely to the extent they relate to and are necessary to (i) allow for the applicable distributions pursuant to the Plan, (ii) permit the 2010 Bond Trustee and the Authority to be compensated for fees and reimbursed for expenses including expenses of its professionals, assert its charging lien, enforce its indemnity and other rights and protections with respect to and pursuant to the 2010 Bond Documents, (iii) permit the 2010 Bond Trustee to set one or more record dates and distributions dates with respect to the distribution of funds to beneficial holders of the 2010 Bonds, as applicable, (iv) permit the 2010 Bond Trustee to appear in the Chapter 11 Case, and (v) permit the 2010 Bond Trustee and the Authority to perform any functions that are necessary in connection with the foregoing clauses (i) through (iv).

4.3. **Issuance of 2016 Bonds.** On the Effective Date, the Authority will issue the 2016 Bonds in accordance with the terms of this Plan and pursuant to the 2016 Indenture.

4.3.1. Series 2016A Bonds**.** The Series 2016A Bonds shall be issued as current paying bonds with an aggregate principal amount of $103,691,500. The Series 2016A Bonds shall bear interest at rates between 6.20% and 6.44% per annum and have maturities in the years and in principal amounts as set forth in Schedule 1 to the Restructuring Term Sheet. The Series 2016A Bonds shall further be subject to mandatory redemption/amortization as set forth in the Restructuring Term Sheet. Interest on the Series 2016A Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Schedule 2 to the Restructuring Term Sheet. The Series 2016A Bonds will be subject to optional redemption prior to maturity commencing on the fifth (5th) year after the Effective Date, at a price equal to: in year 5, at a price of 102%; in year 6, at a price of 101%; and thereafter at par.

4.3.2. Series 2016B Bonds. The Series 2016B Bonds shall be issued as current paying bonds with an aggregate principal amount of $20,514,750. The Series 2016B Bonds shall bear interest at 5.625%, payable semiannually, and shall mature on May 15, 2020. The Series 2016B Bonds shall be subject to mandatory optional redemption from Entrance Fees as set forth in the 2016 Indenture.

4.3.3. Series 2016C Bonds**.** The Series 2016C Bonds shall be issued in the aggregate principal amount of $21,918,750 and shall bear interest at an annual rate of 2.0% per annum. Interest and principal on the Series 2016C Bonds shall be payable semiannually, but only to the extent of Excess Cash, in accordance with the Distribution Waterfall, applied first to accrued interest, then to principal. The Series 2016C Bonds shall mature on May 15, 2055 and any balance outstanding on the Series 2016C Bonds at final maturity shall be due and payable in full. To the extent available Excess Cash is insufficient to pay interest on the Series 2016C Bonds on any scheduled Interest Payment Date, the amount of such unpaid interest shall compound and therefore shall bear interest at the interest rate due on the Series 2016C Bonds. The Series 2016C Bonds shall be subject to redemption as follows:

| **Years** | **Redemption Price as a Percentage of Principal** |
|---|---|
| 1-5 | 65% |
| 6-10 | 75% |
| 11 to maturity | 100% |

4.3.4. Sponsor Note. On the Effective Date, the Sponsor will deposit the Sponsor Contribution into the Operating Reserve Fund with the proceeds to be used in accordance with the Restructuring Term Sheet. The Sponsor will receive the Sponsor Note in the amount of the Sponsor Contribution, which shall be subordinate in security and payment to the Series 2016 Bonds and payable from Excess Cash in accordance with the Distribution Waterfall. The Sponsor Loan will be repaid solely from Excess Cash and will have a final and bullet maturity in the same year as of the Series 2016C Bonds. The Sponsor Loan will be non-interest bearing.

4.3.5. Priority of 2016 Bonds and the Sponsor Note**.** The Series 2016A Bonds and the Series 2016B Bonds will be *pari passu,* secured by a first priority Lien on all assets of the Reorganized Debtors and will be senior to the Series 2016C Bonds and the Sponsor Note in repayment. The Series 2016C Bonds will be secured by a Lien on all assets of Reorganized Debtors and be subordinated to the lien securing the Series 2016A Bonds and the Series 2016B Bonds and will be senior to the Sponsor Note. The Sponsor Note will be secured by a lien on all assets of Reorganized Debtors, subordinate to the 2016 Bonds, and any parity bonds issued under the 2016 Indenture.

