## <u>EXHIBIT A</u>

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "Plan Support Agreement") is made and entered into as of January 11, 2016 (the "Effective Date") by and between Timothy Place, NFP (the "Corporation"), Christian Healthcare Foundation NFP (the "Foundation" and together with the Corporation, the "Borrowers") and each of the undersigned holders of Bonds (as defined herein) (the "Consenting Holders", and together with the Borrowers, each a "Party" and collectively the "Parties").

## RECITALS

A.     The Illinois Finance Authority (the "Authority") issued its (i) $109,115,000 Revenue Bonds, Series 2010A (Park Place of Elmhurst Project) (the "Series A Bonds"); (ii) $7,875,000 Revenue Bonds, Series 2010B (Park Place of Elmhurst Project) (the "Series B Bonds"); (iii) $5,000,000 Revenue Bonds, Series 2010C (Park Place of Elmhurst Project) (Accelerated Redemption Reset Option Securities (ARROS) (the "Series C Bonds"); (iv) $10,275,000 Revenue Bonds, Series 2010D-1 (Park Place of Elmhurst Project) (Tax-Exempt Mandatory Paydown Securities (TEMPS-75) (the "Series D-1 Bonds"); and (v) $15,350,000 Revenue Bonds, Series 2010D-2 (Park Place of Elmhurst Project) (Tax-Exempt Mandatory Paydown Securities (TEMPS-65) (the "Series D-2 Bonds" and together with the Series A Bonds, Series B Bonds, Series C Bonds and Series D-1 Bonds, the "2010 Bonds").

B.     UMB Bank, N.A., is the successor trustee (the "Bond Trustee") under that certain Bond Trust Indenture, dated as of May 1, 2010, by and between the Bond Trustee and the Authority (the "2010 Indenture"), pursuant to which the 2010 Bonds were issued.

C.     Pursuant to a Loan Agreement dated as of May 1, 2012 between Authority and the Borrowers, the Authority loaned the proceeds of the 2010 Bonds to the Borrowers.  The rights of the Authority under the Loan Agreement were assigned to the Bond Trustee under the terms of the 2010 Indenture.

D.     The Borrowers used the proceeds of the 2010 Bonds primarily to (i) pay or reimburse the Corporation for the payment of all or a portion of the costs of acquiring, constructing, renovating, remodeling and equipping certain heath facilities owned by the Borrowers, and all necessary and attendant facilities, equipment, site work, zoning, entitlements and utilities related thereto, including, but not limited to, the acquisition, construction and equipping of a continuing care retirement community consisting of approximately 173 independent living units, 10 catered living units, 46 assisted living units, 20 memory support assisted living units and 37 nursing beds, related common areas and parking, all known as Park Place Christian Community of Elmhurst ("Park Place"); (ii) provide working capital; (iii) fund debt service reserve funds; (iv) pay a portion of the interest on the 2010 Bonds; and (v) pay certain expenses incurred in connection with the issuance of the 2010 Bonds.

E.     As security for the obligations owing on the 2010 Bonds, the Corporation granted the Bond Trustee, inter alia: (i) a first mortgage lien on the real property on

which Park Place was constructed, and (ii) a first priority security interest in the personal property and fixtures located in Park Place (collectively, the "Mortgaged Property"), pursuant to a Mortgage and Security Agreement, dated as of May 1, 2010, between the Corporation and the Bond Trustee.  Pursuant to a Master Trustee Indenture, dated as of May 1, 2010, among the Borrowers and the Bond Trustee, as Master Trustee thereunder (the "Master Trust Indenture"), the Borrowers granted a security interest in its Gross Revenues (as defined in the Master Trust Indenture) as security for the payment of the 2010 Bonds.  The Authority also granted the Bond Trustee certain collateral under the 2010 Indenture. The 2010 Indenture, the Mortgage, the Loan Agreement and any other document or agreement delivered as security for, or in respect to, the 2010 Bonds or the Borrowers' obligations under any of such documents are collectively referred to herein as the "Bond Documents." In addition, repayment of the 2010 Bonds is secured by moneys deposited to the credit of the accounts in the related respective Debt Service Reserve Funds, established under the Bond Documents.

F.     Each Consenting Holder holds debt arising out of, or related to, the 2010 Bonds and the Consenting Holders hold debt, in aggregate, arising out of or related to the 2010 Bonds equal to at least seventy four and 18/100 percent (74.18%) of the principal amount of the 2010 Bonds outstanding, comprised of: (i) seventy nine and 85/100 percent (79.85%) of the Series 2010A Bonds, (ii) four and a quarter percent (4.25%) of the Series 2010B Bonds, (iii) three and a half percent (3.50%) of the Series 2010C Bonds, (iv) eighty one and 65/100 percent (81.65%) of the Series 2010D-1 Bonds, and (v) eighty nine and 29/100 percent (89.29%) of the Series 2010D-2 Bonds.

G.     Defaults, potential defaults or events of default have occurred (or will occur) under the Bond Documents.

H.     The Borrowers desire to implement a restructuring (the "Restructuring") of its financial obligations with respect to the 2010 Bonds on the terms and conditions set forth in the term sheet (including all exhibits therein, the "Term Sheet") attached hereto as **Exhibit 1**.

I.     The Consenting Holders have agreed to the Restructuring, solely on the terms and conditions outlined in the Term Sheet.

J.     Each of the Borrowers intend to implement the Restructuring by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing cases (the "Chapter 11 Cases"), which Chapter 11 Cases the Borrowers will seek to have jointly administered, in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court") on or before January 18, 2016 (the "Outside Petition Date").

K.     Each Party has reviewed, or has had the opportunity to review, this Plan Support Agreement and the Term Sheet with the assistance of professional legal advisors of its own choosing.

## STATEMENT OF AGREEMENT

In consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. <u>Preliminary Statements</u>.   The statements set forth in the recitals are incorporated herein and form an integrated part of this Plan Support Agreement, subject to such modifications and amendments as may be permitted pursuant to Section 11 hereof.

2. <u>Effectiveness of Plan Support Agreement</u>. Upon the execution of this Plan Support Agreement by the Parties, this Plan Support Agreement will constitute the legally binding and enforceable agreement of the Parties, effective as of the Effective Date.

3. <u>Agreements of the Borrowers</u>.   Consistent with the Borrowers' business judgment and the exercise of their fiduciary duties, the following are material covenants and conditions to the agreements contained herein:

(a)   The Borrowers shall take all reasonable efforts to provide drafts of the following documents (collectively, the "<u>Bankruptcy Documents</u>") in form and substance reasonably satisfactory to the Consenting Holders and the Bond Trustee no later than five (5) business days prior to the Outside Petition Date:

      i)      Petition with required documents**,** including: (i) board resolution, (ii) disclosure of related cases, (iii) top 20 unsecured creditors list, (iv) declaration verifying top 20 unsecured creditors list, (v) list of creditors, (vi) declaration verifying list of creditors, (vii) statement regarding equity security holders and corporate disclosure statement, (viii) declaration verifying statement regarding equity security holders and corporate disclosure statement;

      ii)      Declaration in Support of First Day Pleadings;

      iii)      Motion to Jointly Administer the Chapter 11 Cases;

      iv)      Motion to Approve Disclosure Statement and Solicitation Procedures and proposed Order;

      v)      Joint Plan of Reorganization and proposed Order;

      vi)      Disclosure Statement with respect to the Joint Plan of Reorganization;

      vii)      Motion Authorizing Use of Cash Collateral;

viii)    Motion to Assume Plan Support Agreement and proposed Order;

ix)    Motion to Self-Report in Lieu of an Ombudsman;

x)    Motion to Escrow Entrance Fees and Honor Resident Entrance Fees in the Ordinary Course and proposed Order;

xi)    Motion to Utilize Existing Cash Management System;

xii)    Motion to Pay Employee Wages and Benefits;

xiii)    Motion Prohibiting Utilities From Discontinuing Service;

xiv)    Motion to Pay Prepetition Taxes;

xv)    Motion to Maintain Existing Insurance Programs; and

xvi)    Motion Extending Time to File Schedules and Statements.

(b)    The Borrowers shall take all commercially reasonable steps to obtain approvals for the Restructuring as expeditiously as is reasonably practicable under applicable law, including the solicitation of requisite acceptances by means of the Disclosure Statement.

(c)    The Borrowers shall take all commercially reasonable steps to obtain any and all requisite regulatory or third party approvals necessary to consummate the Restructuring as is reasonably practicable.

(d)    The Borrowers will take all commercially reasonable efforts to file the Chapter 11 Cases, contemporaneously with the Bankruptcy Documents, no later than the Outside Petition Date (the date on which the Chapter 11 Cases and Bankruptcy Documents are actually filed shall be referred to herein as the "Petition Date").

(e)    The Borrowers shall take all reasonably necessary steps in seeking to obtain from the Bankruptcy Court an order confirming the Plan (as defined herein) reasonably acceptable in form and substance to the Consenting Holders (the "Confirmation Order") by March 29, 2016.

(f)    The Plan effective date occurs on or before April 1, 2016 (the "Effective Date").

(g)    The Borrowers shall take no action inconsistent with the Restructuring, the transactions contemplated thereby, or the expeditious confirmation and consummation of such transactions, except as otherwise permitted under this Plan Support Agreement.

(h)    Subject to the exercise of their fiduciary duties, the Borrowers shall not file a petition under the Bankruptcy Code or seek any similar relief without providing the Bond Trustee and the Consenting Holders at least five (5) business days' written notice thereof.