4.3.6. 2016 Bond Documents**.** In connection with the foregoing matters described in this Section 4.3.6, on the Effective Date, the Authority, the Debtors, and the 2016 Bond Trustee, as applicable, will enter into the 2016 Bond Documents, including the 2016 Indenture, the 2016 Master Indenture, and the 2016 Mortgage. The 2010 Bond Trustee shall transfer substantially all funds and accounts created or maintained under or pursuant to the 2010 Indenture in accordance with the 2016 Bond Documents and this Plan.

4.3.7. Effective Date Transactions. Upon the Effective Date, the Debtors shall establish and/or maintain the accounts and funds described in the 2016 Bond Documents and the Restructuring Term Sheet. Upon the Effective Date, all Entrance Fees, including any Entrance Fees received and escrowed by the Debtor after the Petition Date pursuant to the Entrance Fee Escrow Agreement, shall be deposited with the 2016 Master Trustee in the Entrance Fee Fund. The deposits in the Entrance Fee Fund, together with the balances of the Debtors' operating accounts and the Operating Reserve Fund, as of the Effective Date, the revenues and other income of the Debtors available on the Effective Date, and the Sponsor Contribution shall be applied in the following order of priority to the extent of available funds: (i) to pay any Refunds due and owing; (ii) to pay the professional fees and expenses incurred in connection with the transactions contemplated under this Plan (including, without limitation, any costs associated with obtaining opinions from bond counsel) subject to the Budget; (iii) to fund the Debt Service Reserve Fund up to any shortfall, if any, to the initial Debt Service Reserve Fund requirement, after transfer of the balance of the Debt Service Reserve Fund held under the 2010 Indenture;

(iv) to fund the Operating Account in an amount equal to approximately 45 Days Cash on Hand; and (v) to fund the Operating Reserve Fund in an amount equal to 105 Days Cash on Hand.

4.3.8. Additional Terms of 2016 Bonds**.** Additional terms and conditions with respect to the 2016 Bonds are set forth in the Restructuring Term Sheet and in the 2016 Bond Documents. To the extent of any inconsistencies between the Restructuring Term Sheet and the 2016 Bond Documents, the 2016 Bond Documents shall govern the respective rights and obligations of the parties.

4.4. **Section 1145 Exemption.** Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the 2016 Bonds shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act of 1933 (as now in effect or hereafter amended) and any other applicable state or federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities. Any person who solicits or participates in the offer, issuance, sale, or purchase of the 2016 Bonds issued under, or in accordance with, this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, is not liable, on account of such solicitation or participation, for violation of an applicable law, rule, or regulation governing solicitation of acceptance or rejection of this Plan or the offer, issuance, sale, or purchase of securities pursuant thereto.

4.5. **Sponsor and PMDI Agreements.** On or before the Effective Date, the Management Agreement will be terminated and PMDI will waive all accrued and unpaid management fees through the Effective Date. On the Effective Date, the Sponsor shall enter into a new management agreement with the Reorganized Debtors, which shall be included in the Plan Supplement, that shall provide for an annual management fee in an amount no greater than the Base Management Fee. On or before the Effective Date, the Development Services Agreement and the Liquidity Support Agreement will be terminated and the Sponsor will waive all fees, expenses, and other amounts owed to the Sponsor by the Corporation under such agreements.

4.6. **Greystone Agreement.** Pursuant to that certain Termination Agreement and General Release, entered into by and between the Corporation, Greystone, and the Sponsor, on the Effective Date, the Greystone Agreement will be terminated and, in exchange for a settlement payment, Greystone will waive and release any and all claims, liabilities, or other amounts, including any outstanding fees and expenses, currently or in the future owed under the Greystone Agreement. Such settlement payment in the amount of $250,000 shall be paid by the Sponsor.

4.7. **Assumption of Residency Agreements.** On the Effective Date, the Reorganized Debtors shall assume all of the Residency Agreements in their entirety.