(i)    In the event the Borrowers propose a plan of reorganization that does not comply with this Plan Support Agreement or that constitutes a Support Agreement Termination Event, the Borrowers will not assert that the Consenting Holders have expressly or impliedly supported, endorsed, or otherwise agreed to any financial information, including any projections or liquidation analysis, included in the Bankruptcy Documents.

(j)    The Borrowers will not:

      i)    incur any further indebtedness with priority over the Bonds;

      ii)    transfer any assets other than in the ordinary course of its business other than miscellaneous assets not necessary for the operations of Park Place; and

      iii)    take any action that would result in entry of an order terminating, whether in whole or in part, the Borrowers' exclusive right to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code.

4.    <u>Agreements of Consenting Holders</u>.

(a)    <u>Ownership</u>. Each Consenting Holder represents and warrants that, as of the date hereof, such Consenting Holder either (i) is the sole legal or beneficial owner of a principal amount of the 2010 Bonds outstanding as set forth on **Schedule 1** hereto, and all related claims, rights, powers, and causes of action arising out of or in connection with or otherwise relating to such 2010 Bonds or the Bond Documents (collectively, the "<u>Claims</u>"), or (ii) has the power and authority to bind the legal and beneficial owner(s) of such 2010 Bonds and Claims to the terms of this Plan Support Agreement and, in either case, such Consenting Holder has full power and authority to vote on and consent to such matters concerning such 2010 Bonds outstanding and such Claims and to exchange, assign and transfer such 2010 Bonds and Claims.

(b)    <u>Restrictions on Transfers</u>. Until this Plan Support Agreement has been terminated in accordance with Section 8, each Consenting Holder shall not voluntarily sell, transfer, or assign any of its 2010 Bonds or Claims or any option thereon or any right or interest (voting or otherwise) therein unless the transferee thereof (i) has already executed this Plan Support Agreement or (ii) agrees in writing by executing the form of Joinder attached hereto as **Exhibit 2** to be bound, for the benefit of the Parties, by all of the terms of this Plan Support Agreement.   Subject to applicable securities and bankruptcy law, this Plan

Support Agreement shall in no way be construed to preclude any Consenting Holder or any of its respective subsidiaries or affiliates from acquiring additional 2010 Bonds; *provided*, *however*, that any such additional 2010 Bonds acquired by such Consenting Holder or any subsidiary or affiliate thereof shall automatically be deemed to be subject to the terms of this Plan Support Agreement.

(c)     Voting on the Plan.  Subject to the terms and conditions of this Plan Support Agreement, and so long as this Plan Support Agreement has not been terminated, and further provided that the Disclosure Statement approved by the Court contains information substantially similar to that set forth in the Disclosure Statement filed as part of the Bankruptcy Documents, each Consenting Holder will vote all claims that it holds or as to which it has voting authority with respect to the 2010 Bonds outstanding, the Claims, and all other claims, rights, or interests that exist against the Borrowers to accept a plan of reorganization proposed as part of the Chapter 11 Case that reflects the Restructuring outlined in the Term Sheet (such plan, the "Plan") and that is filed by the Outside Petition Date.

(d)     Support.  So long as this Plan Support Agreement has not been terminated, each Consenting Holder will not:

> i)      support or encourage, directly or indirectly, any financial restructuring or sale of assets concerning the Borrowers or their assets, other than the Restructuring;

> ii)     take any action inconsistent with the Term Sheet, the transactions contemplated hereby or thereby, or the expeditious confirmation and consummation of such transactions;

> iii)    vote against the Plan or otherwise agree, consent, or provide any support, to any other chapter 11 plan or other restructuring or sale or liquidation of assets concerning the Borrowers or their assets, other than the Restructuring;

> iv)     object to or otherwise commence any proceeding to oppose or alter the Plan or any of the terms of the Restructuring (or any other document filed in furtherance of, and that is consistent with the Restructuring);

> v)      make (and will not direct the Bond Trustee to make) any election under Section 1111(b) of the Bankruptcy Code, and will vote against and/or direct the Bond Trustee to object to any action or motion to make such an election; or

vi)    direct the Bond Trustee to take any action or otherwise act in a manner contrary to the terms of this Plan Support Agreement.

(e)    <u>Adequate Information; Compliance with Section 1125(g) of the Bankruptcy Code</u>. Each Consenting Holder has obtained adequate information regarding the Restructuring and that the Borrowers have provided all material, relevant information that the Consenting Holder has requested in advance of executing this Plan Support Agreement. Additionally, for purposes of this Plan Support Agreement, the solicitation of its support of the Plan in accordance with the terms and conditions hereof complies with applicable law and that each Consenting Holder was solicited in a manner complying with applicable law.

(f)    <u>[Reserved]</u>

(g)    <u>Appearing in the Bankruptcy Court</u>.  Notwithstanding any provision in this Plan Support Agreement to the contrary, nothing in this Plan Support Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Bankruptcy Court so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Plan Support Agreement and the Restructuring and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring.

(h)    <u>Direct the Bond Trustee</u>.  To the extent necessary, each Consenting Holder will direct the Bond Trustee to take actions consistent with this Plan Support Agreement.

(i)    <u>Documents</u>.  The Consenting Holders shall direct the Bond Trustee to take all reasonable efforts to draft the following documents in form and substance satisfactory to the Consenting Holders no later than the Outside Petition Date:

i)    Cash Collateral Order;

ii)    2016 Amended and Restated Bond Indenture;

iii)    2016 Amended and Restated Master Trust Indenture; and

iv)    2016 Amended and Restated Loan Agreement (collectively with the documents listed in (i) through (iii) above, the "<u>Plan Support Documents</u>").

5.    <u>Representations and Warranties of the Borrowers</u>. Each of the Borrowers represents and warrants to the Consenting Holders that the following statements are true, correct, and complete as of the date hereof:

(a)    it has all requisite corporate or similar authority to enter into this Plan Support Agreement and, subject to any necessary Bankruptcy Court approval, carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of the Borrowers' obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

(b)    the execution, delivery, and, subject to any necessary Bankruptcy Court approval, performance by such Borrowers of this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)    the execution, delivery, and performance by such Borrowers of this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body;

(d)    to the best of its knowledge, after reasonable diligence, the information provided in connection with the Restructuring and this Plan Support Agreement did not and does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; and

(e)    subject to the assumption of this Plan Support Agreement pursuant to 11 U.S.C. § 365, this Plan Support Agreement is, and shall be, a legally valid and binding obligation of such Borrower, enforceable in accordance with its terms.

6.    <u>Representations and Warranties of the Consenting Holders</u>. Each Consenting Holder represents and warrants to the Borrowers that the following statements are true, correct, and complete as of the date hereof:

(a)    it has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Plan Support Agreement and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

(b)    the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)   the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

(d)   this Plan Support Agreement is the legally valid and binding obligation of such Consenting Holder, enforceable in accordance with its terms.

7.   <u>Alternative Transactions</u>.   From and after execution of this Plan Support Agreement until it is terminated pursuant to Section 8 hereof, neither of the Borrowers, nor any of their respective officers, directors, employees, agents, representatives, or affiliates (including any investment banker or financial advisor retained by the Borrowers or any of the foregoing) shall, directly or indirectly, encourage, solicit, or initiate any inquiry or proposal from, or encourage, solicit, or initiate any negotiations with, or solicit or initiate any discussions with any person or entity (other than the Consenting Holders and the Bond Trustee or an affiliate, associate, representative or agent of the Consenting Holders) concerning any potential sale of the Borrowers or restructuring of the Borrowers or a transaction that is similar to, in conflict with or in substitution of the Restructuring pursuant to the terms hereof (each, an "<u>Alternative Transaction</u>"), or agree to endorse or take any other action to facilitate any Alternative Transaction, unless the Borrowers have obtained the prior written consent of the Consenting Holders holding all rights related to or otherwise having voting authority with respect to 75% of the principal amount of the 2010 Bonds held collectively by the Consenting Holders who are signatory hereto (the "<u>Requisite Consenting Holders</u>").