4.8. **Reorganized Debtors' Board of Directors.** The existing members of the Boards of Directors of the Debtors shall continue to be members of the Boards of Directors of the Reorganized Debtors. The Boards of Directors of the Debtors consists of Sharon Clousing, Cal Tameling, Tim Breems, Rich Van Hattem, Justin Kats, Ken Schoon, and Don Van Dyk.

4.9. **Officers of the Reorganized Debtors.** The existing officers of the Debtors shall continue to be officers of the Reorganized Debtors. Such officers shall serve in accordance with applicable non-bankruptcy law. The existing officers of the Debtors include Richard C. Schutt (President and Chief Executive Officer), Ray Hemphill (Executive Vice President of Project Development), William DeYoung (Chief Financial Officer), and Barry Vander Genugten (Vice President of Finance).

4.10. **Employee Benefits.** Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtors may: (i) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity at any time, and (ii) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; *provided, however,* that the Debtors' or the Reorganized Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing herein shall limit, diminish, or otherwise alter the Reorganized Debtors' or the Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.

4.11. **Vesting of Assets in the Reorganized Debtors.** Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, or as soon as practicable thereafter, all property of the Debtors' Estate and all Causes of Action of the Debtors (except those released pursuant to the Releases by the Debtors) shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing the 2016 Bonds). On and after the Effective Date, except as otherwise provided in this Plan, the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.12. **Restructuring Transactions.** On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Persons may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable Persons agree; (iii) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Persons determine to be

necessary or appropriate, including making filings or recordings that may be required by applicable law.

4.13. **Corporate Action.** Upon the Effective Date, all actions contemplated by this Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, and all matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by this Plan (or necessary or desirable to effect the transactions contemplated by this Plan) in the name of and on behalf of the Debtors or the Reorganized Debtors, as the case may be, and any and all other agreements, documents, securities, and instruments relating to the foregoing.

4.14. **Section 1146 Exemption from Certain Taxes and Fees.** Pursuant to section 1146(a) of the Bankruptcy Code, any transfer of property and any issuance, transfer, or exchange of a security in connection with or pursuant to this Plan shall not be subject to any stamp, mortgage recording, or other similar tax, charge, or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax, charge, or governmental assessment and, as applicable, to accept for filing and recordation instruments or other documents pursuant to such transfer of property or to permit the issuance, transfer, or exchange of a security without the payment of any such tax, charge, or governmental assessment. Such exemption specifically applies, without limitation, to (i) the creation and recordation of any mortgage, deed of trust, lien, or other security interest; (ii) the making or assignment of any lease or sublease; (iii) any restructuring transaction authorized by this Plan, including, without limitation, the issuance by the Authority of the 2016 Bonds; or (iv) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under this Plan.

4.15. **Preservation of Causes of Action of the Debtors.** In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, the Exculpated Claims against the Exculpated Parties and the Debtor Released Claims against the Released Parties), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including those Causes of Action listed in the Plan Supplement, whether arising before or after the Petition Date, and the Reorganized Debtors' right to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Person may rely on the

absence of a specific reference in the Plan Supplement, this Plan, or the Disclosure Statement to any Cause of Action against such Person as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such Person. Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Person on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or the Reorganized Debtors, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in this Plan. Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or by an order of the Bankruptcy Court, the Reorganized Debtors expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of this Plan. For the avoidance of doubt, nothing in this Section 4.14 shall affect the "Release by the Debtor" provided in Section 8.2 of this Plan.

## SECTION 5
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1. **Assumption and Rejection of Executory Contracts and Unexpired Leases.** Except as otherwise provided in the Plan or in an order of the Bankruptcy Court, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by the Debtors; (ii) expired or terminated pursuant to its own terms before the Effective Date; (iii) is the subject of a motion to reject filed on or before the Effective Date; or (iv) is identified as an Executory Contract or Unexpired Lease to be rejected in the Plan Supplement filed on or before the Effective Date.