8.   <u>Termination of Support Agreement</u>. Upon the occurrence of any Support Agreement Termination Event, this Plan Support Agreement shall be deemed terminated upon written notice from the non-breaching Party to the breaching Party.  In the event of any such termination, all Parties shall be immediately relieved of any obligations hereunder.  If the Chapter 11 Case has been filed prior to such occurrence, such notice may be provided as part of a motion for relief from the automatic stay; *provided* that nothing herein shall be deemed to require a motion for relief from the automatic stay to effect such termination *provided further*, in the Chapter 11 Case, the Borrowers shall have two (2) business days to seek a Bankruptcy Court determination that no Support Agreement Termination Event has occurred.  Notwithstanding the above or anything else in this Plan Support Agreement to the contrary, upon termination of this Plan Support Agreement, any Consenting Holder shall be entitled as of right to change or withdraw its vote in favor of the Plan and be relieved from all obligations of a Consenting Holder under this Plan Support Agreement (collectively, a "<u>Withdrawal</u>"), with prior written notice thereof to the Borrowers and, if applicable, compliance with Rule 3018 of the Federal Rules of Bankruptcy Procedure.  The occurrence of any one or more following shall constitute a "<u>Support Agreement Termination Event</u>":

(a)   Failure by the Parties hereto to agree to the form and substance of any of the Plan Support Documents or the Bankruptcy Documents by the earlier of the Petition Date or the Outside Petition Date;

(b)   Any of the Bankruptcy Documents is withdrawn, materially modified or amended (except in the case of a document which is an interim order, by replacement with a final order that would otherwise meet the requirements of a Bankruptcy Document, or with the consent of the Consenting Holders and/or the Bond Trustee);

(c)   The Borrowers fail to file the Bankruptcy Documents on the Petition Date;

(d)   The Petition Date does not occur on or before the Outside Petition Date;

(e)   Either of the Borrowers:

i)      files or supports confirmation of, or fails to actively oppose confirmation of, a plan of reorganization that requests or would result in a withdrawal, modification, or amendment of the Plan, or that, as to any provision of the Plan, materially adversely affects the Consenting Holders;

ii)     files a motion, pleading, objection, lawsuit, or administrative or adversary proceeding (or takes any action in support of such a motion or pleading filed by another party) in the Bankruptcy Court or other court, or otherwise assists in any of the foregoing, that requests or would result in a withdrawal, modification, or amendment (including in the case of document which is an interim order, by replacement with a final order) of the Restructuring; or

iii)    files a motion, complaint, application, or other request seeking to disallow, subordinate, or limit in any way the 2010 Bonds held by the Consenting Holders, the Claims, or the liens of the Consenting Holders and/or the Bond Trustee, or seeking entry of an order by the Bankruptcy Court disallowing, subordinating, or limiting in any way the Bonds, Claims, or liens of the Consenting Holders and/or the Bond Trustee, or asserting a claim against any Consenting Holder and/or the Bond Trustee to avoid any transfer or obligation, or seeking any other monetary or equitable relief from or against any Consenting Holder and/or the Bond Trustee, in its capacity as such.

(f)   Following the Petition Date, the Bankruptcy Court has:

i)      not entered an order authorizing the assumption of this Plan Support Agreement under Section 365 of the Bankruptcy Code within thirty (30) days of the Petition Date or such

later date as is agreed to in writing by the Requisite Consenting Holders;

ii)      entered an order materially staying, reversing, vacating, materially amending or modifying the Cash Collateral Order (which for purposes hereof shall include any interim or final cash collateral order) without the prior written approval of the Bond Trustee, or fails to enter an order approving the use of Cash Collateral on an interim basis by January 25, 2016, and on a final basis by February 23, 2016 on such terms as set out in the Cash Collateral Order;

iii)     not approved the Disclosure Statement by February 23, 2016, or by such later date as is agreed to in writing by the Requisite Consenting Holders;

iv)     not entered the Confirmation Order by March 29, 2016, or by such later date as is agreed to in writing by the Requisite Consenting Holders;

v)      entered an order denying confirmation of the Plan;

vi)     entered an order pursuant to Section 1104 of the Bankruptcy Code appointing a trustee or appointing an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code), including, without limitation, to operate and manage the Borrowers' business (unless the motion resulting in such order was filed or supported by the Bond Trustee), or the Borrowers file a motion, application or other pleading consenting to or acquiescing in any such appointment;

vii)    entered an order dismissing the Chapter 11 Case or an order pursuant to Section 1112 of the Bankruptcy Code converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

viii)   enters an order suspending the Chapter 11 Case under Section 305 of the Bankruptcy Code;

ix)     enters an order in the Chapter 11 Case, over the objection of the Bond Trustee, approving financing pursuant to Section 364 of the Bankruptcy Code that (i) would grant an additional security interest or a lien that is equal or senior to that of the Bond Trustee on any collateral, or (ii) would grant to any party other than the Bond Trustee a super

priority administrative claim that is senior or equal to that granted to the Bond Trustee under the Cash Collateral Order; or

x)     granted relief that is inconsistent with this Plan Support Agreement or the Plan or that would result in a withdrawal, modification, or amendment of the Restructuring that is contrary to the Term Sheet and that has a material adverse effect on the Consenting Holders; *provided* that such relief has not resulted from any action or inaction by any of the Consenting Holders or the Bond Trustee.

(g)   The Effective Date of the Plan shall not have occurred by April 1, 2016 or by such later date as is agreed to by the Requisite Consenting Holders;

(h)   An injunction, judgment, order, decree, ruling, or charge shall have been entered that prevents consummation of the Restructuring and that remains in effect for longer than 30 days;

(i)   There is a mutual written agreement to terminate this Plan Support Agreement by the Parties;

(j)   Failure by the Borrowers to comply with any obligations under this Plan Support Agreement, other than those set forth in this Section 8, and such failure is not cured within five (5) business days after written notice thereof has been given to the Borrowers;

(k)   Failure by the Borrowers to comply with any obligations under this Section 8; and

(l)   Failure by any of the Consenting Holders to comply with any of their obligations under this Plan Support Agreement, and such failure is not cured within five (5) business days after written notice thereof has been given by the Borrowers to such Consenting Holder and the Bond Trustee.

A Support Agreement Termination Event may be waived in writing by the Requisite Consenting Holders and/or the Borrowers, as applicable.

9.    <u>Effect of Termination</u>.  Upon termination of this Plan Support Agreement, all obligations hereunder, shall terminate and shall be of no force and effect.

10.    Cooperation; Further Assurances; Acknowledgment; Definitive Documents.    The Parties shall cooperate with each other and shall coordinate their activities (to the extent practicable) in respect of all commercially reasonable actions necessary to consummate the Restructuring.    The Parties further agree to execute and deliver such other instruments and to perform such commercially reasonable acts, in addition to the matters herein specified, as may be appropriate or necessary, from time to time, to effectuate the Restructuring.

11.    Amendments. This Plan Support Agreement may not be modified, amended or supplemented except in a writing signed by the Parties.

12.    GOVERNING LAW; JURISDICTION.    THIS PLAN SUPPORT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF OR IN CONNECTION WITH, THIS PLAN SUPPORT AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE STATE OF ILLINOIS HAVING JURISDICTION, AND BY EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING; PROVIDED, THAT AFTER THE PETITION DATE THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ISSUES RELATING TO THIS PLAN SUPPORT AGREEMENT PROVIDED THAT THE BANKRUPTCY COURT SHALL FOLLOW APPLICABLE CHOICE OF LAW RULES.

13.    Specific Performance. It is understood and agreed by the Parties that the exact nature and extent of damages resulting from a breach of this Plan Support Agreement are uncertain at the time of entering into this Plan Support Agreement and that breach of this Plan Support Agreement would result in damages that would be difficult to determine with certainty.  It is understood that money damages would not be a sufficient remedy for any breach of this Plan Support Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach.  Such remedies shall be deemed the exclusive remedies for breach of this Plan Support Agreement by any Party or its representatives.

14.    Survival. Notwithstanding any sale of the 2010 Bonds outstanding or Claims in accordance with Section 3(b) of this Plan Support Agreement, the agreements

and obligations herein shall survive such sale and shall continue in full force and effect for the benefit of the Borrowers and the Consenting Holders in accordance with the terms hereof, and any purchaser of such 2010 Bonds and/or Claims shall be bound by and subject to the terms of this Plan Support Agreement.

15.     Headings. The headings of the Sections, paragraphs, and subsections of this Plan Support Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

16.     Successors and Assigns; Severability; Several Obligations. This Plan Support Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives. The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof. The agreements, representations, and obligations of the Consenting Holders under this Plan Support Agreement are, in all respects, several and not joint.

17.     No Third-Party Beneficiaries. Unless expressly stated herein, this Plan Support Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

18.     Consideration. No consideration shall be due or paid to the Consenting Holders and the Bond Trustee for agreement of the Consenting Holders to support the Restructuring and to vote in favor of the Plan in accordance with the terms and conditions of this Plan Support Agreement, other than the Borrowers' agreement to pursue the Restructuring and to file, pursue confirmation of, and implement the Plan in accordance with the terms and conditions of this Plan Support Agreement, which the Parties acknowledge is fair and sufficient consideration to support the Parties' respective agreements hereunder.

19.     Prior Negotiations; Entire Agreement. This Plan Support Agreement constitutes the entire agreement of the Parties related to the Restructuring, and supersedes all other prior negotiations with respect to the subject matter hereof, except that the Parties acknowledge that all Bond Documents shall continue in full force and effect.

20.     Counterparts. This Plan Support Agreement and any amendments, joinders (including the joinder in the form of **Exhibit 2** hereto), consents, or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  Facsimile or scanned signatures on this Plan Support Agreement shall be treated as originals for all purposes.

21.     Construction.  This Plan Support Agreement shall be deemed to have been negotiated and prepared at the joint request, direction, and construction of the Parties, and at arm's length and shall be interpreted without favor to any Party.

22.    <u>Time of the Essence</u>.  Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Plan Support Agreement.