**Notwithstanding anything contained in this Plan to the contrary, each Residency Agreement, and all obligations arising thereunder, including the payment of Refunds and all other entrance deposits and fees, will be assumed by the Reorganized Debtors, as of the Effective Date, pursuant to this Plan.**

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in this Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revert in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in this Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date. After the Effective Date, the Reorganized Debtors shall have the right to

terminate, amend, or modify any contracts, leases, or other agreements without approval of the Bankruptcy Court, subject to the terms thereof.

*5.2.* **Claims Based on Rejection of Executory Contracts or Unexpired Leases.** All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; *provided, that* any such Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by section 502(b)(6) of the Bankruptcy Code. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estate, or their property, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, action by, or order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Class 5 General Unsecured Claims and shall be treated in accordance with this Plan.

5.3. **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.** Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under this Plan is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption.

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full waiver, release, and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting change in control or ownership interest composition and other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

5.4. **Insurance Policies.** Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption and assignment of each of the Insurance Policies.

5.5. **Modifications, Amendments, Supplements, Restatements, or Other Agreements.** Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other

interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated under this Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, unless such Executory Contract or Unexpired Lease has been previously assumed by the Debtors.

5.6. **Reservation of Rights.** Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

5.7. **Contracts and Leases Entered Into After the Petition Date.** Notwithstanding any other provision in this Plan, contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## SECTION 6
## PROVISIONS GOVERNING DISTRIBUTIONS

6.1. **Timing and Calculation of Amounts to Be Distributed.** Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Plan. Except as otherwise provided for in this Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

6.2. **Distributions.** Except as otherwise provided in this Plan, all distributions under this Plan shall be made by the Reorganized Debtors. With respect to the issuance of the 2016 Bonds, such bonds shall be deemed issued and exchanged as of the Effective Date without presentment by the beneficial owners. The Distribution Record Date in connection with the holders of the 2016 Bonds shall be as early as practicable so as to enable the Debtors, the

Reorganized Debtors, the Authority, and their respective agents to comply with the customary practices and procedures of the Depository Trust Company. All Cash distributions to be made to beneficial holders of the 2010 Bonds shall be made to the 2010 Bond Trustee, which shall make such distributions to the beneficial holders of the 2010 Bonds in accordance with the terms of the 2010 Indenture.

6.3. **Payments and Distributions on Disputed Claims.** Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but that later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.4. **Special Rules for Distributions to Holders of Disputed Claims.** Notwithstanding any other provision of this Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

6.5. **Delivery of Distributions in General.** Except as otherwise provided in this Plan, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Reorganized Debtors. Distributions to holders of Allowed Claims will be made at the address of each such holder as set forth in the Debtors' books and records, except that, in the case of holders of the 2010 Bonds, distributions will be made by means of book-entry exchange through the facilities of the Depository Trust Company in accordance with the customary practices of the Depository Trust Company, as and to the extent practicable. Distributions under this Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in this Plan. Neither the Debtors, nor the Reorganized Debtors, shall incur any liability whatsoever on account of any distributions under this Plan except for gross negligence, willful misconduct, or fraud.

6.6. **Undeliverable Distributions and Unclaimed Property.** In the event that any distribution to any holder is returned as undeliverable, the Reorganized Debtors shall use reasonable efforts to determine the current address of such holder. No distribution to such holder shall be made unless and until the Reorganized Debtors have determined such holder's then current address, at which time such distribution shall be made as soon as practicable; *provided, however,* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat or abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property shall be discharged and forever barred.

6.7. **Withholding and Reporting Requirements.** In connection with this Plan and all instruments issued in connection therewith, the Reorganized Debtors shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing

authority, and all distributions under this Plan shall be subject to any such withholding or reporting requirements.