23.    <u>Notices</u>.  All notices, demands, requests, consents, approvals, and other communications ("<u>Notice</u>" or "<u>Notices</u>") hereunder shall be in writing and delivered by (i) courier or messenger service, (ii) express or overnight mail, (iii) electronic mail (with a contemporaneous telephone message at the phone number(s) listed below), or (iv) by registered or certified mail, return receipt requested and postage prepaid, addressed to the respective parties as follows:

If to Borrowers:

Timothy Place, NFP.
18601 North Creek Drive, Suite A
Tinley Park, Illinois  60477
Attention: Chief Executive Officer
Telephone: (708) 342-8100
Telecopier: (708) 342-8000

Copy to:

McDonald Hopkins LLC
Attention: Shawn M. Riley, Esq.
600 Superior Avenue East, Suite 2100
Cleveland, OH 44114
Fax.: 216-348-5474
e-mail: sriley@mcdonaldhopkins.com

If to Trustee:

UMB Bank, N.A.,
Attn:  Virginia A. Housum, Senior Vice President
120 South 6th Street, Suite 1400
Minneapolis, MN  55403
Telephone:  612-308-9775
e-mail:  Virginia.Housum@umb.com

Copy to:

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Attn: Daniel S. Bleck, Esq.
One Financial Center
Boston, MA 02111
Telephone.:  617-542-6000
e-mail:  dsbleck@mintz.com

Copy to: Consenting Bondholders
[See Schedule 1 Attached Hereto]

or to such other addresses as any Party may hereafter designate.  Notice by courier or messenger service or by express or overnight mail shall be effective upon receipt.  Notice by electronic mail shall be effective upon delivery by the sender of a confirming telephone message.  Notice by mail shall be complete at the time of deposit in the United States mail system, but any right or duty to do any act or make any response within any prescribed period or on a date certain after the service of such Notice given by mail shall be, without further action by any Party, automatically extended three (3) days.

24.     Reservation of Rights.  Except as expressly provided in this Plan Support Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies, and interests, including its Claims.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated, or this Plan Support Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights.  Except as required by the Bankruptcy Code to assume, perform, or disclose this Plan Support Agreement, pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Plan Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

25.     Nature of Consenting Holder Obligations.   The obligations of each Consenting Holder hereunder shall be several, and not joint with the obligations of any other Consenting Holder herein, and no Consenting Holder shall be responsible in any way for the performance of the obligations of any other Consenting Holder hereunder.  Nothing herein or in any other agreement or document, and no action taken by any Consenting Holder pursuant hereto or thereto, shall be deemed to constitute the Consenting Holders as a group, a partnership, an association, a joint venture or any other kind of entity, or to create a presumption that the Consenting Holders are in any way acting in concert or as a group with respect to such obligations or the transaction contemplated by this Plan Support Agreement.  Each Consenting Holder shall be entitled to protect and enforce its rights, including without limitation, the rights arising out of this Plan Support Agreement, and it shall not be necessary for any other Consenting Holder to be joined as an additional party in the proceeding for such purpose.

26.     Automatic Stay.   The Borrowers acknowledge that after any commencement of the Chapter 11 Case, the giving of notice of termination by any Party pursuant to this Plan Support Agreement or a Withdrawal shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code.

27.   <u>Support Agreement Not a Plan</u>. This Plan Support Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code. The Plan will not become effective unless and until the Bankruptcy Court enters an order confirming the Plan and the Plan becomes effective in accordance with its terms. This Plan Support Agreement is not intended to constitute a solicitation or acceptance of the Plan.

BORROWERS:

**Timothy Place, NFP**

By:

Print Name: WILLIAM DEYOUNG

Title: CFO

**Christian Healthcare Foundation NFP**

By:

Print Name: WILLIAM DEYOUNG

Title: CFO

**AllianceBernstein Municipal Income Fund, Inc. – AllianceBernstein High Income Municpal Portfolio**

**AllianceBernstein Corporate Shares – AllianceBernstein Municipal Income Shares**

**AllianceBernstein Muncipal Income Fund, Inc. – New York Portfolio**

**AllianceBernstein Municipal Income Fund, Inc. – National Portfolio**

**AllianceBernstein Tax-Aware Fixed Inicome Portfolio, Inc.**

By: _____

Its Authorized Representative
and not individually

Aggregate principal amount of Bonds held on
the Effective Date hereof: $23,275,000

| CUSIP | Amount |
|---|---|
| 45200F3D9 | $      430,000 |
| 45200F3G2 | $      305,000 |
| 45200F3F4 | $  6,185,000 |
| 45200F3C1 | $16,355,000 |
|  | $23,275,000 |

**Invesco High Yield Municipal Fund**

**Invesco Municpal Income Fund**

**Invesco Muncipal Income Opportunities Trust**

**Invesco Intermediate Term Municipal Income Fund**

**Income Muncipal Trust**

**Invesco Advantage Muncipal Income Trust II**

**Invesco Municipal Opportunity Trust**

**Invesco Trust for Investment Grade Muncipals**

By: _Elizabeth Nelson_

Its Authorized Representative
and not individually

Aggregate principal amount of Bonds held on
the Effective Date hereof: $59,190,000

**Western Asset Municpal High Income Fund**

**Western Asset Managed Municipal Fund**

By: _____ - Michael A. Van Raaphorst

<u>Head of New York Operations/CS & Marketing</u>

Its Authorized Representative

and not individually

Aggregate principal amount of Bonds held on

the Effective Date hereof: $21,220,000

Western Asset Management Co
as Sub-Advisor to:
Western Asset Municipal High Income Fund
Western Asset Managed Municipal Fund

## SCHEDULE 1

"CONSENTING HOLDERS"

| Consenting Bondholder | Principal Amount of 2010 Bonds Owned |
|---|---|
| Invesco | $59,190,000 |
| AllianceBernstein LP | 23,275,000 |
| Western Asset Management | 21,220,000 |
| Oppenheimer Asset Management | 4,715,000 |

## **EXHIBIT 1**

TERM SHEET

EXECUTION COPY

## RESTRUCTURING TERM SHEET

This Restructuring Term Sheet (this "***Term Sheet***"), dated as of January 11, 2016 (the "***Execution Date***"), sets forth certain of the principal terms and conditions of a financial restructuring (the "***Restructuring Transaction***") of the outstanding indebtedness of Timothy Place, NFP (the "***Corporation***"), and Christian Healthcare Foundation, NFP (the "***Foundation***" and together with the Corporation, the "***Borrowers***"), including, without limitation, (i) $109,115,000 Illinois Finance Authority (the "***Issuer***") Revenue Bonds (Park Place of Elmhurst Project) Series 2010A (the "***Series A Bonds***"), (ii) $7,875,000 Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2010B (the "***Series B Bonds***"), (iii) $5,000,000 Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project)(Accelerated Redemption Reset Option Securities (ARROS) Series 2010C (the "***Series C Bonds***"), (iv) $10,275,000 Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project)(Tax-Exempt Mandatory Paydown Securities (TEMPS-75)), Series 2010D-1 (the "***Series D-1 Bonds***") and (v) $15,350,000 Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project)(Tax-Exempt Mandatory Paydown Securities (TEMPS-65)), Series 2010D-2 (the "***Series D-2 Bonds***" and together with the Series A Bonds, Series B Bonds, Series C Bonds and Series D-1 Bonds, the "***Series 2010 Bonds***") pursuant to that certain Bond Trust Indenture (the "***Indenture***") dated as of May 1, 2010, between the Issuer and UMB Bank, n.a., as trustee (the "***Trustee***").

The Restructuring Transaction contemplates, among other things, an exchange (the "***Proposed Exchange***") of the outstanding Series 2010 Bonds in the aggregate principal amount of approximately $146,125,000, plus any unpaid accrued and unpaid interest thereon, as provided for herein, for new Series 2016A Bonds, Series 2016B Bonds and Series 2016C Bonds (as such terms are hereinafter defined). This Term Sheet contemplates the consummation of the Restructuring Transaction through a Plan of Reorganization (the "***Plan***") in a Chapter 11 proceeding of the Borrowers (the "***Anticipated Bankruptcy Proceeding***") pending before a court of a competent jurisdiction (the "***Bankruptcy Court***") as more fully described below.

This Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of mutually acceptable definitive documentation between the Borrowers, the Issuer, the Trustee, and the members of an informal steering committee comprised of bondholders currently holding 74% of the outstanding aggregate principal amount of Series 2010 Bonds (the "***Steering Committee***"). This Term Sheet is not and shall not be deemed to be a solicitation of votes for the acceptance of the Consent Solicitation or Proposed Exchange.

**THE TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE SERIES 2010 BONDS. THE TERM SHEET IS SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND COMPARABLE STATE STATUTES. NOTHING IN THE TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION**

EXECUTION COPY

**OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES AND DEFENSES OF THE BORROWERS, THE TRUSTEE, THE STEERING COMMITTEE, AND ALL OTHER PARTIES.**

Capitalized terms not otherwise defined herein shall have the meanings given to them in the Indenture.