6.8. **Setoffs.** Except as otherwise provided herein and subject to applicable law, the Debtors and the Reorganized Debtors, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, setoff against any Allowed Claim (which setoff shall be made against the Allowed Claim, not against any distributions to be made under the Plan with respect to such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such holder have not been otherwise released, waived, relinquished, exculpated, compromised, or settled on or prior to the Effective Date (whether pursuant to this Plan or otherwise), and any distribution to which a holder is entitled under this Plan shall be made on account of the Claim, as reduced after application of the setoff described above. In no event shall any holder of a Claim be entitled to setoff any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors unless such holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtors or the Reorganized Debtors, as applicable, and a holder of a Claim; *provided, that,* where there is no written agreement between the Debtors or the Reorganized Debtors, as applicable, and a holder of a Claim authorizing such setoff, nothing herein shall prejudice or be deemed to have prejudiced the right of the Debtors or the Reorganized Debtors, as applicable, to assert that any holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date. This Section 6.8 shall not be applicable to the distributions to be made to or for the benefit of the beneficial holders of the 2010 Bonds.

6.9. **Insurance Claims.** No distributions under this Plan shall be made on account of an Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to the Debtors' Insurance Policies. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim, then immediately upon such agreement, such Claim may be expunged without an objection to such Claim having to be filed and without any further notice to, action by, or order or approval of the Bankruptcy Court.

6.10. **Applicability of Insurance Policies.** Except as otherwise provided in this Plan, distributions to holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Except as expressly provided in this Plan, nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Person may hold against any other Person, including insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

6.11. **Allocation of Distributions Between Principal and Unpaid Interest.** With the exception of distributions on account of the 2010 Bonds, which shall be treated as provided in Classes 2 and 3 herein, to the extent that any Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for U.S. federal income tax purposes, be allocated on the Debtors' books and records to the principal

amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest.

6.12. **Interest on Claims.** Unless otherwise specifically provided for in this Plan (including interest payable under the 2010 Bonds), postpetition interest will not accrue or be paid on Claims, and no Claim holder will be entitled to interest accruing on or after the Petition Date on any Claim. Similarly, unless otherwise specifically provided for in this Plan, postpetition interest will not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

## SECTION 7
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

7.1. **Prosecution of Objections to Claims.** The Debtors or the Reorganized Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Reorganized Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

7.2. **Retention of Debtors' Rights and Defenses.** Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), the Reorganized Debtors after the Effective Date will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date. This section shall not be applicable to the 2010 Bond Trustee or the beneficial holders of the 2010 Bonds.

7.3. **Distributions After Allowance.** As soon as practicable following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Debtors shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under this Plan, without any interest to be paid on account of such Claim.

7.4. **Estimation of Claims.** The Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Person, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection,

estimation, settlement, and resolution procedures set forth in this Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

## SECTION 8
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

8.1. **Compromise and Settlement of Claims, Interests and Controversies.** Pursuant to section 1123 of the Bankruptcy Code and Federal Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estate, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of this Plan, pursuant to section 363 of the Bankruptcy Code and Federal Bankruptcy Rule 9019(a), without any further notice to, action by, or order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against it and Causes of Action against other Persons.

**8.2. Releases by the Debtors. Pursuant to section 1123(b) of the Bankruptcy Code, and except as specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released by the Debtors, the Estate, and the Reorganized Debtors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable by behalf of the Debtors or the Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Estate, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively), by or on behalf of the Holder of any Claim or Interest or other entity, based on or related to, or in any manner arising from, in whole or in part, the Debtors, the 2010 Bond Documents, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the any agreement or other document formalizing the transactions contemplated by the Plan, or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the**

**Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence or any breach of the Plan Support Agreement by a Released Party (collectively, the "*Debtor Released Claims*").**

**8.3. Releases by Holders of Claims and Interests. As of the Effective Date, except as otherwise provided in the Plan, the Releasing Parties are deemed to have released the Debtors, the Estate, the Reorganized Debtors, and the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors or Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the 2010 Bond Documents, the Debtors' restructuring, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of any agreement or other document formalizing the transactions contemplated by the Plan, or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence or any breach of the Plan Support Agreement by a Released Party.**

**8.4. Notwithstanding anything to the contrary, the releases set forth above in Sections 8.2 and 8.3 do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement, including the 2016 Bond Documents) executed to implement the Plan, including, without limitation, any legal opinion requested or required by an entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan (inclusive of a tax opinion).**