## A.        Implementation of Restructuring Transaction

| Proposed Exchange Process | The Restructuring Transaction will be implemented through the Plan. The Series 2016A Bonds, Series 2016B Bonds, Series 2016C Bonds (each as defined below and collectively, the "*Series 2016 Bonds*") will be issued on the effective date of the Plan (the "*Effective Date*"). The Series 2016 Bonds will be issued pursuant to an Indenture of Trust ("*2016 Indenture*" and together with all related documents necessary for the issuance of the Series 2016 Bonds, the "*2016 Bond Documents*") between the Issuer and the Trustee.<br><br>The Borrowers will commence the Anticipated Bankruptcy Proceedings and will file the Plan and 2016 Bond Documents and a disclosure statement to the Plan (the "*Disclosure Statement*"), that is acceptable to the Trustee and the Steering Committee, which contains the terms and conditions outlined in this Term Sheet, on the timeline set forth below. Prior to the commencement of the Anticipated Bankruptcy Proceeding, the Borrowers shall provide copies of drafts of the Plan, Disclosure Statement and other pleadings, and documents, including the 2016 Bond Documents (collectively, the "*Solicitation Documents*") to the Trustee for its review and consent. Any substantive amendments, modifications or supplements to the Solicitation Documents shall be reviewed by, and acceptable to, the Trustee; provided, however, that no amendment, modification, or supplement shall be materially different from the Term Sheet. |
|---|---|
| Bondholder Support | Prior to the commencement of the Anticipated Bankruptcy Proceeding, and subject to the timeline set forth herein, the Steering Committee agrees to take all necessary steps to enter into a binding support agreement (the "Support Agreement") concerning the Steering Committee's commitment to and support of the Consent Solicitation.<br><br>The Steering Committee agrees to not take any actions inconsistent with this Term Sheet, and to direct the Trustee not to take any actions inconsistent with this Term Sheet. The Steering Committee agrees to consent to the Restructuring Transaction as set forth in the Consent Solicitation by delivering duly executed and completed consents on a timely basis pursuant to the ongoing solicitation of votes for the Proposed Exchange and shall not change such consents; provided, however, such consents shall only be binding to the extent set out in the Support |

| | |
|---|---|
| | Agreement.  The Steering Committee agrees not to otherwise commence any proceeding to oppose the Consent Solicitation or object to the Restructuring Transaction during the term of the Support Agreement.  All such actions by the Steering Committee are subject to the terms of the Support Agreement. |
| **Steering Committee Retention of Bonds and Claims** | The Steering Committee agrees that it shall not sell, transfer, assign, or otherwise dispose of, directly or indirectly, any of the Series 2010 Bonds, or any right, claim, or interest (voting or otherwise) related to or arising from the Series 2010 Bonds, held by its respective members, subject to the terms and conditions of the Support Agreement. |

## B.       Terms of Restructuring

| | |
|---|---|
| **Exchange** | On the Effective Date, (i) the holders of the Series A Bonds, Series B Bonds and Series C Bonds shall exchange the then outstanding Series A Bonds, Series B Bonds and Series C Bonds for a pro rata share of (A) Series 2016A Bonds issued in the aggregate principal amount equal to $103,691,500, and (B) certain of the Series 2016C Bonds in the aggregate principal amount of $21,918,750; and (ii) the holders of the Series D-1 Bonds and Series D-2 Bonds shall exchange the then outstanding Series D-1 Bonds and Series D-2 Bonds for a pro rata share of (A) certain Series 2016B Bonds issued in the aggregate principal amount equal to $20,514,750, and (B) certain of the Series 2016C Bonds in the aggregate principal amount of $21,918,750. |
| **Series 2016A Bonds** | The Series 2016A Bonds shall be issued as current paying bonds with an aggregate principal amount equal to 85% of the outstanding Series A Bonds, Series B Bonds and Series C Bonds.  The Series 2016A Bonds shall bear interest at the rate of 6.375% per annum and have maturities in the years and in principal amounts as set forth on Schedule 1 hereto.  The Series 2016A Bonds shall further be subject to mandatory redemption/amortization as set forth in Schedule 2 hereto. Interest on the Series 2016A Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Schedule 2. <br><br>The Series 2016A Bonds will be secured by a first priority lien on all assets of the Corporation *pari passu* with the Series 2016B Bonds. The Series 2016A Bond shall mature as set forth in Schedule 2, with a final maturity in 2055 (subject to bond counsel approval). <br><br>The Series 2016A Bonds will be subject to optional redemption prior to maturity commencing on the 5th year after the Effective Date, at a price equal to: in year 5, at a price of 102%, in year 6, at price of 101% and thereafter at par. |
| **Series 2016B Bonds** | The Series 2016B Bonds shall be issued as current paying bonds with an aggregate principal amount equal to 85% of the outstanding Series D-1 Bonds and Series D-2 Bonds. The Series 2016B Bonds shall bear interest at 5.625%, payable semiannually, maturing in 2020.  The Series 2016B Bonds |

| | |
|---|---|
| | shall be subject to mandatory optional redemption from Entrance Fees, as set forth below.<br><br>The Series 2016B Bonds will be secured *pari passu* with the Series 2016A Bonds by the assets of the Corporation. |
| **Series 2016C Bonds** | The Series 2016C Bonds (the "***Series 2016C Bonds***") shall be issued in an aggregate principal amount equal to $21,918,750 and shall bear interest at an annual rate of 2.0% per annum.<br><br>Interest and principal on the Series 2016C Bonds shall be payable semiannually, but only to the extent of Excess Cash (defined below), in accordance with the Distribution Waterfall (defined below), applied first to accrued interest, then to principal.  The Series 2016C Bonds shall mature in 2055 (subject to bond counsel approval) and any balance outstanding on the Series 2015C Bonds at final maturity shall be due and payable in full.  To the extent available Excess Cash is insufficient to pay interest on the Series 2016C Bonds on any scheduled Interest Payment Date, the amount of such unpaid interest shall compound and accrue interest at the interest rate due on the Series 2016C Bonds.<br><br>The Series 2016C Bonds shall be subject to redemption as follows:<br><br><table><tr><th>Years</th><th>Redemption Price as a Percentage of Principal</th></tr><tr><td>1-5</td><td>65%</td></tr><tr><td>6-10</td><td>75%</td></tr><tr><td>11 to maturity</td><td>100%</td></tr></table><br>The Series 2016C Bonds will be secured by a lien on all assets of the Corporation subordinate to the lien securing the Series 2016A Bonds and Series 2016B Bonds. |
| **Sponsor Note** | On the Effective Date, Providence Life Services (the "Sponsor") will deposit $5,000,000 (the "***Sponsor Contribution***") with the proceeds to be used in accordance with the terms contained herein.<br><br>The Sponsor shall receive a promissory note ("**Sponsor Note**") in the amount of the Sponsor Contribution, which shall be subordinate in security and payment to the Series 2016 Bonds and payable from Excess Cash in accordance with the Distribution Waterfall (defined below). The Sponsor Loan will be repaid solely from Excess Cash and will have a final and bullet maturity in the same year as of the Series 2016C Bonds.  The Sponsor Loan is non-interest bearing. The Sponsor Note will be secured by a lien on all assets of the Corporation subordinate to the Series 2016 Bonds. Any and all other amounts due to the Sponsor by the Borrower shall be waived as of the Effective Date. |
| **Priority/Security** | The Series 2016A Bonds and the Series 2016B Bonds will be *pari passu*, secured by a first priority lien on all assets of the Corporation and will be senior to the Series 2016C and the Sponsor Note in repayment and security.<br><br>The Series 2016C Bonds will be secured by a lien on all assets of the Corporation and be subordinated to the lien securing the Series 2016A Bonds and Series 2016B Bonds.  The Sponsor Note will be secured by a lien |

| | |
|---|---|
| | on all assets of the Corporation, subordinate to the Series 2016 Bonds, and any parity bonds issued under the Indenture. |
| **Management Fees** | All accrued and unpaid management fees through the Effective Date shall be waived on the Effective Date. A new management agreement with the Sponsor shall provide for an annual management fee no greater than 3.25% of gross operating revenues; provided that no more than $30,000 shall be paid each month as an operating expense ("***Base Management Fee***"), with the balance payable from Excess Cash (as described herein). |
| **Entrance Fees** | The Borrowers shall not reduce the amount of any current Entrance Fees or monthly fees or offer any new discounts to Entrance Fee pricing or create any further benefit programs which reduces current amounts by greater than five percent (5%), without consent of the holders of a majority of principal amount of the Series 2016 Bonds. |

| Indenture Held/Debtor Held Funds | |
|---|---|
| **Operating Account** | Upon the Effective Date, Borrowers shall hold and maintain an operating account (the "***Operating Account***"), which shall be subject to the lien of the Trustee under the 2016 Indenture pursuant to a deposit account control agreement with a depository bank that is reasonably acceptable to the Trustee.  The Operating Account shall contain 45 Days Cash on Hand as an unrestricted amount funded as of the Effective Date (the "***Unrestricted Amount***"). |
| **Entrance Fee Fund** | Upon the Effective Date, the Borrowers shall maintain the existing Entrance Fee Fund under the 2016 Indenture.  After the Effective Date, pursuant to the 2016 Indenture, all Entrance Fees of the Corporation shall be required to be deposited in the Entrance Fee Fund until the Series 2016B Bonds are paid in full.<br>Entrance Fees will only be transferred from the Entrance Fee Fund after any applicable rescission rights under the Residence Agreements have expired.<br>Entrance Fees on deposit in the Entrance Fee Fund shall be applied on a monthly basis as follows:<br>1. To pay any Refunds;<br>2. To replenish the balance of the Operating Reserve Fund and Operating Account to a combined total of 150 Days Cash on Hand;<br>3. To redeem Series 2016B Bonds in authorized denominations; and<br>4. After payment in full of the Series 2016B Bonds, any remaining Entrance Fee amounts will be transferred to the Revenue Fund (as defined herein) and shall be available to flow through the Distribution Waterfall (as defined herein). |
| **Revenue Fund** | Upon the Effective Date, the Corporation shall establish a fund with the Trustee, subject to the lien of the 2016 Indenture, pursuant to which all revenues and other income of the Corporation (the "***Revenues***") shall, on and after the Effective Date, be deposited into such fund (the "***Revenue Fund***").  Funds from the Revenue Fund shall be withdrawn pursuant to the Distribution Waterfall below. |
| **Operating Reserve Fund** | Upon the Effective Date, the Corporation shall maintain the existing Operating Reserve Fund with the Trustee, subject to the lien of the 2016 Indenture, and fund such Operating Reserve Fund with an amount such that the balance therein shall have 105 Days Cash on Hand[1] as of the Effective Date.  The amounts in the Operating Reserve Fund shall be available to the Corporation for Operating Expenses (as defined herein). The Operating Reserve Fund Requirement may be increased by Borrowers' share of Excess |

---

[1] The term "***Days Cash on Hand***" means the sum of the amount in the Revenue Fund, the Operating Reserve Fund and the Operating Account (collectively, "***Total Available Cash***") divided by average daily cash expenditures, including interest expense.  Average daily cash expenditures is defined as [TBD].