**8.5. Exculpation. Except as otherwise specifically provided in the Plan, each Debtor, each Reorganized Debtor, the Estate, and each Released Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any Exculpated Claim, except to the extent such claim, obligation, Cause of Action, or liability arises from actual fraud, willful misconduct, or gross negligence or the breach of the Plan Support Agreement (notwithstanding advice of counsel), but in all respect such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors, the Reorganized Debtors, the Estate, and the Released Parties have, and upon completing of the Plan shall be deemed to have,**

**participated in good faith and in compliance with applicable law with regard to the restructuring of the Claims and Interests in the Chapter 11 Case and in connection with the transactions contemplated by the Plan, the negotiation, formulation, or preparing any agreement or other document formalizing the transactions contemplated by the Plan, or any related agreements, instruments, or other documents (including the 2016 Bond Documents and the Sponsor Note, as applicable, and documents and instruments related thereto and any legal opinion requested by an entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) in connection with the Plan, and the solicitation and distribution of the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

8.6. **Discharge of Claims.** Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Bar Date Order, in this Plan, or in any contract, instrument, or other agreement or document created pursuant to this Plan (including, but not limited to, the 2016 Bond Documents), the distributions, rights, and treatment that are provided in this Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, and rights against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such Claim, debt, or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such Claim, debt, or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim has accepted this Plan. Except as otherwise provided herein, any default by the Debtors with respect to any Claim that existed before or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring, except as otherwise expressly provided in this Plan.

**8.7. Injunction. FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER.**

**FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THIS PLAN, ALL RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY**

**MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THIS PLAN (INCLUDING, BUT NOT LIMITED TO, THE OBLIGATIONS RELATING TO THE 2016 BONDS), ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATE OF SUCH PERSONS ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED, OR DISCHARGED PURSUANT TO THIS PLAN.**

**THE RIGHTS AFFORDED IN THIS PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATE. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN).**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THIS PLAN (INCLUDING, BUT NOT LIMITED TO, THE OBLIGATIONS RELATING TO THE 2016 BONDS) FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL**

**BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(g) OF THE BANKRUPTCY CODE.**

**ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATE, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.**

8.8. **Term of Injunctions or Stays.** Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. Upon the Effective Date, all injunctions or stays contained in this Plan or the Confirmation Order shall be in full force and effect in accordance with their terms.

8.9. **Protection Against Discriminatory Treatment.** Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Persons, including governmental units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Reorganized Debtors or another Person with whom the Reorganized Debtors has been associated, solely because the Debtors have been debtors under Chapter 11, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

**8.10. Release of Liens. Except as otherwise provided in this Plan, the 2016 Bond Documents, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. For the avoidance of doubt, except as otherwise provided in this Plan (including the Plan Supplement, inclusive of the 2016 Bond Documents), all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.**

## SECTION 9
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

9.1. **Conditions Precedent to the Effective Date.** It shall be a condition precedent to the Effective Date that each of the following provisions, terms, and conditions shall have been satisfied or waived pursuant to the provisions of this Plan.

(a) The Bankruptcy Court shall have entered the Confirmation Order containing findings of fact and conclusions of law satisfactory to the Debtors and the 2010 Bond Trustee, which Confirmation Order shall not be subject to any stay and shall be a Final Order, and which Confirmation Order shall include or provide, among other things:

(i) a finding by the Bankruptcy Court that the 2016 Bonds to be issued on the Effective Date will be authorized and exempt from registration under the applicable securities law, pursuant to section 1145 of the Bankruptcy Code;

(ii) all provisions, terms and conditions of the Plan and related documents are approved; and

(iii) all Executory Contracts or Unexpired Leases assumed by the Debtors during the Chapter 11 Case including under the Plan shall remain in full force and effect for the benefit of the Reorganized Debtors or their assignee notwithstanding any provision in such contract or lease (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables, permits, or requires termination of such contract or lease;

(b) The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

(c) The Authority shall consent to the issuance of the 2016 Bonds;

(d) The 2016 Bonds shall be issued by the Authority;

(e) In connection with issuance of the 2016 Bonds, the 2016 Bond Trustee shall have received a satisfactory opinion of bond counsel that the interest on the 2016 Bonds will be excluded from gross income for federal tax purposes;