**EXECUTION COPY**

|  | Cash received pursuant to the Distribution Waterfall below until the balance in the Operating Reserve Fund equals 155 Days Cash on Hand; provided however that until the Series 2016B Bonds are paid in full, the aggregate amount in the Operating Account and Operating Reserve Fund shall not exceed 150 Days Cash on Hand. |
|---|---|
| **Capital Expenditures Fund** | Upon the Effective Date, the Borrowers shall establish a Capital Expenditures Fund (the "***Capital Expenditures Fund***") under the 2016 Indenture. The Capital Expenditures Fund will be funded on a monthly basis from the Revenue Fund (in such order and priority as set forth in the Distribution Waterfall) in an amount equal to one-twelfth of each fiscal year's capital expenditures budget, as set forth in the 10-year projections in the Disclosure Statement, and increased by CPI Index each year thereafter. The Capital Expenditures Fund will be available to fund the Borrower's capital expenditures and will not be included in calculations of Days Cash on Hand. Any balance in the Capital Expenditures Fund at the end of a fiscal year will remain in said fund; provided that the balance of the amount on deposit in the Capital Expenditures Fund will at no time exceed $3,000,000. In the event amounts in the Operating Account and Operating Reserve Fund are insufficient to fund operating expenses, the amounts in the Capital Expenditure Fund may be applied to such purpose. |
| **Bond Fund** | Upon the Effective Date, the Borrowers shall establish a Bond Fund (the "***Bond Fund***") under the 2016 Indenture, subject to the lien of the 2016 Indenture, with subaccounts for each series of Series 2016 Bonds. In accordance with the Distribution Waterfall below, the Bond Fund will receive (i) the monthly payments of principal and interest due and payable under the Series 2016A Bonds and Series 2016B Bonds, and (ii) Excess Cash (as defined below and to the extent provided for in the Distribution Waterfall) with such amounts then being distributed to the holders of the Series 2016C Bonds. |
| **Debt Service Reserve Fund** | Upon the Effective Date, the Borrowers shall establish a Debt Service Reserve Fund (the "***Debt Service Reserve Fund***") under the 2016 Indenture, subject to the lien of the 2016 Indenture to secure payment of the Series 2016A Bonds and Series 2016B Bonds. Upon the Effective Date, amounts in the Debt Service Reserve Fund with respect to the Series 2010 Bonds shall be applied in the following order of priority: (i) to pay accrued and unpaid interest on the Series 2010 Bonds through but not including the Effective Date, then (ii) fees and expenses of the Trustee and its advisors, and (iii) the remaining balance shall be transferred to the Debt Service Reserve Fund under the 2016 Indenture. The Debt Service Reserve Fund shall not become an asset of the Borrowers, but shall remain funds held by the Trustee for the benefit of the holders of the Series 2016A Bonds and Series 2016B Bonds. The Debt Service Reserve Fund Requirement shall equal (i) until the Series 2016B Bonds are paid in full, Maximum Annual Debt Service relating to the Series 2016A Bonds and Annual Debt Service relating to the Series 2016B Bonds to be satisfied prior to the commencement of the redemption of the Series 2016B Bonds and (ii) |

EXECUTION COPY

| | |
|---|---|
| | thereafter, Maximum Annual Debt Service. After payment in full of the Series 2016A Bonds and Series 2016B Bonds, the Debt Service Reserve Fund shall secure payment of the Series 2016C Bonds. Any draw on the Debt Service Reserve Fund shall be an event of default under the Series 2016 Indenture. |
| **Distribution Waterfall** | Upon the Effective Date, all Entrance Fees shall be deposited with the Trustee in the Entrance Fee Fund. Such amounts, together with the balances of the Operating Account, the Operating Reserve Fund, as of the Effective Date, any Revenues available to the Borrowers at such time and the Sponsor Contribution, shall be applied in the following order of priority: <br><br> 1. to pay any Refunds; <br> 2. to pay all professional fees and expenses incurred in connection with the Restructuring Transaction (including, without limitation, any costs associated with obtaining opinions from bond counsel) subject to an agreed upon budget; <br> 3. to fund the Debt Service Reserve Fund up to the shortfall, if any, to the initial Debt Service Reserve Fund requirement; <br> 4. to fund the Operating Account in an amount equal to 45 Days Cash on Hand (approximately $2.4 million); <br> 5. to fund the Operating Reserve Fund in an amount equal to 105 Days Cash on Hand (approximately $5.6 million); and <br><br> Thereafter, all post-Effective Date Entrance Fees and other Revenues of the Borrowers shall be deposited in the Entrance Fee Fund or the Revenue Fund, as applicable, on a weekly basis. <br> Subject to the next sentence, amounts on deposit in the Revenue Fund shall be made available to the Corporation on a monthly basis to satisfy ongoing operations and management costs and expenses of the Corporation, including, without limitation, the Base Management Fee, Refunds and replenishment of any Unrestricted Reserve Amount (collectively, the "***Operating Expenses***"). If an Event of Default (as defined in the 2016 Indenture) shall occur, then the monthly amounts on deposit in the Revenue Fund available for withdrawal to satisfy Operating Expenses shall be made available to the Corporation in an amount not to exceed the amounts set forth in an operating budget established pursuant to the terms of the 2016 Indenture. <br> On the first Business Day of each calendar month, monies in the Revenue Fund shall be distributed in the following order of priority (the "***Distribution Waterfall***"): <br><br> • First, to the Operating Account the amount necessary to pay anticipated Operating Expenses for the upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month), as such amount is set forth in a certificate from the Borrower delivered to the Trustee no later than 10 Business Days prior to the first Business Day of |

EXECUTION COPY

a month;

- Second, to the Capital Expenditure Fund, in an amount equal to $1/12^{th}$ of such Fiscal Year's capital budget[2];

- Third, to the Series 2016A Bonds subaccount and the Series 2016B Bonds subaccount of the Bond Fund, in an amount equal to $1/6^{th}$ of the interest due on the next interest payment date;

- Fourth, to the Series 2016A Bonds subaccount and the Series 2016B Bonds subaccount of the Bond Fund, in an amount equal to $1/12^{th}$ of the principal due on the next principal payment date;

- Fifth, to replenish any deficiency as of the Effective Date in the Debt Service Reserve Fund necessary to make the amount therein equal the Debt Service Reserve Fund Requirement;

- Sixth, to replenish the balance of the Operating Reserve Fund and the Operating Account to a combined total of 150 Days Cash on Hand;

- Seventh, any remaining amounts after application of paragraphs first to sixth above (such remaining amounts referred to as "***Excess Cash***") shall be transferred as follows until the combined balance of the Operating Reserve Fund and Operating Account is 200 Days Cash on Hand:

  o 50% to the Series 2016C Bonds subaccount of the Bond Fund to pay accrued interest and then to redeem Series 2016C Bonds; and

  o 50% to the Operating Reserve Fund.

- After the Borrowers obtain 200 Days Cash on Hand, the Excess Cash shall be distributed as follows:

  o 25% to the Sponsor to pay any accrued and unpaid management fees and the Sponsor Note;

  o 75% to the Series 2016C Bonds subaccount of the Bond Fund to pay accrued interest and then to redeem Series 2016C Bonds.

---

[2] The Borrower may request that funding schedule for a fiscal year be accelerated to accommodate the timing and funding needs of a particular project and the Trustee shall deposit funds into the Capital Expenditure Fund based upon such accelerated schedule upon receipt of a certification from the Borrower that (i) such accelerated schedule shall not adversely impact the Borrower's ability to make monthly debt service payments, (ii) the aggregate amount to be deposited in the account in such fiscal year does not exceed the annual budget, (iii) all other funds (ORF and DSRF) are fully funded and (iv) no defaults have occurred under the Bond Documents.