(f) The Trigger Date (as defined in the Entrance Fee Escrow Agreement) shall have occurred;

(g) The Plan and all Plan Supplement documents, including any amendments, modifications, or supplements thereto, shall be in form and substance acceptable to the 2010 Bond Trustee;

(h) All payments and transfers to be made on the Effective Date shall be made or duly provided for, and the Debtors shall have sufficient Cash on such date to make such payments;

(i) All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained;

(j) All other actions, documents and agreements necessary to implement the Plan shall be in form and substance acceptable to the 2010 Bond Trustee and shall have been effected or executed; and

(k) The Effective Date shall be on or before April 1, 2016.

9.2. **Waiver of Conditions.** The conditions to the Effective Date set forth herein may be waived at any time by the Debtors (except for (i) the Confirmation Order being satisfactory to the 2010 Bond Trustee, (ii) the issuance of the 2016 Bonds, (iii) the bond counsel opinion referred to in Section 9.1(e) above, (iv) the condition that the aforementioned documents and orders be reasonably acceptable to the 2010 Bond Trustee, and (v) the Effective Date shall be on or before April 1, 2016); *provided, however,* that the Debtors may not waive entry of an order or orders approving the Disclosure Statement and confirming this Plan.

9.3. **Effect of Failure of Conditions.** If the Effective Date does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against the Debtors; (ii) prejudice in any manner the rights of the Debtors, any holders of Claims, or any other Person; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders, or any other Person in any respect.

## SECTION 10
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN

10.1. **Modification and Amendments.** Except as otherwise specifically provided herein, the Debtors reserve the right to modify this Plan as to material terms and seek confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Federal Bankruptcy Rule 3019 and those restrictions on modifications set forth in this Plan, the Debtors expressly reserve their right to alter, amend, or modify materially this Plan one or more times, after confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan, *provided, however,* that, except with the prior written consent of each of the 2010 Bond Trustee and the Consenting Holders, the Debtors may not alter, amend, or modify this Plan in any manner that (i) alters or affects the rights or interests of the 2010 Bond Trustee or the holders of the 2010 Bonds, (ii) alters or affects the treatment of the Series 2010A/B/C Bond Claims or the Series 2010D Bond Claims under this Plan, (iii) alters or affects the terms or characteristics of the 2016 Bonds as set forth in this Plan prior to such alteration, amendment, or

modification, or (iv) is inconsistent with the terms of the Plan Support Agreement. Any such modification or supplement shall be considered a modification of this Plan and shall be made in accordance with this Plan. For the avoidance of doubt, nothing in this Section 10.1 shall be deemed to supplant or supersede the requirements of Federal Bankruptcy Rule 3019.

10.2. **Effect of Confirmation on Modifications.** Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Federal Bankruptcy Rule 3019.

10.3. **Revocation or Withdrawal of this Plan.** The Debtors reserve the right to, consistent with their fiduciary duties, revoke or withdraw this Plan before the Effective Date. If the Debtors revoke or withdraws this Plan, or if confirmation does not occur, then: (i) this Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of any Executory Contract or Unexpired Lease effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void, and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Person; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Person.

## SECTION 11
## RETENTION OF JURISDICTION

11.1. Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Case and all matters arising out of or related to the Chapter 11 Case and this Plan, including jurisdiction to:

(a) allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

(b) decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

(c) resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtors are parties or with respect to which the Debtors may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including rejection Claims, cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease,

(ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, (iii) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, any Executory Contracts or Unexpired Leases on the list of Executory Contracts and Unexpired Leases to be assumed or rejected, and (iv) any dispute regarding whether a contract or lease is or was executory or unexpired;

(d) ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(e) adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(f) adjudicate, decide, or resolve any and all matters related to any Cause of Action;

(g) adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h) enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(i) resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551, and 553 of the Bankruptcy Code;

(j) resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation of this Plan or any Person's obligations incurred in connection with this Plan (exclusive of the obligations arising under the 2016 Bonds);

(k) issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of this Plan;

(l) resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications, and other provisions contained in this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(m) enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n) adjudicate any and all disputes arising from or relating to distributions under this Plan;

(o) consider any modifications of this Plan, cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(p) determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(q) hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan (exclusive of those documents relating to the 2016 Bonds);

(r) hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(s) hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

(t) enforce all orders previously entered by the Bankruptcy Court;

(u) hear any other matter not inconsistent with the Bankruptcy Code; and

(v) enter an order concluding or closing the Chapter 11 Case.