| **Operating/Financial Covenants** | |
|---|---|
| **Days Cash on Hand Covenant** | The Corporation shall provide reporting of Days Cash on Hand quarterly. In addition, the Corporation covenants to maintain not less than the amount of Days Cash on Hand set forth herein as each June 30 and December 31, commencing December 31, 2016 (each, a "**Testing Date**"):   (i) 135 Days Cash on Hand as of each Testing Date, commencing December 31, 2016 until the Series 2016B Bonds have been paid in full, (ii) 100 Days Cash on Hand as of the first Testing Date following the quarter in which the Series 2016B Bonds have been paid in full to the third year anniversary thereof, and (iii) 135 Days Cash on Hand as of each Testing Date thereafter. |
| **Cumulative Cash Covenant** | The Obligated Group covenants that it will calculate its Cumulative Cash as of the last day of each Fiscal Quarter, commencing December 31, 2016 and shall deliver an Officer's Certificate setting forth such calculation to the Master Trustee no later than forty-five (45) days after the end of such Fiscal Quarter. The requirement to test Cumulative Cash shall end on the Initial Testing Date (as defined below).  Each Member is required to conduct its business so that as of the end of each Fiscal Quarter (each such date being a "*Testing Date*" for the purpose of this Section), the Obligated Group will have Cumulative Cash no less than the amount described below (the "*Minimum Cumulative Cash*"). <br><br>FISCAL QUARTER ENDED — MINIMUM CUMULATIVE CASH ($)<br>December 31, 2016 — ($3,310,874)<br>March 31, 2017 — (2,569,706)<br>June 30, 2017 — (27,447)<br>September 30, 2017 — 238,746<br>December 31, 2017 — 1,230,978<br>March 31, 2018 — 1,645,859<br>June 30, 2018 — 1,643,116<br>September 30, 2018 — 2,123,615<br>December 31, 2018 — 2,583,392<br>March 31, 2019 — 2,917,645<br>June 30, 2019 — 3,857,386<br>September 30, 2019 — 4,268,304<br>December 31, 2019 and thereafter — 4,679,552 |
| **Debt Service Coverage Ratio Covenant** | Commencing with the earlier of (i) the first fiscal year following redemption in full of the Series 2016B Bonds or (ii) the fiscal year ending December 31, 2020 (the "**Initial Testing Date**"), the Corporation shall achieve a DSCR of not less than 1.15x. The ratio shall be tested quarterly on a rolling four quarter basis, commencing on the Initial Testing Date.  The numerator of the DSCR will include net Entrance Fees (i.e., Entrance Fees, but not Initial Entrance Fees, received during such period minus Entrance Fees refunded during such period) and the denominator will be Maximum Annual Debt Service on the Series 2016A Bonds and the Series 2016B Bonds, if any.<br>Any additional indebtedness for Phase II will not be counted for purpose of |

| | |
|---|---|
| | the DSCR until the earlier of (i) stabilization (90% occupancy of the Phase II independent living units) or(ii) the forty ninth (49th) month following issuance of the Phase II indebtedness. |
| **Additional Indebtedness (parity with Series 2016A and Series 2016B Bonds)** | The Borrowers shall not be permitted to issue any additional indebtedness that would be *pari passu* in priority of payment and security with the Series 2016A and 2016B Bonds except for (i) Capitalized Leases not to exceed $1,000,000 in the aggregate; (ii) refunding indebtedness which demonstrates annual debt service savings, pursuant to the terms and conditions acceptable to the majority in principal amount of Series 2016A and Series 2016B Bondholders and simultaneously with the refunding of any Series 2016A Bonds and Series 2016B Bonds, a proportionate share of Series 2016C Bonds shall also be refunded, with the applicable discounts; and (iii) indebtedness relating to the financing of additional construction of independent living units not to exceed 70 units ("Phase II"), provided that prior to the incurrence of such indebtedness (A) there is a guaranteed maximum price or stipulated contract for construction; (B) no default has occurred under the Bond Documents; (C) certification from the Corporation that (w) at least 92% of the independent living units in the existing Facility are occupied and (x) at least 70% of the independent living units in Phase II have been reserved with deposits equal to 10% of the Entrance Fees; (D) the Days Cash on Hand, DSCR and Cumulative Cash covenants have all been met as of the most recent testing date; (E) a Consultant forecast shows that the DSCR from and after the third fiscal year following completion of Phase II will be at least 1.25 and the Days Cash on Hand at the end of the first Fiscal Year in which the average occupancy of such Independent Living Units is forecasted to reach eighty-five percent (85%) will be at least 200; and (F) as part of such indebtedness for Phase II, the Corporation shall include an amount necessary to (x) pay all interest due and unpaid (including compound interest) on the Series 2016C Bonds, plus (y) redeem at least fifty (50%) percent of the original principal amount of the Series 2016C Bonds, with applicable discounts and shall use such amounts to pay and redeem the Series 2016C Bonds, pro rata, upon closing of such additional indebtedness. Additional Indebtedness related to Phase II shall only be permitted if no more than 70% of such Additional Indebtedness is fixed rate long term indebtedness or as otherwise agreed to by a majority of bondholders and may have priority rights in a waterfall to entrance fees from Phase II. No additional indebtedness shall be secured on a senior basis to the Series 2016A Bonds and Series 2016B Bonds. No additional subordinate indebtedness or non-recourse indebtedness may be incurred until the Series 2016B Bonds are paid in full and at least 50% of the Series 2016C Bonds have been paid, unless such indebtedness is incurred to redeem at least 50% of Series 2016C Bonds. |
| **IL Occupancy Covenants** | Commencing with the first fiscal quarter following the Effective Date, the Corporation will have occupied independent living ("*IL*") units equal to or above the levels set forth two quarters prior in the projections to be agreed upon by the Steering Committee and the Borrowers (the "***IL Occupancy*** |

| | |
|---|---|
| | *Covenant*").  The Corporation shall achieve 90% occupancy of IL units no later than 24 months after the Effective Date (the "***IL Target Covenant***"). |
| **Assisted Living and Nursing Center Occupancy Covenants** | Commencing with the first fiscal quarter following the Effective Date, the Corporation shall achieve and maintain (i) an 85% occupancy level for Assisted Living ("***AL***") units and (ii) an 85% occupancy level for Nursing Center ("***NC***") units, which shall be measured as the average occupancy of the AL and NC units, as applicable, on a rolling four quarter basis (the "***AL/NC Occupancy Covenant***"). |
| **Failure to meet covenants** | (i)  If the Corporation fails to meet the Days Cash on Hand Covenant, the AL/NC Occupancy Covenant, the DSCR Covenant  or the Cumulative Cash covenant as of any testing date, then upon the first occurrence of such non-compliance, the Borrowers shall be required to retain a management consultant acceptable (which approval shall not be unreasonably withheld) to the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2016A Bonds and the Series 2016B Bonds, to provide a report and improvement plan to the Trustee.  The proposed management consultant will be deemed **not** acceptable unless a majority has consented to the proposed management consultant within 14 days.<br><br>(ii)   If the Borrowers fail to meet the Days Cash on Hand Covenant, the AL/NC Occupancy Covenant, the DSCR Covenant or the Cumulative Cash Covenant by the end of the fourth quarter after the report and improvement plan are provided, the Borrowers shall, *if so directed by the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2016A Bonds and the Series 2016B Bonds* (each treated as separate class), appoint an independent third party manager acceptable to such holders or if a third party manager is then managing the facility, replace the manager with a manager acceptable to such holders; provided however that if at the end of such fourth quarter, a Consultant certifies that the Borrowers have complied with all of their recommendations (except any recommendation to replace the Sponsor, as manager), then the period for compliance with such covenants shall be extended by four additional quarters; provided that if the manager fails to comply with such recommendations at any time during such extended four quarter period (other than a replacement of the Sponsor, as a manager) then at any such time, a majority of bondholders may cause replacement of manager.  In the event the Consultant recommends a replacement of the Sponsor, as manager, failure to comply with such recommendation will not result in a change in the Sponsor, as manager unless the Borrowers fail to meet the covenants within eight quarters of the first violation. For avoidance of doubt, failure to comply with such covenants after the extended period (if applicable) may result in a change of management if directed by the majority of bondholders. |

|  |  |
|---|---|
|  | (iii) If on any testing date after the **Initial Testing Date**, the DSCR is 1.0x or below or the Days Cash on Hand is equal to or less than (A) 115 Days Cash on Hand as of each Testing Date, commencing December 31, 2016 until the Series 2016B Bonds have been paid in full, (B) 80 Days Cash on Hand as of the first Testing Date following the quarter in which the Series 2016B Bonds have been paid in full to the third year anniversary thereof, and (C) 115 Days Cash on Hand as of each Testing Date thereafter, it shall constitute an Event of Default under the 2016 Indenture. If the Borrower fails to meet the Cumulative Cash Covenant for any 3 consecutive testing periods, it shall be an Event of Default only if holders of not less than a majority of the outstanding aggregate principal amount of the Series 2016A Bonds and the Series 2016B Bonds direct the Trustee to call an Event of Default.<br><br>(iv) Same remedies in (i) above will apply for failure to meet the IL Occupancy Covenant or the IL Target Covenant, provided that the Borrower shall be required to hire a marketing consultant in lieu of a management consultant. If the Borrowers fail to meet the IL Occupancy Covenant or the IL Target Covenant by the end of the fourth quarter after the report and improvement plan are provided, the Borrowers shall, at the direction of the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2016A Bonds and the Series 2016B Bonds (each treated as separate class), replace the marketing agent, or if there is no acting marketing agent, the Borrowers shall be required to hire a marketing agent acceptable to the Trustee. |

**Reporting Requirements**

| Reporting | The Borrowers shall deliver monthly financial statements (including a balance sheet, an income statement, an escrow statement and a cash flow statement) and a monthly report on marketing, occupancy and sales within 45 days following the prior month end comparing actual results to budget and shall include an explanation of variances of more than 10% from budgeted amounts. Such financial statements shall also include an Entrance Fee analysis. Monthly reporting will be replaced by quarterly reporting after the Series 2016B Bonds have been redeemed in full.<br><br>The Borrowers shall enter into a new Continuing Disclosure Agreement providing for the same reporting as required by the existing Continuing Disclosure Agreement (in addition to the information required above), except for any amendments thereto required to reflect changes to Rules |
|---|---|

| | |
|---|---|
| | 15c2-12. |
| **Update Calls** | Until the later of Stabilized Occupancy (as defined in the 2016 Indenture) or the first year from the Effective Date, the Corporation shall hold monthly calls for holders of the Series 2016 Bonds.  After such time, the Corporation shall hold quarterly calls. |