## SECTION 12
## MISCELLANEOUS PROVISIONS

12.1. **Immediate Binding Effect.** Notwithstanding Federal Bankruptcy Rules 3020(e), 6004(h), or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests are deemed to have accepted this Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, exculpation, discharges, and injunctions described in this Plan, each Person acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

12.2. **Additional Documents.** On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, subject to the consent of the 2010 Bond Trustee. The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any

other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

12.3. **Reservation of Rights.** Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of this Plan, any statement or provision contained in this Plan, or any action taken or not taken by the Debtors or other Person with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or other Person with respect to the holders of Claims or Interests before the Effective Date.

12.4. **Successors and Assigns.** The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of such Person.

12.5. **Votes Solicited in Good Faith.** Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under this Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the 2016 Bonds offered under this Plan.

12.6. **Closing of Chapter 11 Case.** The Debtors or the Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Federal Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

12.7. **Notices.** All notices or requests in connection with this Plan shall be in writing and given by mail addressed to:

If to the Debtors, to:

Timothy Place, NFP
18601 North Creek Drive
Tinley Park, Illinois 60477
Attn: William DeYoung, Chief Financial Officer

Christian Healthcare Foundation, NFP
18601 North Creek Drive
Tinley Park, Illinois 60477
Attn: William DeYoung, Chief Financial Officer

with copies to:

McDonald Hopkins LLC
300 North LaSalle Street, Suite 2100
Chicago, Illinois 60601
Attn: Shawn M. Riley, David A. Agay, Manju Gupta, and Joshua A. Gadharf
Email: sriley@mcdonaldhopkins.com, dagay@mcdonaldhopkins.com, mgupta@mcdonaldhopkins.com, jgadharf@mcdonaldhopkins.com

If to the 2010 Bond Trustee, to:

UMB Bank, N.A.
120 South 6th Street, Suite 1400
Minneapolis, Minnesota 55403
Attn: Virginia A. Housum, Senior Vice President
Email: virginia.housum@umb.com

with copies to:

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111
Attn: Daniel S. Bleck, Esq., Kevin J. Walsh, Esq. and Poonam Patidar, Esq.
Email: dsbleck@mintz.com, kwalsh@mintz.com, ppatidar@mintz.com

All notices and requests to Persons holding any Claim in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in this Chapter 11 Case. Any such holder of a Claim may designate in writing any other address for purposes of this Section 12.7, which designation will be effective upon receipt by the Debtors.

12.8. **Headings.** The headings used in this Plan are inserted for convenience only and neither constitute a portion of this Plan nor in any manner affect the construction of the provisions of this Plan.

12.9. **Severability.** If, prior to confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

12.10. **Validity and Enforceability.** The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. Should any provision in this Plan be determined by the Bankruptcy Court or any

appellate court to be unenforceable following the Effective Date, such determination shall in no way limit the enforceability and operative effect of any and all other provisions of this Plan.

12.11. **Plan Supplement.** Any exhibits or schedules not filed with this Plan may be contained in the Plan Supplement, if any, and the Debtors hereby reserve the right to file such a Plan Supplement.

12.12. **Governing Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Illinois, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of this Plan and the restructuring transactions consummated or to be consummated in connection therewith.

12.13. **Request for Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code.** The Debtors request entry of a Confirmation Order under Bankruptcy Code section 1129(a) and, to the extent necessary, Bankruptcy Code section 1129(b).

[*Remainder of Page Intentionally Left Blank*]

Dated: February 18, 2016

Respectfully Submitted,

**Timothy Place, NFP**

By: ______________________
Name: William DeYoung
Title: Chief Financial Officer

**Christian Healthcare Foundation, NFP**

By: ______________________
Name: William DeYoung
Title: Chief Financial Officer