### General Provisions

| | |
|---|---|
| **Greystone Fees** | Treatment to be approved by the Steering Committee and Trustee. |
| **New 2016 Bond Documents** | The 2016 Bond Documents shall be prepared or, as applicable, amended and modified in a manner necessary to effectuate the Restructuring Transaction.  The 2016 Bond Documents and other agreements governing the Restructuring Transaction shall, except as provided herein, contain all of the existing covenants, defaults and provisions contained in the Indenture and such additional provisions as acceptable to the Steering Committee and consistent with the Term Sheet. |
| **Release/Exculpation** | The Restructuring Transaction contemplated by the Term Sheet shall contain customary release, injunction and exculpation provisions for all Parties to the Restructuring Transaction to the extent available under applicable law. The Parties hereby agree that they will use respective best efforts to obtain approval of such release, injunction and exculpatory provisions, which by way of example only shall include opposing any effort by any person or entity that is not a Party to this Term Sheet to eliminate or reduce the scope of such release, injunction and exculpation provisions. |
| **Binding Effect** | The obligation of each of the undersigned parties to pursue the Restructuring Transaction in accordance with the terms hereof is subject to (i) the negotiation, execution and delivery of mutually acceptable final documentation, (ii) receipt of all necessary consents, including any consent of any party's credit or other committee or board of directors and any regulatory approvals, (iii) receipt of a satisfactory tax opinion confirming that the interest on the 2016 Bonds will be excluded from gross income for federal income tax purposes under the Internal Revenue Code, and (iv) the Effective Date occurring on or before April 1, 2016. |
| **Miscellaneous** | This Term Sheet shall be governed by the laws of the State of Illinois. This Term Sheet may be executed in one or more counterparts, and when all counterparts have been executed, each executed counterpart will have the force and effect of the original. |
| **Timeline** | The following timeline will be applicable: (1) January 18, 2015 – Petition Date (filing of Plan, related Disclosure Statement, Cash Collateral Motion, related first day pleadings and definitive bond documents); (2) January 25, 2016 – Entry of Interim Cash Collateral Order; |

| | |
|---|---|
| | (3) February 23, 2016 – Entry of Final Cash Collateral Order, and approval of Disclosure Statement and Solicitation Procedures;<br><br>(4) February 24, 2016 – Solicitation of Plan;<br><br>(5) March 29, 2016 – Confirmation of Plan; and<br><br>(6) April 1, 2016 – Effective Date of Plan. |

**EXECUTION COPY**

Schedule 1
Series 2016A Bond Maturities

| Series 2010A CUSIP | Series 2016A Maturity (May 15) | Series 2016A Principal Amount |
|---|---|---|
| 45200F3G2 | 2030 | $6,693,750 |
| 45200F3D9 | 2030 | 4,016,250 |
| 45200F3E7 | 2038 | 15,801,500 |
| 45200F3F4 | 2048 | 34,310,250 |
| 45200F3C1 | 2055 | 38,619,750 |
| 45200F3H0 | 2055 | 4,250,000 |

**EXECUTION COPY**

## Schedule 2
## Series 2016A Mandatory Sinking Fund Schedule

| | 2010A: 2020 Term Bond | | 2010B: 2020 Term Bond | | 2010A: 2030 Term Bond | | 2010A: 2040 Term Bond | | 2010A: 2045 Term Bond | | 2010C: 2045 Term Bond | |
| | 2016A: 2030 Term Bond | | 2016A: 2030 Term Bond | | 2016A: 2038 Term Bond | | 2016A: 2048 Term Bond | | 2016A: 2055 Term Bond | | 2016A: 2055 Term Bond | |
| **2016 Coupon:** | 6.200% | | 6.200% | | 6.240% | | 6.330% | | 6.440% | | 6.440% | |
| **2016 Average Life:** | 9.704 | | 9.704 | | 18.376 | | 27.632 | | 36.076 | | 36.076 | |
| Period Ending | Principal | Interest | Principal | Interest | Principal | Interest | Principal | Interest | Principal | Interest | Principal | Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/15/2017 | $ - | $ 249,008 | $ - | $ 415,013 | $ - | $ 986,014 | $ - | $ 2,171,839 | $ - | $ 2,487,112 | $ - | $ 273,700 |
| 05/15/2018 | - | 249,008 | - | 415,013 | - | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2019 | - | 249,008 | - | 415,013 | - | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2020 | - | 249,008 | - | 415,013 | - | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2021 | 322,044 | 249,008 | 536,741 | 415,013 | - | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2022 | 342,575 | 229,041 | 570,958 | 381,735 | - | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2023 | 364,414 | 207,801 | 607,356 | 346,335 | - | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2024 | 387,645 | 185,207 | 646,075 | 308,679 | - | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2025 | 412,358 | 161,173 | 687,263 | 268,622 | - | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2026 | 438,645 | 135,607 | 731,076 | 226,012 | - | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2027 | 466,609 | 108,411 | 777,681 | 180,685 | - | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2028 | 496,355 | 79,482 | 827,259 | 132,469 | - | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2029 | 527,998 | 48,708 | 879,996 | 81,179 | - | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2030 | 257,607 | 15,972 | 429,345 | 26,619 | 810,800 | 986,014 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2031 | | | | | 1,593,236 | 935,420 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2032 | | | | | 1,694,804 | 836,002 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2033 | | | | | 1,802,848 | 730,246 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2034 | | | | | 1,917,780 | 617,748 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2035 | | | | | 2,040,038 | 498,079 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2036 | | | | | 2,170,090 | 370,780 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2037 | | | | | 2,308,434 | 235,367 | - | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2038 | | | | | 1,463,470 | 91,321 | 992,126 | 2,171,839 | - | 2,487,112 | - | 273,700 |
| 05/15/2039 | | | | | | | 2,612,141 | 2,109,037 | - | 2,487,112 | - | 273,700 |
| 05/15/2040 | | | | | | | 2,778,665 | 1,943,689 | - | 2,487,112 | - | 273,700 |
| 05/15/2041 | | | | | | | 2,955,804 | 1,767,799 | - | 2,487,112 | - | 273,700 |
| 05/15/2042 | | | | | | | 3,144,237 | 1,580,697 | - | 2,487,112 | - | 273,700 |
| 05/15/2043 | | | | | | | 3,344,682 | 1,381,667 | - | 2,487,112 | - | 273,700 |
| 05/15/2044 | | | | | | | 3,557,906 | 1,169,948 | - | 2,487,112 | - | 273,700 |
| 05/15/2045 | | | | | | | 3,784,722 | 944,733 | - | 2,487,112 | - | 273,700 |
| 05/15/2046 | | | | | | | 4,025,998 | 705,160 | - | 2,487,112 | - | 273,700 |
| 05/15/2047 | | | | | | | 4,282,655 | 450,314 | - | 2,487,112 | - | 273,700 |
| 05/15/2048 | | | | | | | 2,831,314 | 179,222 | 1,553,412 | 2,487,112 | 170,949 | 273,700 |
| 05/15/2049 | | | | | | | | | 4,365,669 | 2,387,072 | 480,430 | 262,691 |
| 05/15/2050 | | | | | | | | | 4,643,980 | 2,105,923 | 511,058 | 231,751 |
| 05/15/2051 | | | | | | | | | 4,940,034 | 1,806,851 | 543,637 | 198,839 |
| 05/15/2052 | | | | | | | | | 5,254,962 | 1,488,713 | 578,294 | 163,829 |
| 05/15/2053 | | | | | | | | | 5,589,965 | 1,150,293 | 615,161 | 126,587 |
| 05/15/2054 | | | | | | | | | 5,948,325 | 790,299 | 654,377 | 86,970 |
| 05/15/2055 | | | | | | | | | 6,325,403 | 407,356 | 696,094 | 44,828 |
| **Total** | $ 4,016,250 | $ 2,416,440 | $ 6,693,750 | $ 4,027,399 | $ 15,801,500 | $ 18,119,153 | $ 34,310,250 | $ 60,072,728 | $ 38,619,750 | $ 89,724,088 | $ 4,250,000 | $ 9,873,895 |

**EXECUTION COPY**

## **EXHIBIT 2**

JOINDER

**EXECUTION COPY**

# FORM OF JOINDER

This Joinder to the Plan Support Agreement, dated as of January 11, 2016, by and among the Borrowers and the Consenting Holders (the "**Support Agreement**"), is executed and delivered by _____ (the "**Joining Party**") as of _____, 2016.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Support Agreement.

1.  <u>Agreement to be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Plan Support Agreement (and all exhibits and annexes thereto), attached to this Joinder as **Annex I** (as such Plan Support Agreement, exhibits and annexes may be hereafter amended, restated, or otherwise modified from time to time).  The Joining Party shall hereafter be deemed to be a "Consenting Holder" and a "Party" for all purposes under the Plan Support Agreement.

2.  <u>Representations and Warranties</u>. With respect to the 2010 Bonds set forth below its name on the signature page hereof and all related claims, rights, and causes of action arising out of or in connection with or otherwise relating to such 2010 Bonds, the Joining Party hereby makes to the Borrowers the representations and warranties of the Consenting Holders set forth in the Plan Support Agreement.

3.  <u>Notices</u>. For purposes of notices and other communications to be delivered to the Joining Party the relevant addresses and facsimile numbers are set forth below.

4.  <u>Governing Law</u>. This Joinder shall be governed by and construed in accordance with the laws of The State of Illinois, without regard to any conflict of laws provisions that would require the application of the law of any other jurisdiction.

\* \* \* \* \*

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]